Howry, J.,
delivered the opinion of the court:
The rights, legal and equitable, of the parties to this suit relate to a body of 743,257.19 acres of land lying between the ninety-eighth and the one hundredth meridians of west longitude, in what is known as the leased district of the Indian Territory. This leased district contains 7,713,239 acres, and is a part of the country ceded to the United States by France in 1803 within the Louisiana purchase.
It is also a part of the country ceded by the United States to the Choctaw Nation October 18,1820 (7 Stat., 211). The entire cession is described as follows:
“Beginning on the Arkansas Eiver where the lower boundary line of the Oherokees strikes the same; thence up the Arkansas to the Canadian Fork, and up the same to its source; thence due south to the Eed Eiver; thence down the Eed Eiver to the mouth of Little Eiver, which empties itself into the Eed Eiver on the north side; thence in a direct line to the beginning.”
The land in the leased district, if open to settlement as a part of the public domain, has a fixed value of $1.25 per acre, thus aggregating between nine and ten millions of dollars. The petitioners, however, say forty millions of dollars is a reasonable estimate of the value, and there is a statement in the record that a syndicate proposed to take the body of land at the Government price with the expectation of making thirty-five millions of dollars out of it, if given a good and sufficient *39 title. This refers to all of the leased district, valued by a Senate committee at ten millions when the title was obtained, in 1866, and more than forty millions of dollars in 1892. (Sen. Rep. 652,1st sess. 52d Gong.) Under an act graduating the price of public lands (in force in 1866) the price for each acre of the leased district might have been fixed as low as 12tj cents, if the United States had possessed the absolute title and had seen fit to dispose of it. Inasmuch as lands adjoining those in controversy were valued by the claimants and the United States at $1 per acre, it is fair to assume that the lands herein mentioned were worth at least that sum. (Art. 37, 14 Stats., 769.) These references to values are given because of their importance in considering the character of the title to the lands in suit and the nature of the transaction which forms the large feature of this case.
Three parties allege title to the land. These tripartite claims present some remarkable features, not alone for the amount and value of the property, but because of the peculiar circumstances out of which the controversy has arisen and the history attending its progress; the number and variety of the questions at issue and the differences of opinion between the executive and legislative departments of the Government, from which unusual interest has come to be attached to the determination of the case now that the judiciary have undertaken to deal with it.
The petitioners are the Choctaw and Chickasaw nations of Indians, who are domestic, dependent nations, recognized as distinct political communities, with acknowledged territorial limits, under various treaties with the United States. Under the guaranties of these treaties they occupy defined districts in the Indian Territory. The Choctaws number, according to the Report of the Commissioner of Indian Affairs for 1896, as many as 17,819 persons, and the Chickasaws number 6,000 souls. These figures include colored persons of African descent living with each tribe. By the census of 1890 there were 4,500 colored persons among the Choctaws and 3,700 persons of the same color residing among the Chickasaws. These colored persons form a j>art of the inhabitants of those nations. (Census Bulletin of 1890, vol. 25.)
The defendants are the United States and the Wichita and affiliated bands of red men. The Wicliitas in 1891 numbered *40 175 persons, but by later reports they do not exceed 153 souls. Tbe affiliated bands are the Wacos, Towaconies, Caddos, Ionis, Keechies, and Delawares, with apparently a few Comanches. These affiliates in 1891 numbered about 885 persons, and are the remnants of tribes which either originally belonged in Louisiana or Texas or wandered there a number of years ago. Since 1845 their history is substantially the same as that of the Wichitas, whose wanderings they have shared and with whom they have made various more or less temporary settlements, and along with whom they were placed on the present Wichita Eeservation in 1868, (Eep. Comr. Ind. Affs., Vol. I, 352; 1892, p. 386; 1893, p. 702; 1894, p. 576.)
The case arises out of an agreement entered into between the United States and the defendant Indians, June 4,.1891, at Anadarko, in the Indian Territory, under which the Wichita and affiliated bands ceded and relinquished to the United States all their claim, title, and interest in and to a certain tract of country within the leased district mentioned, and the United States stipulated to allot out of said tract lands in sev-eralty to the said Indians.
The. agreement also provided for opening the residue of the lands to white settlement.
The premises are described in the first article of the agreement as follows:
“ Commencing at the point in the middle of the main channel of the Washita Eiver where the ninety-eighth meridian of west longitude crosses- the same, thence up the middle of the main channel of said river to the line of 98° 40' west longitude, thence on said line of 98° 40' due north to the middle of the channel of the main Canadian Eiver, thence down the middle of said main Canadian Eiver to where it crosses the ninety-eighth meridian, thence due south to the place of beginning.’
When the agreement was promulgated, the Choctaw and Chickasaw nations claimed that notwithstanding an alleged cession of the land by them to the United States the land was held in trust by the United States for them. The Wichitas and affiliated bands denied this claim and asserted an exclusive interest in themselves. The executive department of the Government also denied the claims of .the Choctaws and Chickasaws. The provisions of the agreement were subsequently *41 embodied in tbe following language in an act approved March 2, 1895, to wit:
u (a) Said agreement of June 4,1891, is, by said act of March 2, 1895, ‘accepted, ratified, and confirmed,7 as provided in said act.
“ (b) There should be allotted to each and every member of the Wichita and affiliated bands of Indians in the Indian Territory, native and adopted, ICO acres of land, one-half thereof to be allotted in grazing lands; the allotments to be selected within ninety days from the ratification by Congress of said agreement of June 4,1891; the titles to the land taken under such allotments to be held in trust for twenty-five years, in the manner and to the extent provided for in the act of Congress approved February 8,1887. (24 Stats., 388.)
“ (c) Whenever the lands acquired under said agreement of June 4,1891, shall, by operation of law or proclamation of the President, be open to settlement, they shall be disposed of under the general provisions of the homestead and town site laws of the United States, provided that, in addition to the land-office fees prescribed by the statute, the entryman shall pay $1.25 an acre for the land entered at the time of submitting final proof; and that all such entries, where the entryman has resided upon and improved the land by him entered, in good faith, for a period of fourteen months, may be commuted to cash upon the payment of $1.25 per acre. Sections, 16 and 36 and 13 and 33 in each township shall not be subject to entry, but reserved — sections 16 and 36 for the use of common schools, and sections 13 and 33 for university, agricultural college, normal school, and public buildings of the Territory and future State of Oklahoma.
u (d) As fast as the lands open for settlement under the act are sold, the money received from such sales shall be deposited in the Treasury, subject to the judgment of the court in the suit provided for in said act, less a reservation of not exceeding $15,000 for a designated purpose.” '
The petition alleges that the plaimants are Indian tribes recognized and dealt with as such according to the policies which the Government has pursued in regard to the rights of such tribes, and that, at and prior to October 18,1820, the Choctaw Nation of Indians was the possessor of certain lands east of the Mississippi Eiver in the States of Mississippi and Alabama, which, by the first article of a treaty of that date between .the United States and the said nation, they ceded to the United States; .and in consideration of said cession, and in part satisfaction therefor, the United States ceded to the Choctaw Nation the tract of country described in the second article *42 of said treaty, including, among other lands, those described in the petition. JBy the fourth article of said treaty the United States stipulated that the boundaries of said cession to the Choctaws should remain without alteration until the period at which said nation should become so civilized and enlightened as to be made citizens of the United States, and that Congress should lay out a limited portion or parcel of such land for the benefit of each family or individual in the nation (7 Stats., 211).
That the treaty of 1866 was agreed to by the petitioners and their representatives on the faith of the assurances that said lands were being acquired by the United States for the special and specific purpose of settling Indians thereon, and upon no other trust or purpose; and that the cession in article 3 was subject to the said trust and. condition, and subject to the reservation and equity in favor of claimants that if said lands embraced by said cession should cease to be occupied by Indian tribes and become divested of said trust and part of the absolute public domain of the United States, open to occupation and entry under the land laws thereof, then the equity of the claimants should attach; that claimants have during the years since then failed to make any effectual objections to said treaty because of their then and continuing belief that said equity was in substance secured to the claimants by the provisions of said treaty as made; that the repudiation of said equity and trust in favor of claimants would operate as a fraud against them.
Claimants further show that the affiliated bands are fractions of certain ancient tribes; that the Wichita and affiliated bands have no right to or interest in the proceeds of the disposition and sale of said lands; that as between the United States and claimants, by reason of treaty obligations, it is beyond the competency of the United States, as against the grants and provisions of said treaties, to grant unto the Wichita and affiliated bands any title or interest in the lands in controversy or in the proceeds thereof, except the right of occupancy contemplated by the fifth proposition submitted to the Indians for their consideration in the negotiations which resulted in the treaty of .1866.
The prayer of the bill is that the court will pass its decree in favor of the claimants, decreeing that they are in law and *43 equity entitled to tbe proceeds of the sale of all lands here in controversy (as to which proceeds it is provided in the said act that the same shall be deposited in the Treasury subject to the judgment of the court in this suit), and also are entitled to the just and full value of all lands which shall be allotted and reserved under the provisions of tbe said act and of the agreement which by said act is accepted, ratified, and confirmed, as therein provided, as such value shall be ascertained under an accounting made under the order and direction of this court.
The answer of the defendant Indians denies that the United States legally ceded the lands described in tbe petition to the Choctaw Nation, for the reason, as the defendants aver, that the United States possessed no title to the same, the aboriginal title of the Wichita defendants not having been extinguished at the time of the cession. They deny that the Quapaw tribe, from whom the United States derived title, possessed or that the United States received from that tribe any title to the lands west of the extreme eastern portion of what is now the Indian Territory, the said Quapaw Indians never having occupied said lands, being settlers of comparatively recent date upon the portion of the said cession contained in the present State of Arkansas, whither they had come from their former habitat east of the Mississippi.
That the United States had no authority of law to convey by patent or otherwise the lands which attempted to convey to the Choctaw Nation the title stipulated for in the second article of the treaty of September 27, 1830, because the Indian title had not been extinguished when the United States attempted to make the said conveyance.
The defendant Indians deny that the purchase of the lands involved in this suit was made subject to the trust and for the purpose of setting apart the lands embraced in said cession for the friendly tribes then in Kansas and elsewhere, except in so far as by the language used in said treaty it was announced as the policy of the Government and understood by the petitioners to cancel any shadow of title on their part in and to said lands that the same might be employed fully and wholly by these defendants and other friendly tribes of Indians to whom the Government had theretofore, or subsequently might, rightfully grant it, after extinguishing the Indian title as required by law.
*44 Specific grounds for the claims of the defendant Indians to the land are set forth in the answer, as follows: That the pristine habitats of the defendant Indians (except the Delawares) were in Louisiana, Arkansas, Texas, Indian Territory, and Oklahoma. The similarity of the language spoken by them has led ethnologists to class them together as the Oaddoan lingual family. The Siouan family, with the Quapaws as its southern representative, lived northeast, the boundary between the two families following the watershed between the Eed and Arkansas Eiver systems. The Caddo tribe occupied the eastern portion of Texas and western Arkansas and Louisiana. By a treaty with the United States made in 1835 (7 Stat. L„, 470), which, by reference, is made a part of the answer, the Caddo tribe ceded to the United States what are now Miller County, Ark., and, essentially, Caddo Parish, La., and agreed to leave the United States forever. They retired into Texas, not then a portion of the United States, and were residing there when that Eepublic was annexed to the Union. Their right to be there was recognized by the United States in the treaty of 1840, made with the Oaddos and other Indians (9 Stat. L., 844), which treaty, by reference, is made a part of the answer, whereby the signatory tribes were declared to be under the protection of the United States.
About one-half of the Caddos remained in northern Texas until 1859, when they were brought into the Indian Territory under an agreement made in that year at Fort Arbuckle. The other half of the tribe, on the breakihg out of the Mexican war, went to live on Caddo Creek, in the Choctaw Nation, where they remained until moved, with the others, to their present location, in 1859.
It is further alleged that the Wichita tribe have ever lived along the Eed Eiver, their habitat for more than 150 years having been west and south of the Washita Eiver, and hence west to the one-hundredth degree of west longitude.
That on August 24,1835, the United States entered into a treaty with the Comanches and Wichitas in which the right claimed by them was fully recognized by all the signatories, which treaty, by reference, is made a part of the answer (7 Stat. L., 474). •
The Wichita and affiliated bands of Indians pray:
(1) That the petition of the claimants herein may be dismissed.
*45 (2) That this court will decree that these defendants, in law and in equity, are entitled to all the proceeds of the sale of all the lands at issue, and pass a decree that from time to time, as the said sales are made and the proceeds thereof deposited in the Treasury, as provided by the act of March 2,1895, the same may be paid to these defendants.
(3) And for such other and further relief as shall seem proper.
The answer of the United States admits the allegations contained in the first nine sections of the petition except as to the last paragraph of the ninth section, which allegation is denied. The allegations contained in the last ten sections of the petition are denied except as to the first two paragraphs of the nineteenth section.
The allegations contained in the answer of the defendant Indians are denied- in so far as they assert that the defendant Indians, or any of them, had any right of occupancy within the district between Canadian and lied rivers and the ninety-eighth and one hundredth meridians of west longitude prior to 1859, and in so far as they assert that the said Indians were promised or given in 1859 more than 155,240 acres within the said district, and in so far as they assert that the agreement of October 19,1872, was executed without authority and under duress.
The Attorney-General prays as follows:
That the petition of the claimants be dismissed.
2. That the court will decree that the Wichita and affiliated bands of Indians are entitled to so much land in the present Wichita Eeservation as may be allotted to them under Article IY of the agreement of June 4,1891.
3. That no decree be made ip. favor of the Wichita and affiliated bands of Indians for the proceeds of the sales of unal-lotted or surplus lands in the said Wichita Eeservation, unless it shall be also decreed that the said Wichita and affiliated bands of Indians shall execute to the United States a release and quitclaim of all right, title, interest, and claim of any nature whatsoever in, to, or for any lands outside of the limits of the said Wichita Eeservation.
4. That the court will decree that unless such release and quitclaim be executed as aforesaid the proceeds of the sales of unallotted or surplus lands in the said Wichita Eeservation shall be and remain the exclusive property of the United States.
*46 Departing from the usual practice of the court, we have made no findings of ultimate fact. The case is one of equity jurisdiction, and the rules relating to findings of fact in the nature of a special verdict have no application where on appeal the facts and the law may be reviewed as in equity cases appealed from courts of the United States other than the Court of Claims.
In a claim where the jurisdiction was conferred on this court to determine the amount, if any, justly due from the United States to the Western Cherokees, findings of ultimate fact were held to be not in the province of this court because of the intention of the jurisdictional act to have adjusted the rights, legal and equitable, of both parties.
Commenting upon this case on appeal, Mr. Chief Justice Fuller, for the Supreme Court, said that the case would be considered and determined there upon an examination of the entire evidence, because the language of the act of Congress was manifestly used with the intention that equity powers should be exercised in the disposition of the case by this court. (United States v. Old Settlers, 148 U. S. K., 464.)
The present suit comes under the rule stated by the foregoing authority as well as by that laid down in Harvey v. The United States (105 U. S. K., 671).
An analysis of the evidence shows that the claims of the respective parties are rested—
(1) As to the Choctaw and Chickasaw Nations: Upon contracts and rights growing out of treaty agreements with the United States.
(2) As to the Wichita Indians: (a) Upon rights of ancient possession commencing before the Louisiana purchase and extending to the use of the land as aboriginal occupants down to and past the time of the treaty between the United States and the Quapawtribe in!818; (b) upon the recognition alleged to be contained in the treaty of 1835 between the said Wichitas and the United States confirmatory of their first possession; (c) upon their removal from Texas in 1859 to the leased lands; and (d) upon acquired rights to the lands under an alleged agreement in 1872 with the Commissioner of Indian Affairs on behalf of the United States, but which agreement was never formally ratified. This claim applies not only to the lands in suit, but to all the leased district.
*47 (3) As to the affiliated bands: Upon the interest acquired in the Wichita title of occupancy and whatever other rights they had acquired July l, 1859, under an agreement at Fort Arbuckle, in the Chickasaw country.
(4) As to the United States: Upon the ninth article of the treaty of 1855 and the third article of the treaty of April 28, 1866, entered into between the. claimant nations and the United States, under which it is claimed the United States reacquired whatever rights the Choctaw Nation had obtained under preceding treaty stipulations from the United States.
Following is a diagram of the land in dispute, and of the land incidentally involved in the controversy, including also the land originally granted by treaty to the Choctaws, then granted to Spain by the United States and relinquished as to any claim on it by the Choctaws in 1855.
Inasmuch as, by the contentious of some of the parties, a large part of this case is made to rest ,upon rights resulting from aboriginal occupation of the country in dispute, it is well to consider briefly the nature of Indian tenures aud determine whether the occupancy claims of those now asserting the same have anything in them to supersede the titles acquired by those who contend that all aboriginal claims have been extinguished.
Under the agreement which originated the suit the defendant Indians reserved the right to prefer against the Government any and every claim they might believe they had, save and except any claim to the tract of country described in the first article of that agreement. (Art. IV, Agreement of 1891.) The act of 1895, ratifying the agreement of 1891 and conferring the jurisdiction, also provided for the claims of all the parties to be fully considered and determined, and under this the defendant Indians assert that the Quapaws, from whom the United States obtained an Indian title of occupation, possessed no such title, but allege that the Wichitas did, in which the affiliate tribes came ultimately to share.. Thus this claim of the defendant Indians underlies everything else in the case if, being sustained, it is made to operate on the land itself and not merely treated as a claim for compensation for land appropriated by the Government and ceded to others. The matter, then, of the prior occupation of the tract of country at issue and the claims founded thereon by alleged recognition of this occupation will first be considered.

*48

*49 Eights following discovery of lands in this country were first treated by European nations above the jmssessory claims of the aborigines. Yattel declared that the unsettled habitations of Indians were such they could not be legal possessors of the soil. The discoverers, however, came to concede the rights of occupants, and the Indians in possession were permitted to retain their original natural rights as the undisputed possessors of the soil, subject to such conditions as were imposed by those making the discoveries. Discovery gave title to the country and power to grant the soil subject to the Indian right of occupancy. But the Indians were not permitted to grant title to the lands occupied by them, their right being merely that of occupancy and not of ownership.
Early in our history the character of Indian holding was defined substantially as outlined. The United States uunequivocally acceded” to the broad rule by which its civilized inhabitants held the country, and it was not doubted that either the General Government or the several States acquired a clear title to all the lands within the boundary lines described in the treaty of peace between England and the United States, subject only to the Indian right of occupancy, and the exclusive power to extinguish the right was thus vested in that Government which might constitutionally exercise it. (tJohnson v. McIntosh, 8 Wheat., 543.)
The general principles announced were followed by cases which declared that Indian possession or occupation must be respected until they chose to make a cession of their lands to the Government, or made an authorized sale to individuals or abandoned the possession. Their occupation was considered with reference to their habits and modes of life, and consequently their hunting grounds were declared to be as much in their actual possession as the cleared fields of the whites. When their rights became extinct as the lands were abandoned or sold the grants could be made by the Government unencumbered of the right of occupancy. (Mitchell v. United States, 9 Pet., 711-746; Clark v. Smith, 13 Pet., 195.)
The Choctaw claimants allege that these decisions apply to the aboriginal rights of occupancy existing in Indians generally, without reference to those rights existing in one tribe independently of the right of any other tribe to the same tract of country; and aside from this, they say the claim of the *50 defendant Indians to the land in dispute can in no way conflict with that of the Choctaws and Chickasaws to the proceeds of the sales provided for in the act of March 2, 1895, so long as tribal organization should exist in the particular tribe in possession or until they should sell.
The consequences of an abandonment of the occupancy would appear to have been the subject of consideration when the court in Gherolcee Nation v. Georgia (5 Pet., 1, 17) said, in referring to the Indian occupation: “They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases.” And again in United States v. Gools (19 Wall., 591, 593): “The possession, when abandoned by the Indians, attaches itself to the fee without further grant.”
After these announcements another case referring to the power of the Covernment over the Indian title was considered by the Supreme Court and the rule declared in United States v. CJoolc was quoted with approval. Said Mr. Justice Field, “It is to be presumed the United States would be governed by such considerations of justice as would control a Christian people in thejb? treatment of an ignorant and dependent race; * * * the propriety or justice j>f their action toward the Indians with respect to their lands is a question of governmental policy but the power of the United States to transfer the fee was never denied. (Beecher v. Wetherby, 95 U. S. Ii., 517-526.)
More or less cloudiness respecting all titles based on Indian occupation no doubt existed in our early dealings with the tribes, and the uncertainty of occupancy claims must have been greatly augmented as the tribe asserting a possessory right was small in number or roving in habit. But the principles adopted by all departments of the Government in the premises relate to the aboriginal rights of the separate tribes as they were asserted and ascertained. Differences of language, custom, and tradition generally separated the different bands and the occupation of particular country marked these differences of speech and habit and largely governed those who dealt with the tribes in fixing the bounds of their respective habitations.
Boundaries may have been in numerous instances poorly defined, but some general boundary lines must have existed to the places of abode or hunting grounds claimed to justify any specific claim of title by virtue of occupation.
*51 The history of the Indian race shows that some of the tribes had recognized places of abode with defined hunting grounds, while other tribes had none and made no pretenses to ownership of territory at all. Some of the warlike bands depredated extensively and were not infrequently the scourge of the whites, but of the other tribes as well, while others wandered from place to place with no apparent desire for permanent homes and with no special aim to gratify but their nomadic instincts.
In all cases there must have been actual use or occupancy and not mere constructive or desultory possession; some mastery of a tribe over the soil to the exclusion of others, or the joint possession of two or more tribes such as gave to each something of a fixed habitation or use of the land as hunting ground to establish a title by occupancy.
Occupation in its usual sense is where a person exercises physical control over land. (2 Eapalje and Lawrence, Law Diet., 893.'
The absolute nature of the political and territorial rights of' Indians was stated by a learned commentator to have been denied by our colonial ancestors only so far as Indian nations had formed themselves into regular organized governments, within reasonable and definite limits, necessary for the hunter state. (3 Kent’s Com., 387.)
This states the case restrictively in view of our actual dealings with tribes claiming as occupants of territory, but there must have been in all cases tribal organization at least and, subjection of land to the will and control to form the basis of any valid claim of occupation by virtue of more ancient discovery and use on the part of Indians claiming as occupants.
The first question then is whether any of the Indian defendants actually occupied the land in suit, in the sense of an Indian occupation, at the time of the Quapaw cession to the United States in 1818. Except as any occupation at other times may throw light upon their claim of possession as of the time of that cession, it does not become material to inquire whether any of the defendant tribes were in possession or not, but in this view the entire matter of possession will be examined.
The Wichitas claim an unextinguished title to the whole reservation in suit, besides the right of permanent settlement thereon under the agreement which placed them there in 1859. *52 These double claims are not consistent, and so much in conflict, apparently, they can not both stand. Eights by virtue of prior occupation, if established with all the consequences claimed for them, would supersede the agreement which conferred privileges upon the other bands along with the Wichitas independent of occupancy claims of one of the tribes going upon the land under the agreement. ET a ving acq uiesced, when placed upon the laud, to the admission of the affiliates to what is now asserted to be exclusive territory, the Wichitas can not have a decree by which the United States must by any possibility make other provision for the affiliated bands,' except upon the clearest evidence of original right, and unless the circumstances originating the later right are not such as to operate upon the Wichitas as an estoppel.
If the Wichitas are entitled to the premises by virtue of prior occupation the agreement which permanently settled them there must of course be held ineffective and insufficient to meet the full equities of their case.
Resting their claim of prior occupation upon traditions and the writings of travelers and historians, it can not be denied that some things have been shown well calculated to throw a cloud not only upon the extent of the^Quapaw occupation at the time of that cession to the United States, but also to leave room for doubt as to who really did occupy the disputed territory. It remains to be seen whether the doubts attending the claim now asserted have been removed.
The nature and necessity of the case, and the evident intent of the jurisdictional act to have the court consider all the testimony necessary to aid in the determination of the case, has left us no alternative but to’ carefully examine everything offered ; and where doubts have arisen respecting the relevancy or competency of evidence we have not hesitated to give the parties the benefit of the doubt in the spirit suggested by the broad and liberal terms of the statute.
Title by occupation is asserted to the Great Prairie west of the Gross Timbers to the western limits of the United States. This covers an immense scope of country in Texas and all the territory between the Eed Eiver on the south and the Canadian and its North Fork, or the Cimarron and the Arkansas on the north, as well as the country at 95° on the east to the one hundredth meridian on the west. Not only the reservation, but *53 the entire leased district is repudiated as a geographical entity by the Wichitas, but that district is used by them as a convenient form of designating, not their pristine home, but only a portion of it. As they deny the validity of its original setting apart, they say its boundaries should not be used as specially designating their early home.
The Cross Timbers are a growth of smail timber, two long narrow strips between the ninety-sixth and ninety-ninth meridians, extending parallel to each other from the Indian Territory southward to central Texas. (33 Amer. Jour, of Science, 3d ser., 291.) High on the dividing ridge between Eed Eiver and the false Washita there is a range of hills, the southwestern portion of which extends to about the one hundredth degree of longitude. These are generally called the Wichita Mountains. South of the Canadian, a branch of the Cross Timbers projects off westward for 100 miles, then inclines northwest beyond the North Fork, and ultimately ceases in the great sandy plains. (Gregg’s Commerce of the Prairies, 1842.) This woodland is from 5 to 30'miles wide, and from the Arkansas Eiver runs in a southwesterly direction to the Brazos, some 400 miles. (Marcy’s Eep., 1852.)
The country to which title is really asserted by the Wichitas is the whole of the Great Prairie, which includes the ‘‘ Staked Plains,” the general level of whose surface is broken only by the Wichita Mountains. These plains are bound on the west by the mountains of New Mexico and Colorado, while to the north and south there are no natural boundaries nearer than the Arkansas and the Pecos. On the east the claim would cut into the country of the Creeks and Cherokees, as well as the claimants’ country.
It is not within our province to determine claims beyond the immediate reservation in suit, but as this claim goes to the whole prairie, and the evidence to sustain an occupation is the same for all and nearly inseparable, we will examine the issues as presented.
The extent of the country claimed is not the only remarkable feature of the Wichita contention. They say they were a pastoral and peaceful people. We know they wandered from place to place with great frequency, and that even in the eighteenth century they were few in number. History does not attribute to them any strength and vigor as a tribe, or any *54 characteristics denoting aggressiveness or prowess. It is difficult to see bow such a body of people should possess either the inclination or the ability to assert or maintain dominion over so much country in the presence of so many more warlike tribes who, in great numbers, inhabited the same region and roamed over it to supply their wants by force where other means should fail.
That the archaeology of the Western prairie is associated with the history of the Wichita Indians is testimony of value in support of a claim to occupation by those asserting it, but this testimony with respect to the country in issue is impaired by the use of the same name in designating streams in other sections of the country. The name Wichita, or Washita, applies to certain streams in Louisiana, Arkansas, Texas, and the Indian Territory alike. The Washita River of Arkansas and Louisiana was believed to rise near the source of the Arkansas. (Senex’s map, 17105 Le Page du Pratz, vol. 3, p. 152,1758.) It is inferable that the name Fausse Ouachita (False Washita), given on the early maps to the Washita River of the Indian Territory, grew out of the error disclosed by Senex’s map. The value of the testimony is again impaired by the want of proof showing when the Wichita name was impressed upon the country and by whom. Wichita, in the State of Kansas, took its name from the temporary settlement of the tribe there during the war between the States. It does not appear whether white men named the Wichita Mountains or whether the Wichitas undertook to do so.
The word “ Wichita” is said to be Osage for “moving about,” “migrating.” (Amer. Antiquarian, xiii, p. 251.) As a tribe the Wichitas were not savage and warlike like the Comanches and Kiowas, whose tendencies were generally asserted as occasion offered; nor yet gentle and passive as the Shawnees and Delawares, who had permanent homes as long as they could maintain them. The Wichita women cultivated the ground as opportunity and settlement at any one place long enough permitted; but the men, in their later'history, had horses and hunted on the plains and roamed over the country much of the time. The tribe built round, grass-covered huts when stationary, tilling the soil, but changed their location every few years, and official reports leave but little room to doubt that for years before they were taken to the present reserva *55 tion they were marauders and horse thieves. Wandering from place to place for subsistence they can not be said, from the time they first came into notice until prevented from moving about, to be other than a nomadic people, and by their roving tendencies and the conditions as they existed before they were placed on the present reservation, must their claim to any part of the Great Prairie be measured.
The Wichita tribe are called in their own language Kitikitish; by the Spaniards, Taovayase; by the French, Ouachita and Pañis PiqrLés (tattooed Pawnees), and when used on maps and in reports, narratives, and histories the names Wichita, Witchita, Towiache, Tahawayase, Toweash, Toyasli, Towish, Taoviase, Taouayache, Ouichita, Ouachita,'Ouasita, Ousita, Wachita, Washetaw, and Pañis Piqués designate the same tribe or band.
In the classification of the Caddoan groups the tribe has a place, while to the Siouan lingual family ethnologists have assigned the Quapaw and Osage tribes. (Seventh Annual Eep. Bu. Eth.) This is contradictory of their Osage derivative, but we will not stop to discuss this, as the Wichita synonym may have come from their enemies. The connection of the Wichitas with the Caddoan family is thought by their counsel to be a matter of considerable importance, but why it is so does not clearly appear. Even if the two bands were of common origin, we fail to see the bearing of this upon the Wichita claim to country 200 miles above any known place of occupation of the Oaddos nearest the leased district. The Oaddos themselves never had any title to any part of the leased district or pretended that they ever had. It is admitted that they resided in the Brazos Pi ver country in Texas, whence they migrated from southwestern Arkansas, northwestern Louisiana, and northeastern Texas in the early part of the present century. There is nothing substantial to show that they ever saw the immediate country in dispute or that the Wichitas ever saw it until 1859. The fact that ethnologists have classed the Wichitas with the Oaddos can not strengthen the claim of the former to the disputed territory merely because the country inhabited by the Caddoan family was separated from that occupied by the Siouan family. The evidence does not establish to our satisfaction that the boundary line of the Caddoan groups of Indians ran close to the Canadian *56 west of the ninety-eighth meridian or included in the Caddo country all but a small portion of the leased district. That it is mere speculation to attempt to accurately fix this boundary line close to the Canadian west of the ninety-eighth meridian is found in the admission of the Wichitas that it is “ an entirely possible line.”
In 1682 the Wichitas do not seem to have been known to white men. History is silent and tradition gives no account of them before 1688. They are mentioned by Tonty, the Italian explorer, as being in that year along with the Natchitoches. This would put them in what is now known as the site of the town of Natchitoches, in the State of Louisiana. The early maps and authorities generally show the Natchitoches to have lived in Louisiana in the vicinity stated, and the village of the Wichitas is placed in that neighborhood by many maps of the eighteenth century.
Tonty does not state where the Ouasitas actually dwelt, his narrative not fixing a precise location because of the incidental references to them. But he does speak of the chiefs of the Ouasitas and Capichis meeting him, along with those of the Natchitoches, and he explicitly says that the three tribes constituted one people. (Discouvertes en Amérique, Paris, 1697, p. 319; Bélation de la Louisiane, Amsterdam, 1720, p. 196.)
Historians tell us that in 1700 or thereabouts the northern part of Louisiana contained a tribe of Indians called by the French “ Ouichita,” who gave their name to the river. In an account of a journey of St. Denys and Bienville in 169.9 it appears that, after having proceeded to the village of the Wachita, where was found but five huts, it seemed to those travelers that the Indians of that name had mostly removed to the Natchitoches. (Martin’s Hist, of Louisiana, 102.) It is admitted that the connection of the “Ouichita” with the Wichita is “ undoubted,” but insisted that about this time there was a severance of the tribe.
The time of this severance is conceded to be problematical, but thought by those who represent that part now recognized as the survivors to be too ancient to become a matter of tradi-to tion. At all events, itis said thatin 1700 the Wichitas moved the village of the Taensas, on the Mississippi, where the parish of that name now is, and afterwards went west among the Oaddos, who occupied the country in the bend of the Bed *57 Eiver, in Louisiana, Arkansas, and Texas; that the number of these Wichitas was small, having no tribal connection with the Indians of the same name living on the plains; that in 1719 there was a large village of Wichita and kindred Indians on one of the branches of the Arkansas Eiver in the eastern portion of the Indian Territory, and that in 1737 these same Indians, after having lived some years on the Canadian, moved to the southward.
Bienville’s Journal of a voyage from the Taensas (4 Margry, 432 et seq.) shows that at a certain place that explorer found Wichitas who had abandoned their village to go and live with the Taensas. The argument is that Bienville found but few Wichitas then leaving their Louisiana home forever. Le Page du Pratz, who wrote about 1758, states that the Ouachitas went westward, and Dunbar, who visited the Washita Eiver in 1804, reported that the tribe of that name, formerly dwelling on its banks, was said to have gone “into the great plains to the westward.” (Am. State • Papers, Ind. Affs., vol. 1, p. 732; Jeffery’s History of the French Dominions in North and South America, London, 1761, vol. 1, p. 165.) The removal mentioned by Du Pratz could not have been the same referred to by Bienville, there being nothing in his journal to sustain this argument. Bienville does not state how many Wichitas he met on their way to the Taensas country, nor that no other parties were on their way or had arrived. For aught that he says, there is no reason to suppose that Bienville met all of .the tribe who were then in Louisiana, and still less reason for limiting their number. There may have been hundreds of them for anything that appears in' his narrative. It is reasonably certain that the migration referred to by him was not the same as that mentioned by Du Pratz.
The relation of La Harpe and the discovery by him of certain Indian nations situated in the West is also relied upon as historical evidence in support of this contention of early location of the Wichitas. (6 Margry, 249 et seq.) La Harpe says that he advanced to the mouth of the Ouachita Eiver, 14 leagues from the Mississippi, and in his further explorations found on the Canadian, in 1719, certain Wichitas, who, according to the contention of counsel, must have separated from the Louisiana Wichitas some time before.
*58 Counsel for the Wichitas say that there is no reference to a western migration of the Wichitas from Louisiana but of the handful who merged in the Natchitoches in 1700, and that in 1719 La Harpe met those of the same blood on the Cimarron.
It is reasonably certain that Bienville and Du Pratz do not refer to the same migration, and neither of them make any definite statement as to the numbers of the Wichitas. Neither of them suggest a merger in another tribe. According to La Harpe, the Touacaras (Towakonies) were the leading tribe on the Canadian (or, as counsel for the Wichitas suggest, the Cimarron), as he invariably refers to the village as that of the Touacaras, and states that the chief of that tribe was the most respected of all, enjoying certain special privileges which in a savage community would assuredly not have been granted except to a chief whose followers were numerous enough to compel respect and obedience. At the same time La Harpe states that the Toajas were the most numerous nation. He further says that the chief of the Touacaras and six other chiefs of nations met him, and he mentions seven distinct tribal names, counting the names Toayas, Quirasquiris, and Ousita as referring to one tribe. Thus it appears he met seven tribes in all, to wit: Tawakoni, Southern Comanche, Kiowa, Apache, Caddo, Waco, Adái, and Wichita. Leaving out the Wichitas, every one of the other tribes belonged at that time in Texas except the Caddos, who belonged in Louisiana, near the Texas border. The evidence does not show that any of the tribes remained long in or near the locality where La Harpe met them, or that they were in the course of the migration to Texas from some other point. It is probable that their stay, which was only during the summer season, lasted but a few seasons, after which they returned to the region where they properly belonged. If the Wichitas did not return to Louisiana and move westward along the Bed River, but went south-westwardly from the Canadian to the Wichita Mountains and other parts of the leased district, there is no explanation as to what became of the other tribes or why they did not continue their association with the Wichitas in such a movement to the leased district.
It is again contended by the Wichitas that they were the same as the Paniouassas mentioned in an anonymous memoir in Margry, and that they lived on the Upper Arkansas. This *59 anonymous report is taken from the early French records, and it speaks of the nations who lived or who were established on the course of the Red River from the month to points within the knowledge of men, and includes one tribe called “ Toua-oana” or Paniouassas, and these last are placed near the river of the Otouys. The latter name is thought by counsel for the Wichitas to be synonymous with the Otoes, who were, according to the maps of that time, on the Upper Arkansas. Inasmuch as there was a tribe named Sotouys on the Lower Arkansas, near its mouth (written by De l’lsle “Sitouis,” by La Harpe “ Zautoouys,” and by Ross and D’Anville “ Sotouis”), it is more probable than otherwise that the location of the tribe described as Touacanna, or Paniouassas, was not near the Otoes.
We have examined the contentions relating to the origin of the Wichitas, their early traditions, associations, and movements, not alone for the interesting discussion which goes back to the twilight of Indian history west of the Mississippi, but for the earnest argument for the Wichitas in support of their claim and the information which we have supposed might lead to the establishment of something certain for them. But for anything that appears on the maps or in the statements-of the early explorers, we have nothing sufficiently definite or certain to lead to the conclusion that the Wichitas had such an early aboriginal claim as they state. Close examination of the early French and Spanish records, the statements of travelers, and the accounts of historians suggest the most reasonable conclusion to be that the French found the Wichitas originally in Louisiana; that for a short time the tribe or a portion of it passed the summer season on the Canadian in company with portions of other southern tribes, but that ultimately they were driven westward to the Red River by the Ohickasaws, after which time they were found among the Indians whom the Spaniards met and dealt with in Texag. Their descendants are now, asserting the title.
There is less of conjecture in this conclusion than in any other, and it is really not inconsistent with the opinions which the Wichitas themselves have on this branch of their case. They admit an early habitation in Louisiana, and do not satisfactorily prove such a severance of the tribe and departure of a. part of the band from the country south of Red River into *60 tbe country of which the leased district forms a part as to enable us to say with any degree of accuracy or precision that there was an actual permanent division or that any of them ever laid claim' or had a right to claim that country which forms the subject-matter of this suit. The learned counsel for these respondents, recognizing this, say they are “ content for the purposes of this cause to base possessory title on the history of the Wichitas from the middle of the eighteenth century.” (Bee., 491.) If they are content to do so, then the court is also content to reject such statements as explorers have offered concerning the location of the Wichitas outside of what is now Louisiana and Texas, since they are at best, as they appear to us, conjectural for the most part and too indefinite to found upon them the substantial rights claimed upon their authority.
The following is a summary of evidence upon which, for the purposes of this case, the Wichita claim of 'occupancy to tbe “ Great Prairie west of the Cross Timbers to the western limits of the United States” (which includes the leased district) is mainly rested, to wit:
In 1759 the account of Parilla’s defeat shows their residence at “ San Teodoro.” (Pec., 485 and 601.)
This name of San Teodoro was given, in 1778, to one of two Wichita villages visited by Mesieres, one each side of Bed Biver, west of the Cross Timbers. (Bee., 485-480 and 492.)
In 1788 Fragoso, in a journey down Bed Biver, visited and remained six days at the Wichita villages j ust west of the Gross Timbers. (Bee., 480 and 603.)
In 1805 Sibley reported two villages of the Wichita,s on the south bank of Bed Biver, 340 miles in a direct line west from Natchitoches, 30 miles by land west of the False Washita. (Bee.,-480.)
In 1805 Dublanc, governor of Natchitoches, reports (in Bobin, 1807) that the Wichitas occupied two villages, one each side of Bed Biver, 80 leagues above the Gad dos, who were in northwestern Louisiana. (Bee., 1042 and 1339.)
The statement accompanying the letter of J. C Carr (which, without the statement, is printed in the Becord. at page 1039), dated at Natchitoches, in 1819, and purporting to include the Indians of Texas, does not include the Wichitas.
*61 The Melish map of 1818 gives a Wichita village south of Eed Eiver, below the mouth of the Blue Eiver. Long’s map of 1823 shows a Wicliica village north of Eed Eiver, at the mouth of the Blue, the uote stating that it was abandoned in 1810. Melish got his information from Darby. (Eec., 600.) Darby, in his work on Louisiana, at pages 28-29 gives the Wichita villages east of the Blue, but on page 51 says that the Wichita flows into the Eed 70 miles above the Blue and a short distance below the Wichita towns.
The statement of Uts tuts kins, then a child, states that the villages on Eed Eiver were deserted for one at the mouth of Cache Creek, and that thore they had smallpox, which we know was in 1816. (Eec., 1340, and Senate Ex. Doc.)
Morse’s report (Census, 1890, Indians, p. 11) states that the Wichitas lived on Eed Eiver, 1,200 miles, above its mouth, in 1822.
In 1830 A. P. Chotean reported that there was a Wichita village 250 miles from Fort Gibson. (Eec., 1086 and 1342.)
In 1.832 Albert Pike was informed that the Wichitas had always lived in the country around the Wichita Mountains. (Senate Ex. Doc. 13, supra, p. 29.)
In 1834 Colonel Dodge visited the Wichita village on the North Fork of Eed Eiver, near the mouths of Elm Fork and Elm Creek and Mount Webster. He was informed that the tribe formerly lived farther south and that their oldest men were born there. (Eec., 1087 and 1343.)
The report of the Texas Boundary Commission (pp. 64 and 67) gives a statement of a Waco chief, Shot Arm, who was an old man in 1858, that he was born at a village on the North Fork of Eed Eiver, at Mount Webster. (Eec., 487.)
Gatlin’s map of Indian localities in 1833 shows a Waco village on one side of Eed Eiver and a Wichita village on the other. (Census, 1890, volume on Indians, p. 45.)
Wichita Indians informed James Mooney that they moved from North Fork to Fort Sill in the summer, of 1834. (Eec., United States v. Texas, 676.)
Niastor, a Wichita Indian, claims to have been born at Fort Sill in 1837. (Eec., 610.)
General Bee visited the Wichita village on Cache Creek, near Fort Sill, in 1843. (Eec., 503.)
*62 Captain. Marcy, in 1849, reported that the Wichitas lived between the Eed and Washita rivers. (Eec., 1331.)
In 1852 Captain Marcy was at the remains of the Wichita village at Fort Sill, which had been deserted two years before because, as Albert Pike tells us, of inundations and attacks of hostile Indians. (Eec., 503, 1097, and 1341.)
In 1852 Captain Marcy found the Wichitas living at Eush Springs, west of the Cross Timbers, and at the head of Eush Creek. Both of the above locations are shown on the map accompanying Marcy’s report. (Eec., 269 and 604.)
In 1852 Marcy reported that the Wichitas.were entitled to the country around the Wichita Mountains by the right of occupancy and possession. (Eec., 604.)
In 1853 Horace Capron reported that the Wichitas were entitled to the country north to the Ca7jadiau and around the Wichita Mountains, it being originally their country, they never having relinquished the same. (Eec., 1098 and 1343.)
In 1858 the Wichitas deserted the village at Eush Springs and took refuge at Fort Arbuckle. (Eec., 504.)
In 1859 Eector reported that the Wichitas had lived in the country north to the Canadian Eiver from a time beyond anyone’s memory. (Eec., 607.)
Beginning with the account of an expedition in 1759, it appears that Barilla’s defeat was at a place which shows the residence of the Wichitas to have been at San Teodoro, one of the Towaiache villages on the main Eed Eiver, west of the Qross Timbers. The statement respecting this expedition and its results is taken from Hubert H. Bancroft’s work (vol. 5), and is quoted in the record of the case of United, States v. Texas (162 U. S. E., 733), from which it substantially appears that plans for a campaign were made by a conference of officers at Bexar in January, 1759. An army of 500 soldiers and volunteers, with a large force of Apache auxiliaries, started in August under the command of Parilla. After marching some 150 leagues they surprised a ranchería, killing 55 of the foe and making many captives. They then advanced against the towns of the Taovaiases and, in the region of what was later called San Teodoro, found 6,000 Indians, of different tribes, in a strongly fortified position, many of them armed with muskets, and displaying a French flag. The savages did not wait to be attacked, but made a sortie in force, and the Spaniards *63 fled, in a panic. This affair occurred south of the Eed Eiver, thus showing that Taovaiases were located not north but south of the Eed Eiver in 1759. If the Wichitas were located where they were when I)e Mesieres found them in 1778, their location in 1759 was east of the ninety-eighth meridian. Hence, even if the Wichitas had been north of the Eed Eiver, and not south of it, they would not have been in the leased district.
A Spanish officer named De Mesieres made a report in 1778, which also appears in the record in United States v. Texas (890-891), in which he substantially stated that from the Brazos Eiver, where the Tuacanas dwelt, to the stream that waters the Taovaiase village there was seen on the right a forest justly called by the natives the “Big Forest” (Cross Timbers), and that the Taoviase Nation was divided into two villages, one situated north of the Eio Bermejo (Eed Eiver), or Eiver of Nachitoches, and the other opposite; the former village was composed of 37 houses and the latter of 123 houses. There is nothing in the entire statement to show that the Taovaiases occupied any land north of the river beyond the place of the few houses mentioned, and nothing tending to show that they occupied or claimed any part of the leased district. More than three-fourths of the tribe was on the south bank of the river. The double village was east of the ninety-eighth meridian, and that meridian constitutes the eastern boundary of the leased district. The Cross Timbers reach the Eed Eiver at 97° 15' west longitude, as shown by the maps of Austin, 1830; Hunt and Eandel, 1839; Kennedy, 1841, and Tanner, 1846. South of the Eed Eiver their western border is east of 97° 30'.
It does not appear that De Mesieres traveled north of the Eed Eiver at all, and on the whole statement, with other evidence, we conclude that the proofs relating the Parilla expedition and De Mesieres’s visit locate the Wichitas east' of the ninety-eighth meridian, and not in the Wichita Mountains. The ninety-eighth meridian, being the boundary of the leased district on the east, the Wichitas could not have been in the leased district.
The narrative of another expedition about that time (1778) shows that Fragoso started eastward from Santa Fé June 24, 1778. According to his account, he left the Wichita village July 26 and traveled that day 7 leagues in eleven hours. On *64 the next day he traveled twelve hours, but does not state the distance made. On the 28th, after traveling 4 leagues, he reached the Cross Timbers. The average hourly distance made during the twenty-two days prior to his arrival at the Wichita village, for which the distances are stated, was four-fifths of a mile. This would make the distance from the Wichita village to the Cross Timbers about 21 leagues, or 63 miles. . From the Wichita village to the Cross Timbers by the course of Fragoso’s journey the village would appear to be east of the ninety-eighth meridian. The course of the Cross Timbers south of the river is southeast. The more directly south Fragoso went from the Wichita village to the Cross Timbers the nearer was that village to the meridian of the Cross Timbers. The contention that Fragoso did not travel along the Fed Fiver all the distance from the Wicbita village to the Cross Timbers, but traveled southward a part of the time, finds its answer in the statement that the more southerly his course during- this journey of two and one-half days the nearer was the Wichita village to the meridian of 97° 15' and the farther was that village east of the meridian of 98°, which formed the eastern boundary of th.e leased district. And it does not appear that Fragoso traveled along the river the whole 63 miles of his journey, as the river in that region often flows in a southerly and sometimes in a southwesterly direction.
In his report to the Secretary of War (Amer. State Papers, vol. 1, Ind. Affairs, 721 et seq.) Dr. John Sibley said in 1805 that the Fanis or Towiaches lived on the south bank of the Fed Fiver, by the course of the river upward of 800 miles above Natchitoches and by land about 340 miles; that they had two towns near together, the lower town, where the chief lived, bein g called Witcheta and the other Towa a bach. From the mouth of this river, known as the False Washita, through the prairie to the main branch (Canadian) of the Arkensa was a three days’ journey, some 60 or 70 miles in a straight line. From this mouth of the river to the Pañis or Towiache towns the distance was about 30 miles by land and double that distance by water, where the river is nearly a mile wide. The mouth of the False Washita is about 4 miles west of the meridian of 96° 30', according to maps of the Land Office of 1891 and 1897 and by the Indian Office map of 1896. According to Sibley, then, the Wichitas, Towiaches, and Tawakonies *65 were south of the Eed River in. Texas in 1805, some fifty-odd miles east of the eighty-ninth meridian.
According to the statement made by Robin, 1807 (vol. 3, p. 3), concerning the report of Covernor Dublanc, the distance from the Natchitoches (then located near the present site of the town of that name in Louisiana) to the villages of the Taouay-aches and Ouitcitas was 185 leagues by water. The distance from Natchitoches by land to the sharp bend of the Red River in the State of Arkansas is in a straight line 132 miles. The distance in a right line from that bend to the ninety-seventh meridian is 181 miles. If the distance by this crooked river from the Natchitoches to the sharp bend of the Red River and from that bend to the ninety-seventh meridian was three-fourths greater than the distance by the right lines connecting those three points, the whole distance by water from the Natchitoches to the ninety-seventh meridian was about 548 miles; that is to say, only a few miles less than Robin’s estimated distance from the Natchitoches to the villages of the Taouyaches and Ouitcitas. There is apparent harmony, therefore, between Dr. Sibley and M. Robin in the location of these villages east of the ninety-eighth meridian.
An attempt was made in 1806 by Captain Sparks and others to visit the “Pawnee Piquas,” but they were prevented by the Spaniards, who must have had jurisdiction over the band, as Sibley had reported. (Long’s Expedition, vol. 2, pp. 302-314.)
Writing from data collected in 1804-1810, and advising the establishment of a garrison and factory on the Red River, at the present northern boundary of Louisiana, Stoddard said that the Indians, who were then obliged to trade at Natchi-toches, would be equally well, and perhaps better, supplied at the proposed factory, and that in addition to this the Pawnees (who were a different people from those of the same name on the River Platte) and Ietans and some other Indians high up on Red River and to the southwest of it might also obtain supplies from the whites, and thereby be prevailed on to break their connection with the Spaniards. Stoddard described these Pawnees as pursuing no other game than the buffalo, stating, however, that they attended to agriculture and raised more than double the quantity of corn and vegetables necessary for their own consumption, and furnished their neighbors with the surplus in exchange for peltries, so that their trade, *66 then engrossed by the Spaniards, was deemed of considerable value. (Sketches of Louisiana, 455.) According to this statement the Wichitas would seem to have lived in the villages referred to by Sibley.
In his Views of Louisiana, published in 1817 (p. 88), Brack-enridge states that the “Tawakenoes or Pañis” live “south of the Bed Biver, above the Caddoques.” Inasmuch as the Tawa-kenoes are also referred to in their proper place by that writer, we conclude that this is a misprint for “Towiaches or Pañis.”
The maps of Melish of 1816,1818, and 1820 show a “Panee” village on the south side of the Bed Biver, about 96° 15' west longitude. The Wichitas say, however, that the Melish maps are inaccurate. Since the interpretation given those maps by the Supréme Court in United States v. Texas (162 U. S. B., 1) their inaccuracy as to the location of the meridians, astronomically considered, is established. No doubt the longitude of some of the localities is incorrect, and the Panee village is placed farther east by the Melish map than it should have been, according to Sibley’s report; but the fact is probably established that the village was on the south side of Bed Biver, but somewhat farther west.
Humboldt’s map, published in 1811 from data obtained in 1803, shows “Indiens Taouaiazes” about latitude 36° 30' north, longitude 103° west. This indicates a Mexican belief that the Tawehash (Wichitas) were one of the nomad tribes of the Great Prairie.
Pilce’s map of the internal provinces of New Spain, based on information received by him in 1807, shows “IndiensTawayes” south of the Bed Biver. This probably is an engraver’s error for “Tawayes” — that is, Tawehash.
The Wichitas, as Pañis or as Paniassa, are located in Louisiana by De 1’Isle’s map of 1703, by Moll’s map of 1715, by Bernard’s map of 1720, and by De 1’Isle’s map of 1722; by De l’Isle’s map of 1741 on the south bank of the Arkansas Biver, in the Choctaw Nation; on Popple’s map of 1741 in Louisiana; but by his maps of 1735 and 1737 they are located “north of the Arkansas Biver.” Mitchell’s map of 1766 and Le Bouge’s map of 1778 place them north of the Arkansas.
Beferring to the Morse report, which states that the Wich-itas lived on Bed Biver, 1,200 miles above its mouth, in 1822 (Census, 1890, Indians, p. 11), Clark’s census of Indian tribes, *67 dated November 4,1816, contains a statement that the Oadeau and Paneas Pique (Caddo and Wichita) tribes reside “on Bed Biver, near the south boundary line of the Missouri Territory.” Major Long’s report, February 20,1821, states that the Osages had recently driven the Pawne.vs of Bed Biver from their place of residence and compelled them to seek an abode upon the head waters of the “Brassis” or Colorado. (II Long’s Exp., sec. 21,' p. 366.) The Pawneys of Bed Biver to whom he refers can only mean the Wichitas, because they are frequently referred to in Long’s expedition under the name of Pawnee Piquas, whom Long confidently expected to find on the river which he thought to be the Bed, but which proved to be the Canadian. Long’s statement apparently explains the removal from the villages referred to by Sibley in 1805.
When the Chouteau treaty of 1830 was before the Senate inquiry was made of Chouteau, who was a well-known trader and who had traveled in the region of the Arkansas and Bed rivers, as to the proximity of wild Indians to the Choctaw country. He replied that the nearest band of wild or savage Indians was the Paw-nis Pick, whose village was about 250 miles from Fort G-ibson. He stated that they raised corn and vegetables in small quantities, and that other rambling tribes were to be found. These were the Padocas, Aitans, Huitsitas, Hichas, and Consadas. Their range extended south. The Comanches, Arapahoes, Cayouwas, and other bauds were reported as rambling from the head waters of the Great Platte, Arkansas, and Bed rivers in the direction to San Antonio and parallel to that chain of the Bocky Mountains running south. This statement shows not merely that a distinction was made at that day between the roving Huitsitas (Wichitas) and the more sedentary Pawnee Picks (Pañis Piques), but that the latter did not live within the country granted to the Choctaws in 1820 and regranted in 1830. A distance of about 250 miles from Fort Gibson indicates that the village was somewhere on the Bed Biver, near the mouth of the Big Wichita, or perhaps on the Big Wichita, where Austin’s map of Texas (published the year Chouteau’s statement was made) shows a Towiash village. Wherever the village referred to by Chouteau was, it could not have been within the bounds of the country granted to the Choctaws, for Chouteau not only knew what those bounds were, they having been established ten years *68 before, but be actually knew tbe country from personal examination, and it can not be doubted that if the Pawnee Picks, as he called them, or any other Indians had had a settlement within that country, he would both have known the fact and would have reported it.
In the record are certain Indian statements which largely rest upon the traditions of the Wichitas. The most important of these and carrying the greatest weight in establishing an occupancy of the country are the statements of two aged members of the tribe named Ut-tuts-kins and Es-quetcli-ckee (Old Man), and of Niastor, chief of the Towaconies. (Sen. Ex. Doc. 13, 48th Cong., 1st sess., 32 et seq.) These are supplemented by the opinions and information of Horace Capron set forth in his report as special Indian agent for Texas, which in itself is a strong statement of the Wichita case.
Respecting these traditions, there is such an apparent want of any certain knowledge in the persons from whom the information is professed to have been derived, and such absolute want of competent knowledge on the part of the declarants of those material things to which they profess to speak, the statements do not address themselves to the court as possessing any great value, even if admissible as traditionary evidence under the principle relating to ancient boundaries. Neither the circumstances under which the testimony seems to have been derived nor the number and situation of the witnesses entitle the traditions to that credit usually attached to such evidence, weak though it may be at best.
Things transmitted from one generation to another in the lapse of time must necessarily come to be surrounded with much of error and untruth. Such is the case with matters of oral communication not covered by the written memorials of intelligent people. What, then, must be said of the traditions of a race of rude red people, whose reason was weak and imagination strong; who worshiped the sun and danced in the light of the moon to music made from the shin of snakes; of the children of Nature, whose superstitions led them to revel in stories of witchcraft and evil spirits, and whose powerful imaginations, fed by these superstitions, originated the weird tales respecting their origin and lineage?
With limited ideas of their ancestry, knowing but little of places whence their fathers came, an experienced traveler has *69 testified that they could only speak upon the subject in general terms, and that in some instances, where their term of residence in a place was of short duration, they would either lose or conceal their knowledge of a country whence their ancestors came and assert that the Master of Life had created and planted their fathers on the site where they, their posterity, then lived. (II Long’s Expedition, 371.)
The pages of fiction contain nothing more fanciful than the story of Pushmataha, founder of a dynasty and the white man’s friend, who, according to the story of his race, sprang, full armed, from the splinters of a pine tree as it was shivered by the lightning’s flash. And yet this mythology of a race whose descendants are now before us as claimants finds its counterpart in the Wichita tale that their ancestors sprang from the rock of the Wichita Mountains. As proof, the one story is of no greater value than the other, and the Wichita theory of their origin is of no more importance than the early story of the Choctaws, who, according to Gayarre, ascribed their origin to Kamsohatka.
But it is said that Albert Pike, when on the Red River in 1832, heard of a tribe called Pawnee Piets, living in villages in the vicinity of some mountains north of Red River, cultivating the soil near by, and who had, as his informants expressed it, “lived there always.” That the Indians have lived in the neighborhood of Red River for a long time, though at different points, is substantially true, and the expression must be taken as meaning probably no more than that. If the expression meant the site of the particular village it was not true, and the statement can not be relied upon even as evidence that the Wichitas had lived there a long time.
Ski-sa-ro-ka, “an intelligent Toyash,”told Dodge “that their nation lived formerly south,” a statement which is opposed to the theory of a migration from the north. (Am. State Papers, Mil. Affs., vol. 5, 381.)
Albert Pike was the commissioner of the Confederate States who made treaties with the reserve Oomanches and other small tribes. Among these were the Wichitas, first known to him as the Ta wai hash, and so called in the treaty. This was in August, 1861, at which time the Wichitas, or Ta wai hash, preferred a claim to him for compensation “ for the country south of the Wichita Mountains on Cache and Clear creeks,” *70 and the treaty agreed that their claim for compensation should be considered and examined, and that which might be found just and right should be paid to them. Pike expressed the opinion in his letter to the Secretary of the Interior that when the United States sold their country to the Choctaws and Ohickasaws an indisputable claim, by long-continued occupancy and possession and partial cultivation, to the country west of Cache Creek, between the mountains and Red River, to an indefinite distance west, existed in the Wiehitas, for which they ought in common justice and honesty to be paid.
But General Pike possessed, no personal knowledge that the Wiehitas had occupied tbe leased district from time immemorial, and there are no circumstances which lend to his opinion the force of testimony. His letter was merely the expression of an opinion resulting from a promise to repeat in writing what, preceding the date of his letter (July 12, 1882), he had said to the ¡Secretary of the Interior in regard to the Wichita tribe. The statements made by him were not under oath, and while their integrity is not questioned as far as his knowledge went, the most that can be said for them is that the Wiehitas preferred a claim to him for a small part of the leased district now known as the southern end of the Kiowa and Comanche Reservation. The claim then made does not include the present Wichita Reservation.
Gatlin’s North American Indians shows the Pawnee Piets and Wicos on the Red River about latitude 35° 10’ N., longitude 103° lo' W. This would be in the ‘‘'panhandle ” of Texas. (Rec., XT. 8. v. Texan, .supra 171.)
General -Bee found a Wichita village on Cache Creek about 30 miles from its mouth. (Rec., XT. 8. v. Texan, pp. 1219, 1221, 1225.) It does not appear how many of the tribe lived on Cache Creek nor how long they had lived there. The proofs are numerous that the residence of the Wiehitas was in Texas between 1830 and 1850.
The following maps show a Towiash village on the Big Wichita west of the ninety-ninth meridian, to wit: Lee’s map of Texas, 1836, reproduced in United States v. Texas, 184; Austin’s map of Texas, 1837, reproduced in United States v. Texas, 292; Hunt & Randel’s map of Texas, 1839, reproduced in United States v. Texas, 108 and 1016; Arrowsmith’s map in Kennedy’s Texas, 1841; I)e Cordova’s map of Texas, 1849. This shows a “Tanawash” village west of the one-hundredtli *71 meridian and a village on the south side of Fed Hi ver just above the mouth of the Big Wichita. Young’s map, published by Mitchell in 1838 (U. 8. v. Texas, 292), shows a Towiash village north of the Bed Biver, west of the one-hundredth meridian, omitting the Big Wichita altogether; but this map was admitted by Kennedy to be inaccurate, who reproduced it in his book merely to show the location of land grants. (Kennedy’s Texas, vol. 1, p. 336.)
Besides the maps there are other proofs of the residence of the Wichitas in Texas. In alliance with the Wacos were the Pawnee Piets, or Toweashes, residing on the Bed Biver, sometimes on the side of the United States and sometimes in Texas. (Kennedy’s Texas, 1841, p. 349.)
Beferring to the Towaccanies and Toweash, who were said to resemble each other and are often found associated in the same village, it is stated that they live high up on the Colorado, above San Saba. (Moore’s Description of Texas, 1844, p. 32.)
The Whacoes, Tawacanies, Toweash, Aynies, San Pedros, Nabauchoes, Nacadochuts, and Hitchies are small tribes, fragments of tribes long resident in Texas and properly belong to it. Originally, Hitchies excepted, they are of the Caddo stock, being offsets from that family. (Statement of David G-. Burnet, August, 1847; 1 Schoolcraft’s Information Bespecting Indian Tribes, 239.) A Wichita chief called Ta wak o nee Jim testified in United States v. Texas (Bee., 634) that he was born in 1843 in Texas, and came to Fort Sill when about 10 years old, and that the Wichitas used to live at the To wako nee Hills in Texas.
Two years before the annexation of Texas the republic of • that name established a bureau of Indian affairs. All the country west of a line drawn from Bod Biver to the Bio Grande through the five posts established was Indian country, from which settlers were to be excluded except by special permission. (Act Jan. 14, 1843, Tex. Laws, 19.) On the annexation of Texas, in 1845, jurisdiction over the Indians therein passed to the United States, and the Commissioner of Indian Affairs made a report declaring it to be necessary to organize a branch of that department within the boundaries of the territory acquired. He says:
“Owing to the unsettled condition of the Camanches, Witchetaws,andothertribeswholeadawanderinglife, * * * sometimes being in Texas and sometimes in the United States, *72 it has been impossible to extend over them the eye of this department. They have neither belonged hitherto to the one Government nor the other.” (Sen. Doc. No. 1, 29th Cong., 1st sess., p. 454.)
In 1846 the habits of the Indians within the Texas border were reported as so uncivilized and so predatory and wandering that correctness as to their number could not be. relied upon. This report shows that the Toweash, Waco, Towagany, and Wachita Indians were on the Red River above the Cross Timbers, with their villages on both sides and near each other. (Pitchlynn’s report, Jan. 19, 1846, to the Commissioner of Indian Affairs.) In March, 1846, commissioners met chiefs of the Comanche, Mescalero (Lipan), Tawakoni, Waco, Keeehi, Kickapoo, Wichita, and “Toweash”. tribes at Comanche Peak, and held a talk with them in regard to a cessation of hostilities and horse stealing. This resulted in the treaty of May 15, 1846 (9 Stat., 844). This treaty was made in Texas, with Texas tribes, because of the sovereignty which the United States had acquired over them by the annexation. (We fail to see anything in the suggestion of the counsel for the Wichitas that the United States failed to carry out this treaty.) In 1847 a special Indian agent for Texas went to the village of the Wacos, Witchetas, Tab wah ca roos, and Keechies and compelled the return of stolen horses. This village was situated on the Wichita River, and the six tribes met there were reported as making corn to a considerable extent. (Sen. Ex. Doc. No. 1, 30th Cong., 1st sess., 894-896.) If this statement be true, the main Wichita village was on the Wichita River •(i. e., the Big Wichita, where the village is shown on De Cordova’s map), while another village was near the Brazos. If the Wichitas lived on Cache Creek near Mount Scott at that time, it could only have been but a few families. In 1849 the Chickasaw agent reported the Wichitas and other Texas Indians as living in the western part of the Chickasaw country. (Ex. Doc., 31st Cong., 1st sess.) Catlett’s report of that year (ibid., 968) stated, however, that they lived upon the Brazos head of the Trinity and upon the Big Wichita. Agent Neighbors, to all intents and purposes, confirms this report, and consequently before they could have been living in the Chickasaw country.
In 1851 the Wichitas * * * together with about eighty warriors from the Caddoes, W acoes, and Keechies, together *73 with a small proportion of women and children, were reported to have “within the last two years left Texas, and are now inhabiting the Wichita Mountains beyond Bed Biver.” (Sen. Ex. Doc. No. 1, 31st Cong., 1st sess., 523.) This is the first evidence of a residence north of Bed Biver aside from the fraction of a village shown on that side many years before.
In 1851 the Indian agent reported the Wichita population as not over 500 souls. Two years later he reported the population to be 314. (Sen. Ex.JDoc. No. 00, 34th Cong., 1st sess., p. 37.) On July 19, 1852, Marcy passed the deserted Wichita village on Cache Creek, and three days later he came upon the new Waco and Wichita villages on Bush Creek, built after the removal from Texas reported by the agent in 1851. Marcy was probably ignorant of the fact that the Wichitas, or most of them, had been living in Texas. His report must be taken for what it is worth. He was of opinion that their claim to the country around the Wichita Mountains was guaranteed to them by the right of occupancy and possession. (Sen. Ex. Doc. No. 54, 32d Cong., 2d sess., pp. 69, 72, 77.) We attach no value to his opinion.
No treaty of limits has ever been made with the Wichitas. If they were the substantial people iu the early days they now claim to have been the omission to treat with them is remarkable. If the United States did not favor the peaceful and friendly tribe having some permanent abode, it was not because there was any desire to establish friendly relations with wandering savages at the expense of those willing to aid the pioneer whites in civilizing the country.
During the times the French, Spanish, Mexican, and Texas governments had dominion over .the tribe the Wichitas were not recognized as aboriginal possessors of the soil. Ignored for two centuries by the political departments of five governments, how can the judiciary now establish limits of territorial occupation for them without something more specific than what we have to tell where their limits began and where they ended in that vast region known as the Great Prairie west of the Gross Timbers? —
We find as a fact that even if the Wichitas occupied any portion of the prairie they did not do so alone. Their claim, then, can not be considered an exclusive claim. Prior to 1833 twenty-seven other tribes resided between the Bed Biver and the Canadian. And some six years before the removal of the *74 Wiebitas to their present reservation the Northern Oomanches and Kiowas were reported as numbering 18,950, while the Southern Comanches were placed at 1,000 in number. (Eeport Actg. Supt. Howard, 1852.) Whatever their number in the eighteenth century, these last three bands roamed over the prairies and were certainly as much prairie Indians as any others. They were more numerous than the Wichitas, and, making greater use of the prairie, were more entitled to be called prairie Indians.
Which of these tribes was first on the prairie does not clearly appear, but as the entire region was used indiscriminately by the various bands, and all were there in common from time to time, one insignificant band can not now be deemed to have held the only original occupation of the country.
The failure of the Wichitas is greater still to show an established occupancy ahead of others to the reservation in suit, in the sense of Indian occupation, until a date comparatively recent. It is quite probable that from time to time they passed over it while roaming over other parts of the country north of Eed Eiver, but it is doubtful if their claim to the reservation would ever have been given life but for the act of the Government in quartering them upon it after the Choctaw lease of 1855.
From all that appears in their earlier history we find that the Wichitas were inhabitants of the country now constituting the present State of Louisiana, whence they were driven by the Ohickasaws into the Caddo Nation, which about the middle of the eighteenth century was in northwestern Louisiana and northeastern Texas. For years before the annexation of Texas they were as much the subjects of foreign control and jurisdiction as one of the domestic tribes within the jurisdiction of the United States.
The court would be lost in the realms of conjecture in attempting to- reconcile the different theories of the origin of the Wichitas. One of their traditions places the main tribe on the Neosho Eiver, in Kansas, about 1781, from whence two bands left the main tribe, one taking up a residence in Texas and the other locating near the present town of Wichita in Kansas. Modern reports class them as Wacoes and Towa-conies, and virtually one people. The three tribes speak the same language, and those Wichitas prosecuting the present *75 claim presumably came out of Tesas. The Wacoes and Towh-conies lived there beyond the prairies and pretend to nothing in the way of an interest in the land except under recent agreement.
We deem it unnecessary to pursue the inquiries into this branch of the case further. The main issues have been presented. The labyrinth of detail, if fully stated, would but serve to encumber the record. Our conclusion concerning the matter of occupation is that the Wichitas have not established such an occupancy of the land in suit at the time of its acquirement by the United States as would support the customary Indian title, or possession of such character that the United States can now recognize or is under obligation to protect for purposes of compensation.
We are strengthened in this conclusion not alone by the fact of the purchase of the land from others claiming to be inhabitants of the country, but by the reports of the agents of the United States and the action of the executive and legislative departments of the Government thereunder; the subsequent sale of the country to the Choctaws in 1820 under the supposition that the rights of the aboriginal occupants had been extinguished; the confirmation of the sale to the Choctaws in 1830 as to the reservation in suit; the subsequent admission of the Chickasaws to certain rights; the lease of the land in 1855; the agreement which in 1859 put the Wichitas and their affiliates on the land, and, finally, the failure of the Wichita defendants to assert any claim of prior occupation at the time of the agreement which admitted them to possession. Every presumption is against them as rightful inheritors of the country which the proofs have not overthrown. We therefore dismiss this part of their claim, remitting to further consideration the agreement which established them on the reservation and the extent of their rights measured by that agreement alone.
The Quapaw occupation need only be considered with reference to the extent of country occupied by them with relation to the territory ceded to the Choctaws.
It is entirely possible that the territory actually occupied by the Quapaws did not extend as far west as the cession would indicate, but we know that they were a tribe friendly to the whites who lived west of the Mississippi Eiver, and that they asserted dominion over an extensive scope of country in Arkan *76 sas and beyond. Except when tbe Osages, with whom they were often at war, did not successfully dispute their sovereignty, they attempted to exercise dominion over all they claimed. The Osage feud and the varying chances of war probably diminished their right to some of the country as an exclusive claim, but that is a question foreign to this cause. According to Clark and Chouteau, the Osages and other governments considered all the property included in the Quapaw cession as belonging to that tribe. (Amer. State Pap., vol. 11, Ind. Affrs., 177.)
The cession discloses some doubt on its face as to the extent of their possessions, but is sufficiently certain to include the leased district. Certain Quapaw “claims” are mentioned in the cession, but they relate to “land east of the Mississippi and north of the Arkansas River,” and these claims were transferred with country more certainly thought to be owned by the Quapaws. The country west of the Mississippi and south of the Arkansas included in the cession is referred to not as territory merely claimed by the Quapaws, but as territory which both parties accepted as Quapaw country without referring to it merely as country “claimed.” As to this, the Government believed that the Quapaws were in unquestionable ownership, not only because that tribe was found in possession, asserting dominion, and using it as a part of their territory, but because others were not found on the land asserting claims or in position to assert any. These coincidences made up rights of occupancy by the tribes, unilke the paper muniments of title prevailing among civilized people.
The contention that the Quapaws never laid claim “of their own accord” to anything but a small tract of land, the boundaries of which bear much resemblance to the reservation retained by them, and that through the machinations of the whites they were led to claim more than they would have done of their own volition is not proven. There is reason to believe that the treaty with the Osages, subsequent to the Quapaw treaty, embracing a part of the same land, grew more out of the desire of the United States to keep the peace among the Indians than by any belief that the Osages had any real title to the country acquired in the cession from them, which had previously been included in the Quapaw cession. But this fact does not help the Wichitas. For, as between two tribes, like the *77 Osages and tbe Quapaws, wbo were willing to stay in a country and bunt over a large portion of contiguous territory and figbt for tbe right to do so, it is not probable that a wandering band, like the Wichitas, indigenous to no place and unwilling to contend with their more warlike neighbors, had any such equal claims.
There is less reason to suppose that the United States in first treating with the Quapaws sought to extinguish their supposed or exaggerated claims to the country than to believe that by the subsequent treaty with the Osages the object was to extinguish their real claims to previously acquired possessions. Without something more tangible on the subject than that before us we must conclude that the Osage treaty, covering a part of the leased district, evidences the interest which that tribe was willing to quitclaim to the United states and the Government was willing to buy, rather than the transfer of any substantial right to the land acquired from the Quapaws.
What rights did the Wichitas acquire in these lands by virtue of the treaty of August 24, 1835! And did the United States and the Choctaw Nation acknowledge the Wichita title by occupancy to the Great Prairie which they are now estopped to deny! (7 Stat. U, 474.)
Texas at the time of that treaty had not been admitted to the Union, and the territory covered by its terms lay anywhere between the United States and the settlements and hunting grounds of the Indians named in the treaty and the Bepublic of Mexico within the meaning of its third article ; and covered all of the country north of Bed Biver within the meaning of its fourth article, which are only material to notice in this connection.
It can not be determined from the proof precisely where this treaty was made, but it could not have been far from Bed Biver. Its effect as a grant and an acknowledgment of a Wichita title by occupancy are material to consider.
The treaty of 1835 was the result of an expedition sent out by the United States to our western border under the command of Colonel Dodge. On July 22,1834, Colonel Dodge made an address to the Toyash chiefs and warriors, in which he stated that his party were- the first American officers who had ever come to see the Pawnees, and that they had met as friends, not as enemies, to make peace; that the great Ameri *78 can chiefs wished also to make peace between them and the Osages, who had been at war with the 1'awnees, and to secure peace also between them and the Oherokees, Senecas, Delawares, Choctaws, and all other red men. It was shown to the Wichitas that the American officers had met a party of Comanches, with whom it was also desired they should be at peace. (Doc. 2, 23d Cong., 2d sess.) -On the next day a similar address was made to the Comanches, but supplemented by a statement as follows:
“You say that the Indians over Red River are your enemies. They kill you when you meet. These are Mexican Indians and do not make treaties with our greatfather, the President. But he will protect yon when you make peace with the Osages and other tribes that have been at war against you.” (Doc. 2, 23d Cong., 2d sess., p. 83.)
Major-General Macomb, in giving an account of the expedition, says that Colonel Dodge held a council with the Comanches and Pawnees (or Toyaslas), the Kiowas, and the deputation of Indians which accompanied him, amounting in all to about 2,000 persons, explaining the object of the expedition, and that he was instrumental in bringing about a friendly intercourse between several hostile tribes. (Ibid., p. 44.)
The official report of the Secretary of War shows “that some of the western tribes of Indians roaming through the extensive prairies west of Arkansas and Missouri, particularly the Comanclies and Kiowas, have for some years interrupted the peace of that quarter by predatory attacks upon our citizens, and upon the indigenous and emigrant Indians whom we are under obligations to protect. * * * The dragoons were ordered to establish permanent tranquillity; and if this should fail, to repel any hostile demonstrations which might be made. The object of the expedition was obtained without a single act of hostility.” (Ibid., pp. 33,34.)
The President informed Congress in his message of the movement “into the territory of the wandering and predatory tribes inhabiting the western frontier and living adjacent to the Mexican boundary, known principally by their attacks upon our own citizens and upon other Indians entitled to the protection of the United States,” and that the object of peace had been effected. (Ibid., 17.)
The treaty accomplished then what was contemplated to be done. The preamble states that it was entered into “for the *79 purpose of establishing- perpetual peace and friendship between the United States and the Comanche and Wichita nations and their associated bands or tribes, and between those nations or tribes and the Cherokees, Muscogee, Choctaw, Osage, Seneca, and Quapaw nations or tribes of Indians.” Whatever rights then recognized or given were incidental to the main object of peace, and the treaty was not one of limits or of cession.
The first and second articles provide for perpetual peace and forgiveness for past injuries.
Article 3 provides:
“ There shall be a free and friendly intercourse between all the contracting parties hereto, and it is distinctly understood .and agreed by the Comanche and Wichita nations, and their associated bands or tribes of Indians, that the citizens of the United States are freely permitted to pass and repass through their settlements or hunting grounds without molestation or injury on their way to any of the provinces of the Republic of Mexico,” etc.
Article 4 provides:
“ It is understood and agreed by all the nations or tribes of Indians, parties to this treaty, that each and all of the said nations or tribes have free permission to hunt and trap in the great prairie west of the Cross Timbers to the western limits of the United States.”
Article 5 provides:
“ The Comanche and Wichita nations, and their associated tribes or bands of Indians, severally agree and bind themselves to pay full value for any injury their people may do to the goods or other property of such traders as the President of the United States may place near to their settlements or hunting ground for the purpose of trading with them.”
Article 6 provides:
“ The Comanche and Wichita nations, and their associated bands or tribes of Indians, agree that in the event of any of the red people belonging to the nations or tribes residing south of the Missouri River and west of the State of Missouri, not parties to this treaty, should visit their own towns or be found in their hunting grounds they will treat them with kindness and friendship and do no injury to them in any way whatever.”
The treaty was not signed by any of the associated bands, and for this reason it is contended that they were not parties to the agreement. This is true as far as any obligations to or from the associated bands extended, but not true in the sense that the signatories did not recognize them to be in possession *80 of such settlements and bunting ground on tbe way to tbe Republic of Mexico from tbe United States, as were possessed by tbe others. In any event, whatever rights were conceded to be in tbe Wicbitas tbe same rights were also recognized to be partly in tbe Comancbes, so that if the few hundred Wicb-itas in existence at that time bad settlements and bunting grounds in tbe pathway of travel from tbe United States to Mexico, then numbers of Oomanehes bad settlements and bunting grounds along tbe same route.
Tbe contention that the Comancbes were improperly joined because of the probability that they were in Texas can not be accepted in the face of the treaty which recognized the Comancbes to be in tbe United States as well as in Mexico; and as Colonel Dodge found a large body of them not far from tbe border, as be did tbe Wicbitas and tbe associated bands, and both Comancbes and Wichitas treated for a common purpose, tbe Comancbes can not be held to have been improperly joined. That all of tbe associated bands and Wicbitas, as well as,Comanches, roamed in one country about as much as in the other, and had been living in Mexico as well as in the United States, appears in tbe history of that time. They were all regarded as land pirates of tbe great West who depredated upon tbe Mexicans of the interior States and murdered our own people on the road from St. Louis to Santa Fe (Eaiues’s report to Lewis Cass, Secretary of War, Mar. 11, 1836), and were on Eed Eiver, sometimes in the United States and sometimes in Texas, in alliance with the Wacos and tbe Cad dos as far as the Pawnee Piets were concerned. (Eep. Tex. Oommr. Ind. Affs., Nov. 3,1838; Sen. Eep. 171, 30th Cong., 1st sess., 47; Kennedy’s Texas, vol. 1, 349.) Fragments of tribes', separately considered and quite insignificant, include the Toweasb, “ long resident in Texas ” and properly belonging to it. (Statement of tbe President of tbe Texas Eepublic, Aug. 20,1847; 1 Schoolcraft, 239.)
Whatever presumptions arise from tbe recitals respecting tbe settlements of tbe border tribes, tbe references relating to such settlements apply to tbe year of tbe treaty. This was seventeen years after the extinguishment of the Quapaw title and ten years after the Osage quitclaim. And it does not appear when tbe border tribes established their settlements or to what extent or where. The evidence leaves no room to *81 doubt that whatever settlements the Oomanches, Wichitas, and associated bands possessed they were either on the border or close to it, but when they got on the American side is not shown. Even if on the American side there is no proof showing any of the settlements on the immediate lands in controversy. There is a gap in the history of the Wichitas from the time Sibley mentions them, in 1805, to the time Dodge visited them, in 1834. This the Wichitas admit (Rec., 1340), and the account they attempt to give of themselves in the meantime does not satisfactorily account for what they themselves admit.
Again, it is unreasonable to suppose that several thousand Choctaws would, for the sake of peace with a few hundred Wichitas, knowingly surrender large bodies of land which the larger tribe was very well able to defend, and as neither the Choctaws nor the United- States supposed the treaty referred to claims of any kind on the land, and the cession of territory was not the purpose of the treaty, neither the Choctaws nor the United States are estopped to deny the Wichita claim of prior occupation.
As the Choctaws and Creeks extended their occupation and improvements to the country acquired by them under grants from the G-overnment the Oomanches became dissatisfied. This led to a construction of the treaty of 1835 by the Indian Office. In 1837 instructions were given to the special Indian agent which, after calling his attention to the dissatisfaction of the Oomanches, directed him to explain to that tribe the matter so that they might understand the United States had purchased the lauds from the tribes possessing the occupant title and had guaranteed the exclusive right in the emigrant Indians. (Instructions to Agent Chouteau.)
The emigrant Indians included the Choctaws, and under the instructions Chouteau and another commissioner for the United States entered into a treaty on May 26, .1837, with the Kiowas, ICatakas, and Towacoros. (7 Stat. L., 533.) This treaty was in effect a construction of the previous treaty of 1835. It was, at least, inconsistent with any cession in 1835 to the Wichitas or others, and at variance with the idea that the Government supposed in 1835 it was making any admission as to the title to these lands.
But if the treaty of 1835 be considered an admission of Wichita occupation it, must also be construed with that of 1837 *82 as an admission of Osage, Quapaw, Seneca, Comanche, Mus-cogee, and Cherokee occupation. Neither treaty appears to us as an admission of title in favor of any tribe at the expense of the emigrant tribes who already owned the land under contracts, and who only agreed to share the privilege of hunting-on the land with the nomads of the treaty to secure the peace and quiet designed by the Government in the first instance.
The joint claim of the defendant Indians to the lands leased is based upon an alleged agreement made with the United States at Fort Arbuckle on July 1, 1859. This supposed agreement is not made the foundation of the Wichita claim, but as confirming their more ancient title and admitting the affiliated bands to an interest in it.
Under apprehensions of an attack from the Comanche tribe, the Wichitas in a body had abandoned their village at Bush Creek and retreated to Fort Arbuckle, in the Chickasaw country, in 1858. Under threats of extermination, a number of other tribes had fled from Texas to the same vicinity.
By the treaty between the United States and the petitioners in 1855 certain territory was leased for settling thereon a large number of Indians, described as follows:
* * * “ The Wichita and such other tribes or bands of Indians as the Government may desire to locate therein, excluding, however, all the Indians of New Mexico, and also those whose usual ranges at present are north of the Arkansas Eiver, but including those bands whose permanent ranges are south of the Canadian, or between it and the Arkansas.” (11 Stat. L., 613.)
That the defendant Indians were not to have exclusive occupation of the leased district, but only sufficient land for their actual occupancy, was contemplated, and that the Government intended to settle other tribes there is shown by the official history of the time. (Ind. Commr.’s Eeports, 1855, p. 473; 1856, pp. 566, 726; 1857, pp. 296,549; 1858, pp. 354,355-360, 526.)
Fifty thousand dollars was appropriated for the expense of collecting and establishing the Southern Oomanches, Wichitas, and certain other bands of Indians on reservations to be located south of the Arkansas and west of the ninety-eighth degree of longitude. (Act of March 3,1857,11 Stat. L., 183.)
The tribes whose permanent ranges were immediately south *83 of tlie Arkansas were tbe Gomanches^Kiowas, and Apaches, with whom the United States had made a treaty on July 27, 1853, wherein they are described as “inhabiting the said (Indian) territory south of the Arkansas River.” (10 Stat.L., 1013.) The authority to settle upon the leased district all Indians who properly belonged south of the Arkansas and east of New Mexico is clear, but when the district was first leased- it was not intended to place upon it the greater number of affiliated bands, viz, the Anadahkos, Caddoes, Tawakonies, Wacoes, Tonkawas, and Penetetkka Comanches, as they had but recently been placed on reservations in Texas, where they were doing fairly well, and the Texan hostility to them did not break out till the latter part of 1858. (Reports for 1855, H. Ex. Doc. No. 1, 34th Cong., 1st sess., pp. 330,497-505.) These reservation Indians, however, were as much within the purport of the provision for the use of the leased district as other Texas Indians. While the Choctaws and Chickasaws retained a right to settle in the leased district, it does not appear that any of them actually did so.
Besides the language employed in the treaty of 1855 respecting the purposes for which the leased district was obtained, we find that the western end of the Choctaw country was to be opened to the permanent settlement of the Southern Comanches, Wichitas, and such other Indians, within prescribed limits, as the United States might determine to locate therein. (Ind. Oommr.’s Rept., Nov., 1855, p. 329.) The Southern Comanches were nomadic savages, living in the central and southern part of western Texas, and numbered several thousand. The Penetethka Oomanches were not of the same band. They numbered something under 300 in 1855, in Texas, where they had just been placed on a reservation. (Ibid., 498.)
On March 30,1859, the Acting Commissioner of Indian Affairs instructed the superintendent within whose charge the leased district lay as follows:
“Fix upon a suitable location for the Wichitas, and make such examination of the country as will enable you to determine the proper places for locating and colonizing the Texas and other Indians which it is intended to place within that district. In carrying out this policy, the different bands, so far as they can not be united, are to be located upon distinct reservations, with circumscribed limits, containing only so much *84 land as may be necessary for tbeir actual occupancy and use. * * *
“ So soon as it may be practicable and safe for tlie Wichitas to remove to tlieir new location, you will require them to go there, giving them to understand that it is to be their permanent home. * * * The same understanding must be impressed upon the other Indians.”
On September 20,1859, the agent reported as follows:
“In pursuance of instructions from your office * * * I selected, in the month of June last, reserves on the Fausse Wachita River, near the old Kechai village, and about 40 miles northeast of the eastern extremity of the Wichita Mountains, in the river valley, on the south' side for the Comanches and other Indians from Texas, and on the north side, between the river and Sugar Tree Creek, for the Delawares and Cad-does, heretofore affiliated with the Wichitas or Ta-wai-hash; and for the latter and the bands of Kechais affiliated with them, I selected a reserve on the Canadian, some 25 miles west of those on the Fausse Wachita. (Sec. of Interior’s Rep., 1859, pp. 382-3, 533, 033.)
He further reported that, for reasons stated, he had included pasture lands in these reservations, making them much larger than was needed for cultivation. Their aggregate area was 154,240 acres.
Superintendent Rector, of the Southern superintendency, primarily represented the United States in the council at Fort Arbuckle. Major Neighbors and Albert Pike were officially associated with him in behalf of the Government. It is conceded that contemporary correspondence concerning the agreement alleged to have been made there is silent on the subject of what promises were made to the Wichitas and others (Rec., G30), but it is claimed that the evidence given since then by those present proves the contentions of the answer respecting the confirmation of the more ancient title of the Wichitas.
We deem it unnecessary to review the occurrences between the agents of the United States and the defendant Indians which led to their removal. We find as a fact that the tribes assembled at Fort Arbuckle were told that the Government would give to them for their occupancy reservations then established, containing 154,240 acres, for farming and grazing purposes, and that they would be allowed to hunt, when permitted to leave the reservations for that purpose, on any land within the leased district not specifically assigned to other Indians.
*85 The Indians who had fled from Texas got larger reservations by consenting to remove than the 12 square leagues they had while in Texas. These numbered three-fourths of the tribes present. The Wichitas and the remnants of other tribes, who constituted one-fourth of those present, then possessed the right to hunt and trap on the G-reat Prairie, but had been deprived of even that privilege to any appreciable extent by hostiles. This right was surrendered when they consented to go on the new reservation, but nothing more. The Texas Indians surrendered nothing which they were then either able to enjoy or claiming the privilege of enjoying.
The agents of the United States made no treaty with these people in 1859. Evidently the Government considered treaties to be unnecessary. The want of them does not relieve the Government of its duty to mate good its duly authorized promises; but no agreement, in point of fact, was made to give to the defendant Indians the leased land, and if by any construction there was, those representing the United States were without authority to make such agreement. Nothing stated then could bind the United States with respect to -the title to the reservation; still less could anything which occurred at Fort Arbuckle take from the Choctaws and Ghickasaws rights reserved by them under the treaty of 1855 in the leased land.
A Government astronomer employed to locate the ninety-eighth and one-hundredth meridians made a map of the leased district, writing across it the words “Leased country for Cad-does, Wichitas, Keecliies.” An army officer transmitted this map to the War Department with a letter alluding to the district as the “ Wichita country.” This is the origin of the name áxiplied to the reservation in suit.
The defendant Indians fled to Kansas during the war, but returned apparently to the same reservations in 1807. (Ind. Oommr.’s Kept., 1807, p. 23.) In the meantime, however, the Government had made a treaty with the Comanche and Kiowa Indians, October 18, 1865. (14 Stats., 717.) It was provided that a district bounded by the New Mexico line, a line from the southeast corner of New Mexico to the mouth of the North Fork, the Ked River to the ninety-eighth meridian, that meridian to the Cimarron, that stream to the Kansas line, to the New Mexico line, “ or such portion of the same as may hereafter from time to time be designated by the President for that pur *86 pose,” should be “ set apart for the absolute aud undisturbed use and occupation of the tribes who are parties to this treaty and of such other friendly tribes as have heretofore resided within said limits, or as they may from time to time agree to admit among them.” This district included the entire leased district; and ultimately the present Kiowa and Comanche Reservation was established within that district by th.e treaty of October 21,1867. (16 Stats., 581.) The Cheyenne and Arapahoe Reservation, disposed of by the Act of March 3,1891 (26 Stats., 1022), was similarly carved out of the leased district by Executive order of August 10,1869.
The title to Greer County was then in dispute between Texas and the United States. With the setting apart of the reservations above named the country covered in the present Wichita Reservation was left undisposed of and open.
An agreement between the Wichitas and the United States is offered in evidence as the only action of the Government looking to an extinguishment of the occupancy of the Wichitas of territory outside their present reservation to which that tribe was a party. This agreement appears to have been made October 19,1872. (Sen. Ex. Doc. 13,48th Cong., 1st sess.; Rec., 435.) The only importance claimed for it by the defendant Indians is that it first laid out the restricted bounds of the reservation in suit in which it was intended the Indian defendants should live.
The agreement purports to grant to the defendant Indians, for a home, the tract of country known as the Wichita Reservation in consideration of the cession by the Indians of all right, title, interest, or claim of any nature in and to any lands in Texas, Louisiana, Indian Territory, or elsewhere within thé limits of the United States. It was made on the part of the Indians by members of the tribe, professedly without authority; and on the part of the United States by the Commissioner of Indian Affairs, also without authority, and was never recognized by Congress until the act of March 2,1895, under which the rights of all the parties to this suit were to be ascertained. The agreement is therefore subject to the rights of the parties as ascertained by the courts.
The efforts to revive the agreement for any purpose is met at the outset by the absence of the claimants as parties to it and the fact that their rights can not be affected by it. Nor *87 can tbe defendant Indians claim title to tbe reservation assigned and at tbe same time be beard to repudiate tbe agreement for wbat it tabes from them. This they are attempting to do in asserting larger claims. If any trust of any character in the lands existed, it would be inconsistent in the United States to say that tbe agreement assigned homes to Indians which now can be taken from them by opening tbe lands to white settlement. The most that can be said for the agreement is that if valid for any purpose it became so for the assignment of homes to tbe tribes by tbe Indian Office, for which the tribes paid nothing, either in money or in land as the equivalent of money.
The questions in this case involving greater difficulty are: (1) The character of the estate conveyed by the Choctaw Nation to the United States by the treaty of 1806j (2) in what respect tbe rights of tbe petitioners have been violated, if at all, and to what extent, and (3) upon what basis, if any rights of the claimants have been violated, shall the interests of all the parties be adjusted?
Certain subordinate matters are necessary to be examined to properly interpret the treaty claimed to be violated.
Tbe Choctaws are an ancient race of red people whose early homes were east of the Mississippi River. The United States made their first treaty with them in 1786, by which certain aboriginal rights of the tribe as occupants of the soil were specially recognized. Thus, before the adoption of the Constitution, following the example of the discoverers of the continent, the United States began to recognize customary Indian rights in the Choctaws to lands occupied by them.
Before the Revolution the right to regulate trade with the Indians within tbe colonies was understood to belong to the prerogative of the Crown (Story on Const., sec. 1099), and Federal supervision and control of the tribes was conferred by the Constitution, which gave power to Congress “to regulate commerce with foreign nations and among the several States and with the Indian tribes.” (Const., sec. 8, art. 3.) The first Indian-intercourse act was passed July 22,1790, and was followed by the permanent act of 1802, which established Federal supervision over contracts for the extinguishment of Indian title to lands within the several States.
Difficulties were encountered in tbe enforcement of the intercourse laws, which resulted in tbe policy of removing tbe *88 tribes from tlie white settlements and segregating Indians upon reservations. Exchanges of l^nds were accordingly made by treaty with the tribes, not merely because of duty to a dependent people, but also because any other course was inconsistent with the public peace. The character of the titles obtained bythe Indians under these treaties have never been questioned. The lands conveyed to the Indians were qualified as to the fee in more or less degree, while those given in exchange to the United States by the Indians generally conveyed whatever rights of occupancy the Indians had.
When the Louisiana territory was acquired Congress manifested its policy of removing Indians by authorizing the President to exchange for lands occupied by the tribes east of the Mississippi Eiver the country owned by the United States lying west of the river, where the tribes would be free from the encroachments of the whites and under the general superintendency and protection of the Government. (Act March 26, 1804; 2 Stat. L., 283.)
In 1817 Mississippi was admitted to be a State in the Union, and some of the lands occupied bythe Choctaws were wanted, and as the result a treaty was concluded between the United States and the Choctaw Nation October 18,1820, in which the removal of the tribe was provided for in part upon the assurance that the objects of the United States were grand and humane in the promotion of their civilization and their perpetuation as a nation.
In consideration of the cession to the United States by the first article of the treaty of the land therein mentioned lying in Mississippi by the Choctaws, the second article of the treaty, “ and in part satisfaction for the same,” ceded to the Choctaw Nation a tract of country west of the Mississippi Eiver situate between the Arkansas and Eed rivers and bounded as follows:
“ Beginningon the Arkansas Eiver where the lower boundary line of the Cherokees strikes the same; thence up the Arkansas to the Canadian fork, and up the same to its source; thence due south to the Eed Eiver; thence down Eed Eiver, three miles below the mouth of Little Eiver, which empties itself into Eed Eiver on the north side; thence a direct line to the beginning.” (7 Stat. L., 211.)
By treaty of January 20,1825 (7 Stat. L., 234), the eastern boundary line of tlie Choctaw Nation, as defined by the first treaty, which took some of those people west of the Missis *89 sippi, was modified by tbe retrocession to tbe United States of a fraction of tbe land first acquired in 1820 by tbe Cboctaws from tbe United States. But no land was retroceded in tbis readjustment of boundary lines by tbe Cboctaws from tbeir possessions on tbe west. So, if by tbe treaty of 1820 tbe Cboctaws acquired title to any territory beyond the one-bundredtb meridian, that title remained unimpaired so far as any agreement was concerned.
Tbe defendants say that prior to tbe cession to tbe Choctaw ¡Üation tbe land west of tbe one-bundredtb meridian bad been ceded to Spain. Tbis contention will be examined later, but for tbe presentís noted to array tbe facts in consecutive order.
Tbe treaty of 1820 did not satisfy -the demand for Indian land, and the enactment of certain laws subjecting tbe Indian occupants to local government caused tbe United States to take steps looking to tbe establishment of the Cboctaws on tbereservation westof theMississippi, which resulted in another agreement, under which' assurances were given that upon tbe removal of tbe tribe they were to be free from tbe presence of white men.
By the treaty concluded September 27,1830, called the treaty of Dancing Babbit Creek, it was provided in tbe third article (7 Stat. L., 333) that tbe Choctaw Nation should and did thereby cede to tbe United States the entire country they then owned and possessed east of the Mississippi Biver, and that they would remove as early as practicable; and that tbe Choctaw Nation should and did surrender to tbe United States all the remaining lands at that time owned by them in Mississippi. Under tbis treaty tbe body of Choctaws removed from their possessions east of tbe river to the lands purchased and acquired by them west of tbe river under the terms of tbe treaty of October 18,1820, as modified in 1825, and as tbe limits were defined in tbe treaty of Dancing Babbit Creek. Thus, there was no cession of lands east of tbe Mississippi Biver for lands west of that river by tbe treaty of 1830. Tbe exchange made in 1820 left tbe Cboctaws with 10,000,000 acres of land, which by tbe treaty of 1830 tbe United States got for nothing.
Tbe amount and sufficiency of tbe consideration received by tbe Cboctaws for their possessions need not be considered. Whether tbe bargain which dispossessed them of tbeir early possessions and gave to them other land was upon adequate *90 consideration, and whether their removal was forced upon them and how it was done, is no part of our duty to consider. It is enough to say that the Choctaws had substantial rights to barter; and in surrendering lands and agreeing to move and carry out agreements the Choctaws furnished a sufficient consideration for whatever contracts the Government entered into with them respecting their n ew possessions. The treaty agreements had all the necessary elements of binding contracts. {Foster v. Feilson, 2 Pet., 314; Head Money Oases, 102 U. S. R., 540.)
The reasons that prompted the Government to contract for the change of domicile of the Choctaws and Chickasaws also moved the authorities to treat with the Cherokees, the Creeks, and the Seminóles. These tribes and the petitioners together had their early homes in Tennessee, Georgia, Alabama, and Mississippi. Seven treaties were made with the Cherokees between 1785 and 1835, and nine treaties were made with the Creeks, beginning in 1790 and ending in 1833. Two treaties were made with the Seminóles, who constituted a branch of the Creeks, in 1834. (7 Stat. L., 423.) Most of these treaties related to the rights and claims of the tribes as occupants of the soil east of the Mississippi, and were based on the same political motives which actuated the Government to obtain the title in the case of the Choctaws.
Under the trade and intercourse act of June 30,1834, Congress provided that u all that part of the Gnited States west of the Mississippi and not within the States of Missouri and Louisiana or the Territory of Arkansas,” should, for the purposes of the act, be considered the Indian country. Reduced by the successive formation of States and Territories the remainder now constitutes the Indian country. Under the policy which secured the removal of the southern Indians other tribes were at various times removed to that region from different parts of the country, but some of them now there are indigenous to the soil.
The treaties with the Cherokees, Creeks, Seminóles, Choctaws, and Chickasaws, providing for their removal, were executed nearly contemporaneously, and, having the same objects and purposes, contained many similar provisions. Under them these five tribes were placed near each other in the Indian country. There they formed Indian governments, unmolested *91 for many years by the whites, becoming known as the Five Civilized Tribes, and their institutions prospered as no other experiment of the kind, before or since, has done among the Indians, without any great degree of intelligence among the masses, it is true, but in a manner generally satisfactory to the Government.
In contracting with the Five Tribes the Government intended, and the Indians expected, that the exchange of lands would insure to the tribes permanent homes and local self-government not inconsistent with the Constitution of the United States and the acts of Congress regulating trade and intercourse, but free from white intruders. Messages of State and Territorial governors, letters from heads of Executive Departments, propositions of commissioners authorized to deal for the Government with the tribes, and general history abound in statements which prove the inducements held out to the tribes to be as stated, if they would but make an exchange of lands. These official and historical statements need not be repeated in detail as judicial notice will be taken of them. Guarantees followed each treaty, or were a part of each, substantially securing to the tribes (which included the Choctaws) governments of their own, unembarrassed by white intrusion or the jurisdiction of any State or Territorial government.
The act authorizing the President to cause a patent or grant to be made to a tribe for their new possessions was pursuant to the policy of keeping the whites away from the Indians. (Act of May 28, 1830, 4 Stat. L., 411.)
The early treaties with the Cherokees, the Creeks, and the Seminóles are mentioned because subsequent treaties with them will hereafter be noticed as serving to explain the dealings of the Government in its attempt to secure more land for (he use of Indians without reservations; and they illustrate, in part at least, if they do not materially interpret, the treaty made with the Choctaws and Chickasaws when the Government came to treat with those tribes for the land described in this suit.
The treaty of 1830 stipulated that the United States should issue a patent to the .Choctaw Nation as follows:
“Article 2. The United States, under a grant specially to be made by the President of the United States, shall cause to be conveyed to the Choctaw Nation a tract of country west of the *92 Mississippi Biver, in fee simple, to them and tbeir descendants, to inure to them while they shall exist as a nation and live on it, beginning near Fort Smith, where the Arkansas boundary crosses the Arkansas Biver, running thence to the source of the Canadian Fork, if in the limits of the United States, or to those limits; thence due south to Bed Biver, and down Bed Biver to the west boundary of the Territory of Arkansas; thence north along that line to the beginning.”
Besides the patent promised to the Choctaws, the United States obligated themselves, by the fourth article of the treaty, to secure to the Choctaw Nation the jurisdiction and government of all the persons and property that might be within their limits west, so that no Territory or State should ever have the right to pass laws for the government of the Choctaw Nation and their descendants; no part of the land granted them should ever be embraced in any Territory or State; but the United States should forever secure said nation from and against all laws except such as from time to time might be enacted in their own national councils, not inconsistent with the Constitution, treaties, and laws of the United States, and except such as might, and which theretofore had been, enacted by Congress, to the extent that Congress, under the Constitution, were required to exercise and legislate over Indian affairs. It was. further provided that all intruders should be removed from the Choctaw Nation and kept without.
Private property was to be always respected and on no occasion taken for public purposes without just compensation being made therefor to the rightful owner.
Pursuant to the stipulation the patent provided for was issued to the Choctaw Nation, of which the following is a copy:
“The United States of America, to all whom these presents shall come, greeting:
“Whereas, by the second article of the treaty begun and held at Dancing Babbit Creek, on the fifteenth day of September, in the year of our Lord one thousand eight hundred and 'thirty [as ratified by the Senate of the United States on the 24th day of February, 1831], by the Commissioners on the part of the United States, and the Mingoes, chiefs, captains, and warriors of the Choctaw Nation, on the part of said nation, it is provided that ‘the United States, under a grant specially to be made by the President of the United States shall cause to be conveyed to the Choctaw Nation’ a tract of country west of the Mississippi Biver, in fee simple, to them and their descendants, to inure to them while they shall exist as a nation and *93 live on it, beginning near Fort Smith, where the Arkansas boundary crosses the Arkansas Eiver, running thence toithe source of the Canadian Fork, if in the limits of the Un ted States, or to those limits; thence due south to Eed Eiver, and down Eed Eiver to the west boundary of the Territory of Arkansas; thence north along that line to the beginning, the boundary of the same to be agreeably to the treaty made and concluded at Washington City in the year 1825.
“ Now, know ye that the United States of America, in consideration of the premises, and in execution of the agreement and stipulation in the aforesaid treaty, have given and granted, and by these presents do give and grant, unto the said Choctaw Nation the aforesaid tract of country west of the Mississippi, to have and to hold the same, with all the rights, privileges, immunities, and appurtenances, as intended to be conveyed to them in the aforesaid article, in fee simple, to them and their descendants, to inure to them while they shall exist as a nation and live on it, liable to no transfer or alienation except to the United States and with their consent.”
The act of Congress of May 28,1830 (4 Stats., 411, supra), referring to patents to be issued to land, is as follows:
u Be it enacted, etc., That it shall and may be lawful for the President of the United States to cause so much of any territory belonging to the United States west of the river Mississippi, not included in any State or organized Territory, and to which the Indian title has been extinguished, as he may judge necessary, to be divided into a suitable number of districts for the reception of such tribes or nations of Indians as may choose to exchange the lands where they now reside and move there, and to cause each of said districts to be so described, by natural or artificial marks, as to be easily distinguished from every other.
“2. And be it further enacted,, That it shall and may be lawful for the President to exchange any or all of such districts, so to be laid off and described, with any tribe or nation of Indians now residing within the limits of any of the States or Territories, and with which the United States have existing treaties, for the whole or any part or portion of the territory claimed and occupied by such tribe of nation, within the bounds of any one or more of the States or Territories, where the land claimed and occupied by the Indians is owned by the United States, or the United States are bound to the State within which it lies to extinguish the Indiau claim thereto.
“3. And be it further enacted, That in the making of any such exchange or exchanges, it shall and may be lawful for the President solemnly to assure the tribe or nation with which the exchange is made that the United States will forever secure and guaranty to them, and their heirs or successors, the coun *94 try so exchanged with them; and, if they prefer it, that the United States will cause a patent or grant to be made and executed to them for the same: Provided always, That such lands shall revert to the United States if the Indians become extinct or abandon the same.”
The contention that the United States derived their sole authority to convey the lands covered by the patent to the Choctaws under the act of Congress of May 28,1830 (supra), relates to the defense of the Wichitas with respect to their claim as aboriginal occupants. They aver that no authority of law existed for the conveyance to the Choctaws by patent Tinder that act because the Wichita title as occupants had not been' extinguished when the patent was issued to the Choctaws. As the Wichitas have not shown any aboriginal title to extinguish and the United States have not denied the validity of the grant as far as admitted to be extended, it follows that for all the land the Choctaws acquired under the patent title thereto passed to them according to the recitals of the grants; but upon the theory that the Wichitas have rights as occupants their contention will be noticed.
By the first section of the act May 28,1830, the right of the Government to convey public lands to which title of the Indians had not been extinguished was limited, but the right to convey by treaty independent of that act existed as full as before the enactment. It has been held , that although the act might be applied to lands ceded to the Cherokees it did not necessarily apply under that treaty because a sale could be made directly by a treaty. (.Holden v. Joy, 17 Wall., 211.) In the case of a grant by the Government under these circumstances no doubt rights by virtue of occupation would be recognized in the form of compensation to those deprived of aboriginal possession by Government, interference, but the superior right of those claiming under a cession from the Government by treaty and without the patent is not open to discussion. (Beecher v. Wetherby, supra.)
The second treaty with the Choctaws providing for the cession of lands to them contains no allusion to the act of May 28,1830, and that treaty must be regarded as a confirmation of the cession made in 1820 within the limitations imposed by the terms of the last grant.
Even then, if the Wichitas possessed an unextinguished aboriginal title, the treaty with the Choctaws operated directly *95 upon the grant, free from any occupation claim on the laud itself, or for the value of the land as against the grantees. That was a matter between the Indian occupants and the United States.
The valid and binding force of the treaty of 1830 has been repeatedly recognized by various acts of Congress. One act provides for the satisfaction of all claims arising under the treaty. (Act of August 23,1842, 5 Stat. L., 513.) Another authorized a suit to be brought by the Choctaws in this court for the recovery of money claimed to be due them under the treaty. (Act March 3,1881, 21 Stat. L., 334.) In the case of The Ohoetaw Nation v. The United States the judgment in favor of the Choctaws largely rests upon the provisions of the treaty of 1830. (Ohoe. Nation v. U. S., 119 U. S. K., 1.) The treaty had been carried into effect and came within the rule declared in Holden v. Joy (supra), where it was said, “but it is not necessary to decide the question in this case, as the treaty in question has been fully carried into effect and its provisions have been repeatedly recognized by Congress.”
The Chickasaws were neighbors of the Choctaws east of the Mississippi Eiver. They were a distinct nation, occupying a large tract of country in Tennessee and Mississippi, and spoke practically the same language as the Choctaws. Efforts were made from time to time by the Government to remove that tribe, with the result that a treaty was made between the United States and the Chickasaws, which was proclaimed 1st day of March, 1833 (7 Stat. L., 381), by the first article of which these Indians ceded to the United States all of their property lying east of the Mississippi. By its second article the Government agreed to have the property ceded to it surveyed and sold, and another article provided for a payment to the Chickasaws of the proceeds of such sale as compensation for said lands. The Chickasaws agreed to hunt up and procure homes for their people west of the Mississippi, suited to their wants and, conditions. It was stipulated that should they fail to procure such a country to remove to and settle on, previous to the first public sale of their lands east of the Mississippi, they were to select out of the surveys in the Chickasaw Nation a comfortable settlement for their families, to include the then present improvements, if the land was good for cultivation, and if not, they might take it in any *96 other place in the nation unoccupied by any other person. Following this came the treaty of May 24,1834 (7 Stat. L., 450), in which it was provided that “ the Chickasaws are about to abandon their homes which they have long cherished and loved, and, though hitherto unsuccessful, they still hope to ñnd a country adequate to the wants of their people west of the Mississippi and within the limits of the United States. Should they do so, the Government of the United States hereby consents to protect and defend them against the inroads of any other tribe of Indians and of the whites, and agrees to keep them without the limits of any State or Territory.'17 Under these conditions negotiations were commenced between the Choctaws and Chickasaws, at the instance and under the • supervision of the Government, the result of which was that on January 17, 1837, a convention was entered into between the Choctaw and Chickasaw nations (11 Stat. L., 573), which was approved by the United States. Its third article provides as follows:
“Article 3. The Chickasaws agree to pay the Choctaws, as a consideration for these rights and privileges, the sum of five hundred and thirty thousand dollars, thirty thousand of which shall be paid at the time and in the manner that the Choctaw annuity of 1837 is paid, and the remaining five hundred thousand dollars to be invested in some safe and secure stocks, under the direction of the Government of the United States, redeemable within a period of less than 20 years, and the Government of the United States shall cause the interest arising therefrom to be paid annually to the Choctaws in the following manner: twenty thousand dollars of which to be paid as the present Choctaw annuity is paid, for four years, and the residue to be subject to the control of the General Council of the Choctaws, and, after the expiration of fouryears, the whole of said interest to be subject to the entire control of the said council.”
Under the agreement of 1837 the Choctaws sold to the Chickasaws certain rights and privileges, out of which grew some dissensions resulting in the treaty of J une 22,1855, proclaimed March 4, 1856 (11 Stat. L., 611), between the United States and those nations. By article 1 the boundaries of the Choctaw and Chickasaw country were defined, and the country guaranteed to the Choctaws and Chickasaws, subject to the rever-sionary rights of the United States.
By article 2 the Chickasaw district was reestablished to the ninety-eighth meridian on the west.
*97 By tbe ninth article tbe Cboctaws relinquished all their right and title to the lands which by the treaty of 1820 they claimed had been ceded to them, but which the United States had also ceded to Spain in 1821. The lands thus relinquished to the United States lay west of the one hundredth meridian.
And by this article the Choctaws and Chickasaws leased to the United States the district known to this case as the leased district, of which the Wichita Reservation is a part. ■
Negotiations which resulted in the treaty of 1855 began between the Choctaw delegates and the Secretary of the Interior about April 1, 1854. In a letter dated July 11, 1854, the Choctaw delegates announced that their country extended west to the source of the Canadian, and they threatened to take possession of that portion which they claimed lay west of the one hundredth meridian. The reply of the Secretary stated that he refrained from noticing some expressions in the Choctaw letter because he did not doubt they were used “ without due reflection,” but no specific answer was made to the claim of the Choctaws respecting the extent of their territory. About the 1st February, 1855, pending the negotiations, Robert L. Neighbors, an Indian agent for Texas, suggested the propriety of negotiating with the Choctaw delegates for a tract of land lying on the east side of Red River, “ for the colonization of the Wichita Indians and such other prairie Indians as may be convenient to that location.” (Sen. Ex. Doc. No. 13, Forty-eighth Gong., first sess., p. 15.) This suggestion impressed the Government, and accordingly the delegates were asked their terms for land to be used for the purposesindicated. They said they would take $400,000 for the lease of their country west of the ninety-ninth meridian for the purpose named. The Secretary of the Interior, on being informed of this, gave instructions to the Indian Commissioner as to the proposed lease, stating that, notwithstanding the claim of the Choctaws to the country west of the one hundredth meridian was regarded by the Department as without foundation in law or equity, yet further trouble might be prevented in regard to it by inserting an article in the convention then about to be held requiring the Choctaws to relinquish and abandon all right or claim to the land described. On being asked the terms upon which they would agree, the Chickasaws consenting, to lease the country between 98° and 100° and the Red and Cana-- *98 dian rivers for the permanent settlement of the Wichita and other bands of Indians, with an understanding that the Choctaws should relinquish and quitclaim in favor of the United States whatever interest they had in the country lying west of the one hundredth degree of west longitude, the Choctaw delegates replied that for the lease alone they would want $600,000, but $800,000 for the lease and relinquishment together, i. e., $400,000 for each. The Indian Commissioner then proposed that “ If the Choctaws will propose to lease to the United States the territory west of 98° and east of 100° west longitude, the Chickasaws assenting, and couple with it a relinquishment of all claim west of 100° west longitude, the Government will agree to pay them $600,000.” (Sen. Ex. Doc. No. 13, Forty-eighth Cong., first session, p. 15; Choc. Nat. v. U. S., 1292-1295.) This was accepted and the treaty resulted. The Chickasaws agreed to take $200,000 for the lease of their interest in the country between 98° and 100° and this- agree-was incorporated in the treaty.
It is earnestly contended by the defendants that the Choctaws had no real claim to any lands west of the one hundredth meridian, because the treaty of 1820 had given them no such lauds; but even if it had been afterwards believed to have done so, such grant had become void by the subsequent Dancing Rabbit Creek treaty and because of the intervening cession to Spain.
Two of the calls of the conveyance of October 18, 1820, to the Choctaw Nation are for natural objects, namely: First, the source of the Canadian River, and, second, the Red River. A third call is for the course due south to the Red River, connecting the two streams. This course, being due south from the source of the Canadian, is inconsistent with the other two calls, because the source of the Canadian is farther west than that of the Red River by several degrees and far enough west of the one hundredth meridian, if fractional townships are included, to amount to over 12,000 square miles, or 8,225,280 acres of land.
The evidence of the circumstances under which the treaty of 1820 was made, it is claimed, is such as to show that neither party thereto intended that any land west of the one hundredth meridian should be included in the cession, and there fore no such land was included. Maps are introduced to prove *99 that tbe parties to tbe Quapaw treaty of 1818 intended to fix tbe western boundary of tbe Quapaw cession on or near tbe oue hundredth meridian, because by those maps tbe source of tbe Canadian was located in that degree of west longitude, and it is asserted that they were tbe.only maps published prior to 1820 which located tbe source of tbe Canadian. By tbe map of Arrowsmitb its source was fixed on the meridian of 97° 5', by that of Pinkerton at 97° 15', by that of Melisb at 99° 45', by that of Pike at 100° 18', and by that of Darby at 99° 9'.
While it may be true that no map published prior to 1820 delineated tbe Canadian Biver, by that name, with its source west of tbe one-hundredth meridian, yet there were maps in existence which did in fact delineate the stream subsequently known as the Canadian, with its source west of the one hundredth meridian. (Map of De l’Isle, De l’Isle’s Atlas Nou-veau, vol. 1, No. 5; vol. 2, No. 28; Boehme’s map, published at Amsterdam in 1746; American Maps, vol. 1, No. 18.)
During the period commencing in 1805 and ending in 1821 there are evidences that some of these maps were used by the United States in the negotiations with Spain, at different times, preceding the treaty with that country which resulted in an exchange of the land between the Canadian and Bed rivers, west of tbe one hundredth meridian, for Florida, then owned by Spain.
Among the proofs of the title of the United States to all the land between the Mississippi and the Bio Grande del Norte, watered by rivers flowing into the'Gulf of Mexico or the river Mississippi, are the maps last mentioned. They were used by Secretary Madison, by Ministers Monroe and Pinckney, by Secretary Monroe, and by Secretary Adams, and as later geographical explorations gave to the world the absolute information that tbe true source of the Canadian was on tbe meridian at 104° 30' west longitude, we think the evidence sufficiently clear to conclude that the possessions of the United States covered the territory ceded to the Choctaw Nation by the treaty of 1820.
As to the understanding and intention of the parties to the treaty of 1820 and that of 1818 respecting the source of the Canadian and the western boundary of the cessions named in those treaties the evidence discloses but little. We know, *100 however, that in the year 1685 France became the owner of the province of Louisiana, which included all the lands west of the Mississippi and east of the Eio Bravo, between rivers emptying into the Mississippi or the Gulf of Mexico. This province was ceded, in its full extent, by France to Spain, November 3,1762. It was retroceded, in its entirety, to France, October 1,1800. France made the cession to the United States April 30, 1803.
When the United States actually sold the western part of the province of Louisiana, including all the land west of the one hundredth meridian, to the Spanish King, the treaty with the Choctaws had been closed. But the treaty with Spain which gave to that country the western part of the province of Louisiana had been signed Februaiy 22,1819, and approved by the Senate within two days thereafter. The King of Spain refusing to ratify, the treaty expired by its own limitation August 22,1819. After further negotiations the Spanish King ratified the treaty October 24, 1820. Upon its presentation to this Government the Senate ratified and the President approved the treaty February 19,1821. Thus over one month had elapsed after the Choctaws had acquired title by the ratification of its treaty when by another act of the Government Spain obtained title to the same territory.
There is no evidence that pending the Choctaw treaty the United States disclosed to the people of that nation any purpose to sell the land to a foreign power or that negotiations had been resumed for the sale after the rejection of the treaty which proposed to convey it to Spain.
On July 30,1820, Maj. Stephen H. Long, of the Topograx>hical Engineers, in command of a detachment of a small exploring party which had been sent out by the Secretary of War in 1819 to explore the Mississippi, Missouri, and navigable tributaries, reached a small stream which he believed to be the Bed Eiver. Following along near it about 800 miles (by the windings of the stream about 1,000 miles), he reached its confluence with the Arkansas Eiver on September 10, when he discovered that the stream was the Canadian Eiver. Eeaching Belle Point (Fort Smith) on September 13, 1820, he communicated with the Secretary of War the last of a series of brief reports of his journeys, in which he substantially reported that the source of the Canadian was in the neighborhood of the one *101 hundred and fourth meridiau. (Am. State Papers, Ind. Affs., vol. 2, 335-339; Bee., 745; Long’s Expedition, vol. 2, pp. 58-168.)
This report of Major Long reached the War Department in November, 1820. He himself left Belle Point on September 21, reached Cape Girardeau on October 8, went on to or toward St. Louis, but was taken ill on the way, returned to Cape Girardeau toward the end of the month, being still in ill health, and proceeded to Washington. On November 24,1820, orders were addressed to him at Washington directing him to go to Philadelphia, and as soon as practicable furnish a report of the country traversed by his expedition with a map. This he ultimately did, the report bearing date Philadelphia, February 20, 1821. (Long’s Expedition, vol. 2, pp. 264,284,321,324.)
If Long’s letter was received before November 8,1820, it was in possession of the Government two months before the ratification of the treaty with the Choctaws. If received on the last day of November, it was more than a month before. No matter what time in November the letter was received, the Government had knowledge before the ratification of the treaty that the source of the Canadian was far west of the one hundredth meridian. The presumption must be that the treaty-making powers had this knowledge.
There is no proof that in the negotiation or in the ratification of the Quapaw treaty either the Quapaws or the United States used any maps at all or considered the matter of longitude. When the Choctaw treaty of 1820 came.to be negotiated by Generals Jackson and Hinds for the United States at the Choctaw treaty ground, October 13,1820, the chiefs and headmen of the tribe were told that the limits of their new country u will extend from the Arkansas Biver, where the Cherokee line begins, south to the Bed Biver and west to the head source of the Arkansas Biver.” . When the treaty, as it was signed ■five days later, was forwarded it was accompanied by an official report of Generals Jackson and Hinds to the Secretary of War, under date of October 19-21,1820, in which they stated:
“ We have the pleasure to inform you that on yesterday we concluded and signed a treaty with the Choctaw Nation of Indians, by which the United States have obtained a cession of about six millions of acres of land, in exchange for the country between the Arkansas and Bed rivers, beginning on the Arkansas where the lower line of the Cherokee boundary *102 strikes the same; thence up the Arkansas River to the Canadian Fork; thence up the same to its source; thence due south to Red River; thence down Red River to a point 3 miles below the mouth of Little River, which empties itself into Red River on the north side; thence a direct line to the beginning. From an examination of the map you will find that Little River is about 60 miles above the Great Raft on Red River, and that we have located the Choctaws as high up the same as practicable.” (Am. State Papers, Ind. Affs., vol. 11,241.)
If calls for natural objects control courses and distances in the case at bar, then, on the principle declared in Preston’s Heirs v. Bowmar (6 Wheat., 580) and Newson v. Pryor (7 Wheat., 7), the western boundary of the ceded territory was on a right line drawn from the source of the Canadian (104° 30' W.) to the source of the Red River (103° 30' W.). If the maps relied on by the defendants constitute a part of the treaties, then the matter of longitude must govern as shown by the maps. 'Under these last conditions the western boundary would not only be restricted to the one hundredth meridian, but by some of the maps this boundary would be east of the one hundredth meridian far enough to exclude from the original Choctaw cession the whole of the leased district. This would be the case on the meridian fixed by Arrowsmith, as well as that fixed by Pinkerton.
Taking the proof all together, we do not think it was the intention to place the western boundary at the one hundredth meridian. It does not appear, except inferentially, that the commissioners made use of any of the maps, nor does it appear, even by inference, that these maps were exhibited to the Choctaws. The minutes of the commissioners show that they reduced to writing the propositions submitted respecting the extent of country the tribe was to receive, and these propositions, and the action of the parties with respect to them, negative the belief that longitudes or meridians were mentioned. Natural calls being matters easily understood by ignorant and untutored Indians, and longitudes and meridians not being terms they would likely comprehend, we do not think, from all that is before us on this subject, that the Choctaws understood the United States to cede not what was actually ceded in proper form, but what was not ceded. It is certain that the Government was in possession of information before the ratification of the treaty that the source of the Canadian *103 was far to the west of the one hundredth meridian as delineated by the earlier maps, and in the absence of proof it can not be assumed that the treaty was ratified with the knowledge that the boundaries fell short of the actual source of that river.
There is as much reason to say that the maps which excluded from the cession much of the country now occupied by the Chickasaws were used as to say that the other maps then in existence delineating the source of the Canadian about the one hundredth meridian were made the basis of the treaty boundaries. The use of all the maps involve contradictions and destroy the value of the argument. Upon the question of intention we think it more probable that the Government originally intended to acquire from the Quapaws, and also intended to grant to the Choctaws, all the territory west of the one hundredth meridian to the dominions of Spain.
The ratification of the Spanish treaty which fixed the boundary of the United States on the line of the one hundredth meridian was subsequent to the ratification of the treaty with the Choctaws which gave to those people the land that extended to the source of the Canadian. With the ratification of the Spanish treaty, however, such title as had been granted to the Choctaws became extinguished. Ratification related back to the time of the signing of the treaty as between the United States and Spain. (Yattel, B. 4, C. 2, sec. 22; Davis v. Police Jury, 9 How., 280, 289; Saver v. Yalcer, 9 Wall., 32, 34.) The treaty with Spain being binding-on the United States from the date of the signing thereof, the treaty rights of domestic Indians to the land itself were lost, but the right to compensation for the value of the land remained with the Choctaws as against the Government which first gave, and then took from them, the land.
But the questions relating to the extent of the original cession to the Choctaws and the intention of our Government in ceding land to them which at the time we were trying to sell to Spain in exchange for Florida, as well as the matter of the inconsistency of the treaty of 1830 with that of 1820 and the intermediate action of the Government in actually ceding the land west of the one hundredth meridian to Spain, can only be material now in determining what amount of money was ultimately paid by the United States for the leased district. *104 No relief is sought by the nation on account of any early claim to country which they failed to get. Whatever interest the Choctaws had in the land ceded to Spain after its apparent cession to them was settled by the treaty of 1855. Having treated the Choctaw quitclaim to the territory west of the one hundredth meridian as the relinquishment of a substantial right, the Government is not in a position to raise that question anew and assert that the treaty of 1820 was made void by that of 1830, so as to deprive the Choctaws of the right of compensation to land ceded in 1820 but not ceded in 1830. Nor do we understand that the Government has denied the effect of its action in recognizing the claim of the Choctaws to compensation since its acceptance of the offers to relinquish the claim until this suit. The probabilities are that when this question arose the parties viewed the matter as one best kept out of the courts for their respective interests, and in the doubts which each had as to their rights compromised the difference in the manner set forth, from which resulted the agreement of 1855.
While we have gone far enough into the question to say that by the cession of 1820 the Choctaws acquired land beyond the one hundredth meridian, we decline to enter that field of discussion respecting the alleged surrender by them, under the terms of the second grant, of what they had acquired by the guaranties of the first cession because unnecessary. The extent of our opinion is for the purpose of showing a basis for the claim preferred by the Choctaws in 1855; but whether their claim was dealt with as one of strict legal right or made to rest upon moral considerations alone, it was clearly recognized by the language of the treaty which recited a consideration for the relinquishment of a certain tract and the lease of another.
In the Net Proceeds case it was said that the treaty of 1830 was evidently and purposely executed not so much to secure to the Indians the rights for which they had stipulated as to effectuate the policy of their removal. (Choctaw Nation v. United, States, 119 IJ. S. R., 38.) So, if the treaty of 1830 annulled that of 1820 for every purpose, we have the spectacle of the United States acquiring ten million acres of land in Mississippi for nothing and also extinguishing a title to several million acres west of the Mississippi without the payment of anything.
*105 This treaty of 1855 was tbe result in part of tbe necessities of tbe Government in locating tribes on convenient reservations. Tbe colonization of tbe Wicbita and prairie Indians, however, seems to have been nowhere suggested before the special Indian agent for Texas communicated to the Commissioner of Indian Affairs tbe propriety of opening negotiations with tbe Choctaw delegation, as stated. Tbe delegates were then in Washington, and the land designated as desirable was a tract of country lying on the east side of the Red River, known as Cache Creek, near Wichita Mountains. (Sen. Ex. Doc. No. 13, 48th Cong., 1st sess., p. 15.) When the treaty came to be made the preamble expressed the desire of the Government for the Choctaws to relinquish all claim to any territory west of the one hundredth degree of west longitude, and also to make provision for the permanent settlement within the Choctaw country of the Wichitas and certain other tribes or bands of Indians. The preamble further recited a willingness on the part of the Choctaws and Chickasaws to lease, on reasonable terms, to the United States that portion of their common territory west of the ninety-eighth degree of west longitude. When the transaction was consummated the United States held free from any other claim of the Choctaws all of the laud west of tbe one hundredth degree, and it held a per petual lease from both the Choctaw and Chickasaw nations to that portion of their common territory west of the ninety eighth degree, subject to the right of Choctaw and Chickasaw settlement as owners of the land.
Tbe lease did not secure, or purport to secure, to the United States the right to locate Indians generally upon the leased land. The restriction imposed excluded all the Indians of New Mexico and all whose usual ranges were then north of the Arkansas River and whose permanent locations were north of tbe Canadian.
The defendant Indians were placed on the leased land in 1859.
It is argued for the Government that the lease provided for in the treaty of 1855 was in fact not a lease, and that the use of the term “lease” was really a misnomer; that certain parts of the agreement indicate that the Choctaws and Chickasaws permanently parted with their title, and that the land was in *106 fact sold for a particular purpose, but none the less sold — that is, sold in trust.
The land was not sold at all. The United States negotiated for a lease, and though perpetual in character it was none the less a lease.
If anything was needed at the time to continue the rights of the Choctaws and Chickasaws as owners subject to permanent occupation by certain other tribes as tenants under the control of the United States, the first article of the treaty is a sufficient answer to any doubt cast upon the title .of the lessors.
Again, it is argued there was no term fixed. This is true, but the lease rested upon a rental value. The instrument itself does not express what that rental value was, and no apportionment was made of the amount paid for the lease and the amount given for the other land, but we know the character of the preceding negotiations. Certain Indians to whom the lessors did not object could come on, but other Indians to whom they did object could not. The leased territory was to remain open to settlement by Choctaws and Chickasaws as before, and the jurisdiction of the Choctaw Nation was to remain as agreed upon at or immediately after the time of the severance of the government of that tribe from that of the Chickasaws. (Arts. 1, 2, and 3, Tr. 1855.) The land was inalienable without the consent of the lessors, which implied a future sale for their use. The lease must therefore be viewed as a mere permit, the premises remaining Choctaw and Chickasaw country, subject to special uses by the Government for other Indians.
Under their political control and government the Choctaws fixed four boundaries for the districts of their country. The Hotubbee district was embraced within the limits of the ninety-eighth and one hundredth degrees of west longitude and between the Bed and Canadian rivers, known as “lease land.” (Choc. Cons., 1861, 7, 8, and 13; Choc. Laws, 1860; Art. 3, Tr. of 1855.) Under their constitutions the Supreme Court had jurisdiction of the other three districts until Hotub-bee district should be duly organized and officers elected therein. (Article!, sec. 2, Jurisdic. Dept.) Under the articles, which include general provisions of the constitution, appears the following:
“Until Hotubbee district shall be duly organized, the principal chief of the Choctaw Nation shall exercise such author *107 ity oyer the citizens of this nation living in that district as be may deem expedient for tbe protection of person, life, and property.” (Art. 7, sec. 1, Geni. Provs.)
This assumption of Choctaw exercise of government was never objected to by the United States.
The rights of the Choctaws and Chickasaws as between themselves had been fixed by agreement, with the consent of the Government, in the proportion of three-fourths to the former and one-fourth to the latter tribe in all land to which either tribe could lay claim. The western boundary of the Chickasaws was the ninety-eighth degree. Their eastern boundary, which is the western boundary of the Choctaws, was so located as to embrace in their country 4,650,935 acres. East of them were the lands of the Choctaws, 6,668,000 acres. West of them in the leased district, 7,713,239 acres. The total acreage aggregated 19,052,174. One-fourth of this closely approximates the quantity embraced in the Chickasaw boundaries, entitling the Choctaws to 14,289,136. Thus, the leased district must be embraced to get that number of acres. Without the leased district they would have but 6,688,000 acres. This proportion would make 6 to 4 instead of 3 to 1. If the Government’s theory be correct the Choctaws would be wanting in more than 7,000,000 acres of their jurisdiction, as well as that much of their jiro rata part of land, for no consideration at all. Such a result does not appear to be sustained by any agreement made at any time between the nations or the United States.
Early after the beginning of hostilities between the States the slaveholding tribes of the Southwest made common cause with the South. There were individual Indians in the Territory connected with these nations who adhered to the United States throughout the war, but the large majority of Choctaws and Chickasaws did not do so. The Choctaws and Chickasaws entered into an alliance, offensive-and defensive, with the Government of the Confederate States July 12, 1861. (1 Con-fed. Stats., 311-331.) The Creeks, Cherokees, Seminóles, and other tribes made similar treaties with the Confederate Government, but it is not material to notice the extent of any of them. Sufficient it is to say that hostilities were carried on under them against the United States until June, 1865. Many of the wild tribes who had in the great struggle taken up arms against the Government remained in hostility for some time *108 after the surrender of tbe Southern forces. The history and extent of the operations of those Indians are set forth, in various decisions of this court, and are mentioned to show that when the Government resumed negotiations with the tribal organizations of civilized Indians some of the border^ tribes continued to create a great deal of trouble for the Government. (Litchfield v. Z7. S. et al., 32 O. Gis. R., 585.) And this state of affairs produced an era of treaty and concession with the hostiles as far as the United States could approach them.
The importance of preserving certain country for the use of Indians alone was greatly felt by the Government as the civil war began to close, Undoubtedly the Government had in view in the treaties made subsequent to the close of the war the greater peace and security of the Indian country and of all persons put there by Government authority. The public domain contained millions of acres of unoccupied lands, and no purpose was expressed by any one in authority for the Government to buy more land for public uses.
To secure.homes for such tribes as it might be expedient to remove, it was officially recommended that in all treaties thereafter to be made with the former owners of the country terms should be insisted upon, and, if need be, enforced, for the purpose of locating nonreservation Indians. (Rep. Comr. Ind. Affs. for 1865, p. 34.) This report recognized (what the commissioners for the Government subsequently acted upon) the existence of lights which the tribes had previously acquired by treaty. Although the act of August, 1862 (12 Stat. L., 528), conferred power upon the President to abrogate treaties with hostile tribes, this authority was never exercised with respect to the treaties existing between the United States and the Choctaws and Ghickasaws, nor was it generally exercised as to other Indians. The results vindicated not only the beneficence but the wisdom of the policy of President Lincoln in refusing to declare the forfeitures, inasmuch as that policy tended to disarm the hostiles and bring them in subjection to the Government at a time when its military strength was sorely tried. The act clothed the President with discretion to declare the treaties abrogated if the same could be done consistently with good faith and legal and national obligations. Whatever the motive in permitting the obligations of Indian treaties to remain in effect, the fact can not be *109 obscured that the close of the war found every obligation with the civilized tribes unimpaired, just as if they had not taken up arms against the Government. (Bep. 262, pt. 2, H. B., 50th Cong., 1st sess.)
When the policy of the Government to locate other tribes in the Indian Territory without reference to their previous habitations became manifest, another problem presented itself. There were several thousand freedmen there who had formerly been held as slaves. They were without property or rights of property in the soil, and, being dependent upon Indian protection and living upon Indian land, the Government undertook to supervise the interests of the blacks and at the same time to make some small provision for them because of their precarious situation.
The commission appointed to carry out the objects of the Government met a number of Indian delegates in council at Fort Smith, Ark., September 8,1865. Besides the representatives of the five civilized tribes, there were present representatives of the Osages, Senecas, Quapaws, Wyandottes, Wichi-tas, and Gomanches. (Bep. Gommr. Ind. Affs. for 1865.)
At the beginning of the conference there were present only loyal Choctaws and Ghickasaws. President Gooley made a statement, from which it appears:
“Immediately upon the opening of proceedings, the tribes were informed generally of the object for which the commission had come to them; that they, for the most part as tribes, had, by violating their treaties, by making treaties with the so-called Confederate States, forfeited all rights under them, and must be considered as at the mercy of the Government; that there was^every disposition to treat them leniently, and above all a determination to recognize in a signal manner the loyalty of those who fought upon the side of the Government and endured great sufferings on its behalf. On the next day the delegates were informed that the commissioners were empowered to enter into treaties with the several tribes upon the basis of the propositions submitted.”
These propositions were under consideration for several days. The loyal Choctaws and Chickasaws were divided as to the action to be taken, the Ghickasaws declaring that they were not prepared to reply to some of the propositions, while the Choctaws stated that they were willing to accept every proposition but the seventh. As to that, the answer of the Ghoctaws and Ghickasaws was substantially the same. Both desired its *110 modification so as to provide that no person of African descent, except their former slaves, or free persons of color, who were then or had been residents of the Territory, should be permitted to reside therein unless formally incorporated with the tribe according to the usages of the band. Meantime, regular delegates from the Choctaw and Chickasaw nations, with authority to act, appeared. (Act Sept. 6,1865, Choc. Laws, ed. 1869, p. 405.) The preliminary treaty of xieace, which the council had been informed was essential to the adjustment of any and all questions under any old treaty, had been signed by the loyal Choctaws and Chickasaws before the regular delegates came. The day after the appearance of the authorized delegates the treaty of peace was signed by them, and Commissioners Sells and Parker were appointed on behalf of the United States to confer with committees of the Choctaws and Chickasaws in relation to additional treaties.
On the last day of the council the Choctaw and Chickasaw delegates were informed that an additional treaty for their consideration was ready.
dust before final adjournment Commissioner Parker announced that the commission had considered certain modifications of the proposed treaty which had been submitted by'the Choctaws, but would decline to entertain the modifications suggested.
There is no proof as to what the modifications suggested were, but the draft of the unsigned treaty is in existence (Choc. Laws, ed. of 1869, p. 410), and in the report of Commissioner Cooley we have a statement concerning this treaty. (Rep. of 1865, p. 36.) This report shows that a treaty was agreed upon with the Choctaws and Chickasaws upon the basis of the seven propositions mentioned, and that the tribes agreed to the opening of the leased lands to the settlement of any tribe whom the Government of the United States might desire to place thereon, and to the cession of one-third of their remaining area for the same purposes, the United States to restore the Choctaws and Chickasaws to their rights forfeited by the rebellion.
Following is a copy of the unsigned treaty:
“Articles of agreement and convention between the United' States and the Choctaw and Chickasaw tribes of Indians, made and concluded at Fort Smith, Arkansas, the-day of September, A. 1). 1865, by D. N. Cooley, Elijah Sells, Ely S. Parker, *111 and Thomas Wistar, commissioners on the part of the United States, and the delegates of the Choctaw and Chickasaw tribes of Indians, signing this instrument.
“Art. 1. Peace and friendship are hereby firmly established between all the citizens ot the United States and all the individuals comprising the aforesaid tribes, and all the friendly relations that existed between them before the rebellion, shall be, and the same are hereby, renewed.
“Art. 2. The Choctaw and Chickasaw tribes of Indians do hereby bind themselves to use their influence, and whenever called upon by the Government to aid in compelling the Indians of the plains to maintain peaceful relations with each other, with the Indians of the Territory and with the United States.
“Art. 3. The Choctaw and Chickasaw tribes of Indians hereby admit that the institution of slavery is abolished, and that slavery or involuntary servitude shall never hereafter exist in either tribe, except in punishment of crime, whereof the party shall have been duly convicted, and they promise and agree that measures shall be immediately taken by their respective National Councils, to properly provide for such emancipated slaves as may have belonged to the members of the respective tribes; such provision to be subject to the approval of the President of the United States.
“Art. 4. The Choctaw and Chickasaw tribes of Indians, hereby agree to open their country to the settlement of friendly Indians from Kansas and elsewhere, upon such terms as may hereafter be agreed upon by the respective parties and approved by the Government, and the Government may settle such friendly Indians on a portion of said Territory east of the ninety-eighth degree of west longitude, not necessary for the use of said Choctaw and Chickasaw tribes, as it may desire, not exceeding one-third of the whole remaining Territory, for a fair and equitable consideration, to be fixed by the Government.
“Art. 5. The Ghoctato and Chickasaw tribes agree to a modification of the 9th article of the treaty concluded at the city of Washington, the 22nd day óf June, A. N. 1855, by which they agree that all that portion of their common territory tcest of the ninety-eighth degree west longitude, leased to the United States, may be used for the permanent settlement of the Wichita and such other tribes or bands of Indians as the Government may desire to locate thereon, without exception or restriction as to the character of the tribes.
“Art. 6. The Choctaw and Chickasaw tribes of Indians promise and agree to submit and recommend, at the first meeting of their respective General Councils, the adoption of the plan proposed in the Senate bill 459, 38th Congress, 2d session, to provide for the consolidation of the Indian tribes, and to establish civil government in the Indian Territory; it being understood to be the settled policy of the Government *112 of the United States that all the nations and tribes in the Indian Territory be formed into one consolidated government, after the plan proposed in the bill above referred to, adopted by the United States Senate, 1865, the Government of the United States reserving said right.
“Art. 7. The United States, in the event of the adoption by the Choctaw, Chickasaw, and other Indian tribes of the government proposed to be established in the Indian Territory referred to in the preceding article, promise and agree that no white person except officers, agents, and employees of the Government, and of any internal improvement authorized by the Government, will be permitted to go into and settle in said Territory, unless formally incorporated and naturalized into one of the resident tribes, according to their laws, customs, and usages.
“Art. 8. The Choctaw and Chickasaw tribes of Indians, anxious for the restoration and preservation of kind and friendly feelings among themselves, do hereby declare a general amnesty of all past offences, either against their government or the Government of the United States, and no Indian or Indians shall be proscribed, or any act of forféiture or confiscation passed against those who may have remained friendly and loyal to the United States, but they shall all enjoy equal privileges with other members of said tribe.
“Art. 9. The United States hereby promise and agree to restore the Choctaw and Chickasaw tribes of Indians to all their rights and privileges in lands and annuities, that they were possessed of, and entitled to, and they shall be applicable to the same objects as existed at the breaking out of the rebellion, except such part or parts of annuities and moneys as have been expended by the President in providing for the relief of destitute Indians, who were reduced to want on account of their friendship to the Government of the United States, which shall not be refunded.
“Art. 10. It is hereby mutually agreed, that all of the provisions of the treaty of June 22d, 1855, between the United States and the Choctaw and Chickasaw tribes of Indians not inconsistent with the foregoing articles are hereby adopted and made a part of this instrument.
“Art. 11. The Choctaw and Chickasaw tribes' of Indians expressly agree, that any amendment to this treaty, which the Senate of the United States may make, shall be taken and held as a part of the same, and as binding in every respect as if it had, after being made, been formally submitted to and ratified by such parties.”
(Laws of the Choctaw Nation, p. 410 et seq.)
The council adjourned subject to the call of the Secretary of the Interior.
*113 Although the foregoing treaty was never ultimately executed, it was reported by the Indian Commissioner to have been agreed upon, subject to approval of the Choctaw and Chickasaw councils, and then to be signed in Washington. (Eep. of Sec. of Int. for I860, p. 204.) The volume of the testimony shows, however, that it was not agreed upon. The Indians present disclaimed any authority to enter into formal agreement about anything but the termination of hostilities, and asked time to report to their people, stating that when they did so commissioners would be appointed to make further treaty. That was the final understanding, probably for the reason given by the president of the commission that there could be no satisfactory representation of the Indians until the differences between the loyal and disloyal members were healed. (Eep. of Commrs., p. 35.)
The draft of the unsigned treaty and the ultimatum contained in the seven propositions submitted by the commissioners were given to the representatives of the petitioners to be submitted to their people. It was stated at the close of the address of President Cooley, on the day that the propositions were made known, that the agents would be supplied with printed copies of the address and would be requested to go with an interpreter to their respective tribes for the purpose of fully explaining what was said therein. This language evidently contemplated that the commissioners themselves did not expect to conclude any agreement at that time respecting the land of the Choctaws and Chickasaws. From all that was said and done it is clear then that no absolute agreement was entered into between the parties respecting the land, but every suggestion made contemplated the acquirement of land at some future early date for one and the same purpose, and that purpose was the settlement of Indians on the lands to be acquired, without opening any of it to white occupation under the general land laws of the United States, but giving the Choctaw and Chickasaw Indian freedmen the privilege of locating there also, and leaving the Choctaw and Chickasaw interests in the land otherwise unimpaired. The differences between the respective parties related only to the provisions respecting freedmen and not to the nature of the title to be granted or acquired.
Eespecting the fifth of the seven propositions first submitted, the arguments of counsel proceed upon different versions of its *114 language. An examination shows the following form to have been stated by D. N. Cooley, Commissioner of Indian Affairs, as follows :
“A part of the Indian country to be set apart to be purchased for the use of such Indians, from Kansas or elsewhere, as the Government may desire to colonize therein.” (Annual Rep. 1865, p. 34; House Ex. Doc. 1, 39th Cong., 1st séss., vol. 2, p. 202.
Accompanying the report of the Indian Commissioner is the report of D. N. Cooley, as president of the Southern Treaty Commission, and also an official report of the proceedings of the council, in both of which appears the statement that “the treaties must contain substantially the following stipulations.” The form of the fifth is then given, as follows:
“A portion of the lands hitherto owned and occupied by you must be set apart for the friendly tribes now in Kansas and elsewhere, on such terms as may be agreed upon by the parties and approved by the Government, or such as may be fixed by the Government.” (Rep. President Southern Treaty Com., pp. 298, 319.)
The language of the report would imply that no stenographic notes were taken during the sitting of the council.
The draft of the unsigned treaty followed the submission of the seven propositions. In that the commissioners for the United States evidently undertook to express their meaning of the propositions previously submitted. If the contention of the defendants be correct as to the precise language used, the fifth proposition was a demand that the treaty was to be so framed with regard to the lands that a portion of them “must be set apart for friendly tribes.” The fifth article of the unsigned treaty provides that all the lands of the leased district may be used by the United States, “without exception or restriction as to the character of the tribes.” Out of the fifth proposition or demand then grew the treaty of the next season, and as the commissioners submitting the ultimatum understood it, doubtless the Choctaws and Chickasaws also understood it.
Commissioners were appointed by the Choctaw and Chickasaw legislatures to proceed to Washington, the two acts of the Choctaw government having been approved October 17 and 18, 1865, respectively, and the one act for the same purpose passed by the Chickasaw legislature was approved November 18,1865. (Cons, and Laws Choc. Nat,, 1869, p. 420; Cons., Laws, and Treaties Chics., Fort Smith, Ark., 1867, p. 100.) The authority *115 of tbe five Choctaw commissioners was limited to “the purpose of completing negotiations with the Government of the United States, commenced at Fort Smith, Ark., oh the 15th of September, A. D. 1865, and any agreement or stipulation which the commissioners should enter into with -the United States was not to be binding until ratified by the general council of the Choctaw Nation.” The authority of the three Chickasaw commissioners was declared to be “with full and efficient powers to reconstruct, or enter into new treaties or conveyances with the United States of America, or any authorized agent thereof, necessary, in their judgment, to obtain full guaranties and securities of all the rights, interests, or claims held by the Chickasaw Nation, or any individual member thereof, under former treaty stipulations with the Government of the United States, whereby the happiness and interests of the Chickasaw people may be advanced.” Some months after the treaty was executed the two Indian governments qualified their ratification as hereinafter shown.
Between the adjournment of the council assembled at Fort Smith and the consummation of the agreement at Washington nothing relating to the terms of the treaty is disclosed. In the negotiations preliminary to the signing of the treaty John H. B. Latrobe, of Baltimore, represented the commissioners of the two Indian governments, and his name appears a subscrib'ing Witness to the document.
There is nothing in the record.to indicate that the Choctaws and Ohickasaws had any information as to the purpose of the Government except as embraced in the fifth proposition and the fifth article of the unsigned treaty submitted at Fort Smith. These g'ave the Indians to understand that the purpose was only to extend the rights of the United States in the land beyond the treaty of. 1855, and this purpose was also understood by the United States.
Passing the question of the right of the Government as the guardian to change its purpose and take the land for such consideration as it saw fit to give, the record discloses nothing to show the exercise of the power of the Government to acquire the land upon terms different from those first submitted except such as may be derived from the ceding clause of the treaty itself. Every presumption, then, must be indulged in case of doubt that in consummating the treaty the original purpose was intended to be carried out, and that when the treaty was *116 actually executed, the agents of the Government supposed they were embodying in the agreement the objects announced by the commissioners at Fort Smith for the cession of the land.
It is certain that the delegates who signed the treaty on the part of the nations came to Washington to give effect to the ultimatum previously submitted to the Choctaws aud Chickasaws, and that the legislatures which clothed them with authority to act were without knowledge of any change of purpose on the part of the United States.
Three of the same commissioners who submitted the seven propositions at Fort Smith aud prepared the unsigned treaty for the United States also framed the treaty of 1866. D. N. Cooley, president of the council and the head of the Bureau of Indian Affairs, who had been active in arranging the preliminary terms of the treaty, consummated the agreement, and did so not merely with one tribe, but with all who had lands which the Government desired to use for the purpose stated to the nations whose interests are now before us. Mr. Cooley reported that the first treaty was made with the Seminóles and that the next treaty in this series was made with the confederate nations of Choctaws and Chickasaws, stating that in all of them “ four principal points came up for settlement, to wit, * * * (fourth) cession of lands by the several tribes, to be used for the settlement thereon of Indians whom it is in contemplation to remove from Kansas.” All were based on the same points of settlement and treated as a series of treaties. (Annual Kep. Com. Ind. Affrs., 1866.)
The Choctaw council, by an act approved December 21,1866, enacted “that the propositions contained in the third and eighth articles of said treaty are hereby deferred until the next regular session of the general council.” (Laws Choc. Na., ed. 1869, p. 450.) The Chickasaw legislature confirmed the treaty and consented to sectionizing the land and allotting the same in severalty, by an act approved November 9,1866, but provided:
“Sec. 3. Be it further enacted,, That the provisions contained in article 3 of the said treaty, giving the Chickasaw legislature the choice of receiving and appropriating the three hundred thousand dollars therein named for the use aud benefit of the Chickasaws, or passing such laws, rules, and regulations as will give all persons of African descent certain rights and privileges, be, and it is hereby, declared to be the unanimous consent of the Chickasaw legislature, that the United States shall keep and hold said sum of three hundred thousand dol *117 lars for the benefit of tbe said negroes. And the governor of the Chickasaw Nation is hereby requested to notify the Government of the United States that it is the wish of the legislature of the Chickasaw Nation that the Government of the United States remove the said negroes beyond the limits of the Chickasaw Nation, according to the requirements of the third article of thé treaty of April 28,1866. (Cons. Laws and Tr. of Chickasaws, 1876.)
For conferring the privileges and rights of property mentioned in article 3 on some 4,500 blacks 10,000 Choctaws would have received $225,000, but for doing the same thing for 3,700 black residents among them the Chickasaws would have got only $75,000. This was a minority of black population in the one case and a majority in the other, but whatever the motive underlying the action of the nations, neither passed the necessary laws to receive the consideration within the two years.
The Chickasaws have never attempted to pass any such laws. Neither have their freedmen been removed. But on May 21, 1883, the Choctaws passed laws in regard to their freedmen (Choc. Laws, 1894, p. 335), following which an act of Congress approved March 3, 1885 (23 Stats., 366), appropriated to them $52,125, net balance estimated to be due them as their proportional part of the money named in the treaty of 1866. All sums paid to the Choctaws and to the Chickasaws were received under article 46, being made, according to an official report, “to the Choctaw Nation or the Chickasaw Nation, or to persons of African descent formerly held in slavery among said nations or their descendants.” (Kept. Oomr. of Ind. Affrs., 1897, Kec., 763; House Kept. 3147, 51st Cong., 1st sess., p. 14.) Payments to the Choctaw Nation were as follows:
Appropriation of July 26, 1866 (14 Stats., 259), under forty-sixth article of the treaty. $150,000.00
Appropriation of July 26, 1866, for interest (14 Stats., 259), under same article.:. 11,250.00
Appropriation of April 10, 1869, for interest (16 Stats., 39), under same article.. 11,250.00
Appropriation of May 17, 1882, for education of freedmen (22 Stats., 72). 7,500.00
Appropriation of March 3, 1885 (23 Stats., 366), to he placed to the credit of the Choctaws on the hooks of the Treasury, computed as follows:
Balance of principal due Choctaws. $67,500.00
Deduct overpayment of interest 1867,
amounting to. $7,500.00
Deduct for same in 1868 . 7,875.00
- 15,376.00
52,125.00
232,125.00
*118 Anri to tbe Chickasaw Nation as follows:
Appropriation of Jnly 26, 1866 (14 Stats., 259), under forty-sixth article of the treaty. $50,000.00
Appropriation of July 26, 1866, for interest (14 Stats., 259), under same article. 3,750.00
Appropriation of April 10, 1869, for interest (16 Stats., 39), under same article. 3,750.00
Appropriation of May 17, 1882, for education of freedmen (22 Stats., 72)... 2,500.00
60,000.00
In 1888 and subsequent years the Choctaw Nation paid to the Choctaw freedmen, out of the general trust fund of the nation, the sum of $7,300, at the rate of $100 per capita, to those who desired to remove from the Choctaw Reservation.
If the transaction had been between individuals, and especially between guardian and ward, inquiry would at once arise how it came that one of the parties, and that party the ward, should, for a consideration of $300,000, part with all interest in nearly 8,000,000 acres of land worth about $8,000,000 (according to the value put by the grantee at the time upon land adjoining the ceded territory) and at the same time bargain to give from other possessions tracts of more than 300,000 acres to get the money, or failing to yield these tracts to the third persons who, by the arrangement were to become the beneficiaries, leave themselves in position to surrender indefinitely land enough for 8,000 people to cultivate besides conferring upon them other rights. But under this treaty neither the integrity of the sovereign nor the good faith of the guardian can be questioned. In looking for the proper objects, then, which we must suppose actuated the sovereign as guardian, the statements and situation of the parties, the amount and value of the grant considered with reference to the consideration, the benefits to be conferred and where they were to go and the ends sought to be accomplished from all the parties possessed of land, may be considered in determining whether the cession was or was not attended with any underlying trusts or uses.
The cardinal rule for all agreements, whether of jmivate contract or of public treaty, is that the full extent properly implied in the terms used should be given a disposition or the signification thereof be restrained, if it be probable that the parties at the time so understood the language embodied in the written agreement.
*119 The general principle is that treaties shall be liberally construed so as to carry out the apparent intention of the parties to secure equality and reciprocity between them. Thus, under a provision in a treaty between France and the United States which gave to the French the right to hold property in all those States of the Union permitted by the existing laws of the States, it was held that the District of Columbia was one of the “ States of the Union” within the meaning of the treaty. (Geoffroy v. Biggs, 133 U. S. B., 258.)
Again,“ subjects” of Spain, as used in a treaty between that country and the United States, has been held to be not merely persons who, by birth or naturalization, owed permanent allegiance to the Spanish Government, but as used in the same sense as the term “citizens” and “inhabitants” when applied to persons owing allegiance to the United States. (The Bizarro, Wheat., 227.)
The familiar rule that treaties between the United States and the Indian tribes must be liberally construed in favor of the Indians was early declared, and all such agreements are attended with this guide for their proper interpretation: That' “ the language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import as connected with the tenor of the treaty, they should be considered as used only in the latter sense. How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction.” (Worcester v. Georgia, 6 Pet., 515.)
It is thought by counsel for the defense that the rule quoted is one of relative application, and, although referred to in a late case, involving the Choctaw and Chickasaw treaty of 1855, the rule is not at all as applicable to those comparatively educated people as to the totally illiterate Oherokees of 1800. Counsel for the defendant Indians think the analogies of the rule are qualified by certain conditions existing at the time of the execution of the treaty,- the two most essential of which, besides the nations being no longer unlettered, being acts of hostility to the Government out of which and because of which existing obligations could be declared forfeited, and next, the relations of the Indians to their former slaves.
*120 Advances in education and learning bad undoubtedly been made by tbe civilized Indians, and they were not so unlettered a people as tbe Cberokees of 1800. Complainant nations bad governments and institutions of tbeir own, and these were carried on witb sufficient intelligence to serve tbe purpose of tbeir creation, in part at least. But tbougb by these governments tbe public peace was fairly well secured, agencies from our own Government were maintained among tli'e nations witb power that restricted them to a degree and our courts exercised jurisdiction over tbeir persons. As nations and as people they'were dependent communities at last. Illiteracy largely prevailed, if history be written from truthful sources; and tbe demoralization incident to tbe close of a great war must have bad its effect upon people who by its results were made more deeply sensible than ever before that they were dependent upon tbe United States for every personal and political right that they might thereafter enjoy.
If any one thing has been settled in our judicial history it is that tbe Indians are tbe wards of tbe nation. Tbe relation of guardian and ward between tbe United States and tbe Choctaws and Ohickasaws existed when tbeir last treaty was executed, and there must be “ such an interpretation of tbeir acts as justice and reason demand where power is exerted by tbe strong over those to whom they owe care and protection.”
Tbe language of Chief Justice Marshall in Worcester v. Georgia has been so often and lately applied that tbe rule cau not be ignored in tbe construction of a treaty executed by tbe claimants a generation ago, whether tbeir acts be considered as the acts of an ignorant people or those of a people helpless and otherwise at a disadvantage. (See The Kansas Indians, 5 Wall., 737, 760; U. 8. v. Kagama, 118 ib., 375, 383; Choctaw Wat. v. U. 8., 119 ib., 1, 28.)
It is urged that tbe plain language of tbe instrument cedes tbe land for a specific consideration, and tbe court can not look beyond this language. This would restrict tbe meaning of tbe parties to tbe ceding clause entirely. The intention as gathered from tbe words must control, and tbe entire instrument must be examined in order that tbe real intention may be ascertained. (1 Kent’s Com., 174; In re Boss, 140 U. S., 453; U. 8. V. Texas, 162 ib., 36.)
*121 Aside from the act which requires that everything deemed necessary by the court to aid it in determining the questions presented and tending to shed light on the claims and equities of the parties, the intent must be gathered not only from the language of the instrument, but attendant and surrounding circumstances may be resorted to as aids to the ascertainment of the meaning and intent of the parties. Thus as in the case of the interpretation of a statute the history of the times may be resorted to in aid of the true construction (U. S. v. Union Pacific B. B. Go., 91 U. S. R., 79), we think for similar causes contemporaneous events may be examined in aid of the interpretation of an Indian treaty as in any law. (Holy Trinity Church v. United, States, 143 U. S. R., 463.)
It is objected generally (1) that propositions (even though conceded to be substantially definite) leading up to the treaty can not be considered to determine the intent, and specially (2) because the objects of the fifth stipulation referring to land for the colonization of Indians were amply provided for in the treaty outside of the clause which cedes the land.
The special objection is not tenable, because the court can not determine whether the fifth stipulation and its objects found expression in the treaty without considering it as evidence for that purpose; but as to the general objection difficulty arises, because we are considering a public treaty and not a private contract.
The rule that courts of equity will open the written contract to let in an equity arising from facts perfectly distinct from the sense and construction of the instrument itself is clear in its application to matters arising out of contract between persons. Pursuant to that rule relief can be had against any deed founded on mistake, and that mistake may be shown by parol proof. (Walden v. Simmer, 101 U. S. R., 577.)
A deed absolute on its face may be shown to be a mortgage by evidence aliunde the instrument, or an absolute conveyance may be shown to be a conditional deed. (Babcoclc v. Wyman, 19 How., 289; Boyd v. McLean, 1 John., ch. 582.) In a question where the transaction to be determined was whether it was a sale or a mortgage, and oral evidence was objected to as inadmissible to contradict, vary, or add to the contents of the writing, extraneous evidence has been held admissible upon *122 principle and authority. The language used by the parties can not be qualified or varied; but where the instrument is in form a conveyance but was in fact intended to be a security, it is competent to show by parol evidence what the real transaction was; the object of the parties in giving and receiving the instrument may be considered; and when courts of equity, looking beyond the terms of the instrument, find the real transaction to be one of security and not of sale, effect will be given to the actual contract to prevent fraud or oppression and to promote justice. (Russell v. Southard, 12 How., 139; Hughes v. Edwards, 9 Wheat., 489; Peugh v. Davis, 96 U. S. It., 336; Bride v. Bride, 98 U. S. B., 514.)
That the cession under consideration was by treaty does not exclude those means of ascertaining the intention of the parties which have the effect of informing the court of every material fact supposed to govern them when the treaty was executed, if, as appears here, the ceding clause be followed by language embodying such terms and conditions as to raise reasonable doubt of what the parties really intended. The terms submitted by the commissioners for the United States at Fort Smith, showing the qualified character of the title proposed to be acquired, and which the delegates to whom the terms were submitted were willing to grant, if such terms do show any such thing, are therefore competent to be considered. They are a part of the res gestee of the transaction which, if explanatory of the objects of the treaty, ought to be considered in common justice, as well as in obedience to the plain command of the statute in this behalf. The act conferring jurisdiction is misleading and delusive if without the power to direct the court to consider the treaty as a contract and apply the rules which obtain in equity to ascertain its meaning Congress has shifted the responsibility of reaching the intent of the treaty upon the court. The inquiry being always open to the Indians how they understood their treaty as a contract, it was competent for Congress to direct the consideration of extrinsic facts in explanation of the intent. This includes the examination of matters historically true and all circumstances throwing light upon the intent and the reason and justice of the matter and the uses in this case to which the small consideration was to be put upon its ultimate payment, so that the treaty should not lead *123 to injustice, oppression, or absurd consequence. (Holy Trinity Ghureh v. The United States, supra.)
It is not witbin the province of a court, either of law or of equity, to consider allegations of fraud or duress in procuring the treaty. (Western Gherokees v. United States, 27 O. Cls. B., 1; United States v. Old Settlers, 148 U. S. B., 466.)
But this is not a case involving the good faith of the action of the Government, or of those officials who procured the treaty, nor within the principle of the case just cited, where both parties were entitled to have and receive, by virtue of the act conferring jurisdiction, only those things to which they were entitled under the stipulations of a treaty plain upon its face, concerning which there was but little or no controversy, but one where the instrument, being ambiguously expressed, left room for doubt as to the intention of the parties. The jurisdictional act, following the rule in equity in such cases, admits proof of matter underlying the instrument as an aid in expounding the ambiguity. It was competent for Congress to direct this method of arriving at the doubtful intent in the matter of an agreement with one of the domestic tribes, not to found an implied trust of that character known to equity jurisdiction as one independent of express intent forced upon the conscience by operation of law, but to ascertain whether a trust arose upon the presumed intention of the parties.
The court can not undertake to do what the parties on the face of the agreement have stipulated they only should do, as shown in the case of The Amiable Isabella (6 Wheat., 1). There it appears the parties to the Spanislrtreaty of 1795 had clearly provided that the form of the passport agreed to be annexed to the treaty was to be fixed by themselves, and it was accordingly held that the court could not annex the form upon the failure of the parties so to do. Here, if the United States have clearly taken the leased land, then they have the possession of whatever they intended to take, and moral obligations are to be excluded, as in all other cases of clearly expressed intent and understanding. But unless it is manifest from the instrument that the United States, for the small consideration named, have the absolute title of these millions of acres for public purposes, and not for mere purposes of Indian settlement, as provided by the treaty of 1855, then the environments of the parties *124 must be taken into account in determining tbe purpose of the cession. If the parties ceding the land in such case understood the proposition to which they were invited to assent as one not designed to take the land from them absolutely, it is not probable they scanned the agreement with the same degree of care and vigilance as the proposition itself. This proposition tended to prevent such scrutiny, and, if it were necessary, throw them off their guard, and in this respect the case is not unlike that of Insurance Company v. Hearne (20 Wall., 494).
The question resolves itself at last into the understanding of the parties, and especially the understanding of the Indians, with respect to the meaning of an uncertain agreement arising out of the transfer of an immense domain for a nominal consideration, the incorporation of a large body of Indians as well as freedmen into the body politic of the plaintiff nations, and the receipt by them of a small sum stipulated to be paid for uses not necessarily relating to the advantage of the parties, but for those whom the treaty provided were to be incorporated. The rules to be applied in arriving at the understanding of the parties are those which relate to a treaty between the Government as a superior and a domestic tribe as an inferior, and the presumption of fact and of right presupposed from the relation existing between the said parties and the rights and conduct of each under the agreement. The use of evidence aliunde the instrument showing, or tending to show, the avowed objects in view does not necessarilyimplythat the language of the treaty is to be amended by the extrinsic matter, or that the treaty executed by the parties is to be displaced for one to be made by the court (which, of course, can not be done), but that the doubtful instrument as it appears to have been written is to be interpreted in the light of the occurrences which explain the intent and the reasons for the different understanding. So that if. the treaty admits of two constructions, one restrictive as to the rights that may be claimed under it, and the other liberal, the latter is to be preferred. (..ELauenstein v. Injnham, 100 U. S. R., 483.) This view is not inconsistent with the argument for the United States in the construction of the Choctaw treaty of 1820, where a map not a part of the agreement is yet sought to be incorporated within its terms upon the mere statement of the commissioners for the Government in transmitting the treaty that *125 Little Eiver, “from an examination of the map,” would be found at a certain place.
The acts and declarations of executive officers of tbe two Indian governments and of the United States are competent, whether viewed as admissions on the part of the nations as an absolute cession or as admissions of a trust on the part of the United States, but such acts and declarations are not binding. Contemporaneous construction, however, by those called upon to act under the law where the matter is ambiguous or doubtful ought not to be overruled without cogent reasons. {Brown y. United, States, 113 U. S. E., 571, and authorities cited.)
Concerning any legislative acts, the importance of these must be measured by their relation to the subject, the language used with respect to the character of the cession, and the circumstances under which they were made.
As the national governments of the two nations never made any express acknowledgment of the absoluteness of the cession of any land, and the Congress of the United States did pass an act fixing in express words the trust character of other lands ceded by the same language by which the lands in suit were ceded, the effect of this act will be considered. (Act of 1891, § 15, 26 Stat. L., 989,1025.)
The lauds mentioned in this act were a part of the leased district, and the statute was passed on the memorial of the Choctaws and Chickasaws to compensate them for precisely the same- kind of an equitable or reversionary interest claimed here. The lands now in controversy had not then been appropriated, but the lands paid for under the act mentioned had been seized under an Executive order, which was subsequently approved, and the Cheyenne and Arapahoe Indians had been placed thereon.
The act is urged by the claimants as a legislative determination in favor of claimants conclusive upon two theories: First, that the act is in pari materia with article 3 of the treaty of 1866, and second, that it is a legislative construction which of itself must be obeyed by the courts as the law of this case. It is assailed by the defendants as an act based on erroneous statements contained in the memorial of the claimants, annexed to a report of a committee of Congress (H. E. 3147, Fifty-first Congress, first session, and Senate Mis. Doc., 107, ib.), whereby Congress was misinformed and its members misled, and also *126 because the provision appropriating $2,991,450 for the payment of the Choctaw and Chickasaw beneficiaries was inserted as an amendment to a general bill in the last days of the Congress which passed the law, and that in spite of House opposition to the Senate amendments the amended bill was passed, as Congress was nearly ready to adjourn. It is finally questioned as not covering the precise land in controversy here.
Eespect for a coordinate branch of the Government forbids the courts to assume legislation to be the result of fraud or misinformation, or that Congress acted hastily or improvidently.
That dangers exist and injustice sometimes results from appropriations in settlement of private claims in all legislative bodies is recognized, and by none more sensibly, perhaps, than by those most responsible; but in all cases it must be taken for granted that those who seek relief state their case most strongly for their interests and draw inferences not calculated in every case to stand the test of careful investigation. While the friends which such a measure secures may even be imposed upon in occasional instances, we can not suppose any act of Congress to be the result of misconception or imposition.
But the entire history of the legislation now assailed refutes the defense. President Harrison withheld his veto to the act in question, though he believed the cession made by the treaty of 1866 was absolute, on the ground that the executive veto would defeat the entire bill carrying appropriations for other objects. This fact subsequently appeared in a special message from the President to Congress, in which he also stated his belief that the lands for which the money was to be paid were not ceded in trust. This message was first considered by the two Committees on Indian Affairs and afterwards in the Senate and House, and again the matter was discussed in the light of the views submitted by the President, and again Congress affirmed its declaration of the trust character of the estate conveyed by the treaty and directed the payment of the money covered by the appropriation.
The debates in Congress are not evidence for the purpose of interpreting a law or treaty. Upon a question of information, or want of it¡ in the legislative body concerning a measure that becomes enacted into law, if such an issue could be raised, debates are admissible to show the fact of discussion, but nothing more.
*127 The action of the Fifty-second Congress affirming their declaration of the trust was qualified by a proviso to the resolution declaring that neither the passage of the original act carrying the appropriation to pay the Choctaws and Chickasaws for their interest in the lands of the Cheyenne and Arapahoe Reservation, lior of the resolution affirming the act, should be held in any way to commit the Government to the payment of any further sum for any interest alleged by the claimants in the remaining lands of the leased district. (Joint Res. Jan. 18, 1893, 27 Stat. L., 753.) Following this came the jurisdictional act in the Fifty-third Congress, that as to the best lands nothing contained in the jurisdictional act shall be construed as a confession that the United States admit that the Choctaw and Chickasaw nations have any claim to or interest in said lands. (28 Stat. L., 898.) Thus Congress was tenacious of the legislative interpretation of the treaty and unwilling to recede from that view as it related to the lands seized, but for any lands thereafter claimed to be taken in violation of the trust the claimants were to be held in abeyance, according to circumstances. The agreement between the United States and the defendant Indians raised the issue in such form Congress chose to send the whole matter here for investigation in connection with the claim of the Wichitas as first occupants.
The jurisdictional act eliminates the binding character of the previous legislative construction, and to that extent is a repeal of the act of 1891. In any event the act of 1891 can not be accepted as binding'on the court, but is chiefly valuable as showing by way of argument that a trust in favor of the claimants was created by the treaty of 1806 on all the lands included in the cession, and as showing that if Congress regarded the matter in that light the claimants probably understood the matter the same way when they executed it.
Article 3 cedes the land in the following language: “The Choctaws and Chickasaws, in consideration of the sum of three hundred thousand dollars, hereby cede to the United States the territory west of the - ninety-eighth degree of west longitude known as the leased district: Provided, etc.”
The claimants contend that even this clause of article 3 standing alone did not transfer or divest the property of the members of- the Choctaw and Chickasaw nations in the lands, because it was.not competent for their governments, except in *128 tbe exercise of the right of eminent domain, to transfer the title owned and enjoyed by the individuals of the nations.
Private ownership of property in territory ceded by one State or nation to another generally remains unimpaired by the terms of treaties which transfer dominion of the ceded country, but how such a question can be put into this case for purposes of practical relief is not clear. It is true the nations in their sovereign capacity have preferred their claim as such and have filed their petition in the name of and for the benefit of the members and citizens of the nations also, but the act conferring jurisdiction directs the court to determine the rights of the nations. No mention is made of the claims of individuals in the jurisdictional, statute, and no claims of a private character seem to have ever been preferred by any of the members of these nations in memorializing Congress on the subject of their rights.
The first grant of lands from the United States, which included those in controversy, was made to the Choctaw Nation. (Treaty of 1820, art. 2.) Under the provisions of the treaty of 1830 and of the patent thereunder, title was vested in “ the Choctaw Nation” and their descendants in fee simple, to inure to them while they shall exist as a nation and live upon it. (Treaty of 1830, art. 2.) The treaty of 1855, by its first article, provided—
“And pursuant to an act of Congress approved May 28, 1830, the United States do hereby forever secure and guarantee the lands embraced within the said limits to the members of the Choctaw and Chickasaw tribes, their heirs and successors, to be held in common, so that each and every member of either tribe shall have an equal undivided interest in the whole: Provided, however, No part thereof shall ever be sold without the consent of both tribes, and that said land shall revert to the United States if said Indians and their heirs become extinct or abandon the same.” (11 Stat. L., 612.)
This guaranty, being pursuant to the act of May 28, 1830 (4 Stat. L., 411), must necessarily be such a guaranty as that act authorized in the following section:
“Sec. 3. And he it further enacted, That in the making of any such exchange or exchanges it shall and may be lawful for the President solemnly to assure the tribe or nation with which the exchange was made that the United States will forever secure and guarantee to them, and their heirs and successors, *129 the country so exchanged with them; and, if they prefer it, the United States will cause a patent or grant to be made and executed to them for the same: Provided, always, That such lands shall revert to the United States if the Indians become extinct or abandon the same.”
It was not the object of the treaty of 1855 to recognize rights, of private ownership or change the nature of the Indian title of occupancy into one of different character. That treaty on its face shows it was in settlement of the claims of the Ohicka-saws as against the Choctaws, and' the lands covered by the guaranty were to be held in common thereafter by the two tribes instead of one; that is, each member of each tribe was to have the same rights in the country of the two nations that, the members of one tribe form erly had under the treaty of 1830, before the convention of 1837 between the two nations. The guaranty was intended to secure to two tribes in common what one tribe had before then enjoyed to itself alone. The land continued to be tribal land after this treaty as much as it had been before, in the sense that when it again became the subject of treaty with the United States the nations could only deal with it, and when they ceded it, such cession by them extinguished the claims of the members absolutely.
The nature of the Indian holding was something like the base or qualified fee defined to be such a one as hath a qualification subjoined thereto, and which must be determined whenever the qualification annexed to it is at an end. ' (2 Blacks., 109.) Defining a qualified base or determinable fee, Chancellor Kent says it is an interest which may continue forever, but the estate is liable to be determined, without the aid of a conveyance, by some act or event circumscribing its continuance or extent. It is the uncertainty of the event and the possibility that the fee may last forever that renders the estate a fee and not merely a freehold. If the condition attached to the fee is one which is certain to happen, then there is a reversion. If such condition is one which may never, happen, there is not a reversion, but only a possibility of a reversion. (4 Kent Com., 9; 1 Washburn on Beal Prop., 90.)
The individuals of these nations had no such estate by any treaty as upon the death of any member descended to his immediate heirs. The land was communal property, which *130 upon the death of any member descended, as to his interest, to ail the surviving members of the tribe alike.
The United States already had sovereignty over the land, subject to the uses of the two nations under the treaties. If by article 3 of the last treaty the nations made an absolute cession, the act of the body politic disposed of whatever private interest the members had in the land, as well as the dominion of the tribes in their corporate capacity.
Subtle and plausible as the argument seems to be as a piece of judicial literature, it is not tenable upon its merits. As the controversy here does not relate to the character of the title as between the members and the nations in their corporate capacity, we could not entertain claims of private ownership on the merits if established.
Following the cession is a proviso relating to the disposition and uses of the fund. Then come numerous articles covering many subjects with much circumstantiality of detail. Prominent features in the treaty which manifest the purposes of the Government are those provisions relating to (1) the admission of persons of African descent resident in the country to certain rights and privileges then possessed by the Choctaws and. Chickasaws and securing to the descendants of the former the same rights and privileges, including rights of property, and (2) those providing for the admission of certain Indians into the country, and (3) the continuation of that condition of affairs which would keep the country for the use of Indians exclusively.
The stipulations announced by the commissioners at the Fort Smith council were manifestly attempted to be carried out, but the manner and form of doing so, and whether accurately and fully embodied in the treaty, afford room for controversy, especially as to the fifth stipulation.
Conspicuously apparent are the provisions establishing an Indian territorial government in the Indian Territory and excluding white men, and confirming to the Choctaw and Chickasaw nations all the rights, privileges, and immunities theretofore possessed by the said nations, or the individuals thereof, to which they were entitled under previous treaties not inconsistent with the one then executed.
Twenty-seven articles are devoted to a scheme for the survey of the lands of the nations east of the ninety-eighth degree *131 of west longitude and a division of tbe lands into severalty with, a right of selection, first, by the Choctaws and Ohicka-saws, and then by Indians known and designated as Kansas Indians, not exceeding 10,000 in number, and then by the persons of African descent named in the third article of the treaty. There was, by the provisions of the treaty in regard to the selections of the land in the order named, a chance for a part of the agreement to- become ineffective, and this part did very soon come to naught by the refusal of the two nations to approve the same.
Why so many things should be annexed to a simple cession of land if the transfer was meant to become absolute does not appear. Enough does appear to make an unqualified transfer seem inconsistent and repugnant, and though some of the conditions and qualifying words leave room to suppose that no reservation as to title or an interest in the land was intended to be made, taken as a whole the language following the cession is inconsistent with the absoluteness of the transfer and offers a glaring want of reciprocity and equality between the parties. There is at . least enough of contradiction and inequality to create the belief that, as the parties did not see fit to make the cession for so much money to be paid and stop at that, something else was intended by one party or the other, or by both.
The first and second stipulations announced by those negotiating the matter for the United States are embodied in article 1 of the treaty as it was actually executed. The third and fourth of these stipulations appear in articles 2,3, and 4. The sixth stipulation is in article 8, and the seventh in article 43.
The third article relates to the cession of the leased district for Indian purposes, and the third and fourth articles to the provisions to be made for freedmen of African descent. The fifth article relates to a general amnesty for past offenses as therein stated. The sixth article relates to granting the right of way to railroads which may be authorized to be constructed through the Territory. Article 8 relates to the establishment of an Indian Territorial government in the Indian Territory, as provided for in the sixth stipulation at Fort Smith. Article 9 relates to educational purposes. Articles 10 and 45 relate to the reaffirmance by the United States of all their former obligations to the Choctaws find Ohickasaws.
*132 Commencing with article 11 and ending with article 37, both inclusive, and including all intervening articles, provision is made for a survey of all the Choctaw and Chickasaw lands east of the ninety-eighth degree and division of the lands into severalty. This is the scheme which fell through because it was made dependent upon the will of the Choctaw and Chickasaw legislatures, as provided in the eleventh article, the first of the articles relating to the scheme. It has no apparent connection with the fifth stipulation at Fort Smith, because that was an absolute requirement, and this scheme was conditional, and because no such scheme was suggested in the fifth stipulation.
Article 38 defines who áre members of the Choctaw and Chickasaw nations. Articles 39 and 40 refer to trading purposes. Article 41 relates to the competency of Choctaws and Chickasaws as witnesses, Article 42 relates to the delivering up of criminals. Article 43 relates to the exclusion of white men from the Indian Territory. Article 44 to the establishment of post-offices. Article 45 is to be read in connection with article 10. Article 46 relates to an advance of money to .Choctaws and Chickasaws. Article 47 relates to certain provisions concerning funds and annuities, effective upon request, after lands had been assigned in severalty. Article 48 relates to payment of the Choctaw and Chickasaw commissioners. Article 49 relates to awards to loyal Choctaws and Chickasaws. Article 50 relates to payments to loyal citizens of the United States for losses. Article 51 provided for an abrogation of all inconsistent treaties and parts of treaties.
Taking the form given by the secretary of the council as to the fifth stipulation, we find that a portion of the lands were required to be set apart for two distinct classes of Indians— (1) friendly tribes then in Kansas, and (2) friendly tribes then located elsewhere.
The following articles of the treaty must be considered to determine the value of the contentions of the defendants with respect to the omission or embodiment of the vital terms of the unsigned treaty and the ultimatum submitted at the outset, to wit:
“Art. 3. * * * Until the legislatures of the Choctaw and Chickasaw nations, respectively, shall have made such laws, rules, and regulations as may be necessary to * * * *133 give to suca persons, who were residents, as aforesaid, and tbeir descendants, 40 acres, each, of tbe land of said nations, on the same terms as the Choctaws and Ohickasaws, to be selected on the survey of said land, after the Choctaws and Chickasaios and Kansas Indians have made their selections, as herein provided; * # *
“ Art. 11. * * * Should the Choctaw and Chielcasaw people, through their respective legislative councils, agree to the survey and dividing their land, on the system of the United States, the land aforesaid east of the ninety-eighth degree of west longitude shall be, in view of the. arrangements hereinafter mentioned, surveyed and laid off in ranges, townships, sections, and parts of sections; * * *
“Art. 12. The maps of said surveys shall exhibit, as far as practicable, the outlines of the actual occupancy of members of the said nations, respectively, and when they are completed shall be returned to the said land office at' Boggy Depot for inspection by all parties interested, when notice for ninety days shall be given of such return. * * *
“Art. 15. At the expiration of the ninety days notice aforesaid, the selection which is to change the tenure of laud in the Choctaw and Chickasaw nations from a holding in common to a holding in severalty shall take place, when every Choctaw and Chickasaw shall have the right to one quarter section of land. * * *
“ Art. 25. During ninety days from the expiration of ninety days’ notice aforesaid the Choctaws and Chickasaws shall have the exclusive right to make selections, as aforesaid. * * *
“ Art. 30. The Choctaw and Chickasaw nations shall receive into their respective districts, east of the ninety-eighth degree of west longitude, in the proportion of one-fourth in the Chickasaw and three-fourths in the Choctaw Nation, civilized India/ns, from the tribes known by the general name of the Kansas Indians, being Indians to the north of the Indian Territory, not exceeding 10,000 in number, who shall have in the Choctaw and Chickasaw nations the same rights as the Choctaws and Chickasaws, of whom they shall be the fellow-citizens, governed by the same laws, and enjoying the same privileges, with the exception of the right to participate in the Choctaw and Chickasaw annuities and other moneys and in the public domain, should the same, or the proceeds thereof, be divided per capita among the Choctaws and Chickasaws, and, ambng others, the right to select land, as herein provided for Choctaws and Ohickasaws, after the expiration of the ninety days, during which the selections of land are to be made, as aforesaid, by said Choctaws and Chickasaws. * * *
“ Art. 31. And whereas some time must necessarily elapse before the surveys, maps, and selections herein provided for can be completed, so as to permit the said Kansas Indians to make their selections in their order, during which time the United *134 States may desire to remove the said Indians from their present abiding- places, it is hereby ag'reed that the said Indians may at once come into the Choctaw and Chickasaw nations, settling- themselves temporarily as citizens of the said nations, respectively, upon such land as suits them and is not already occupied.
“ Art. 37. In consideration of the right of selection herein-before accorded to certain Indians other than the Choctaws and Ohickasaws, the United States agree to pay to the Choctaw and Chickasaw nations, out of the funds of Indians removing into said nations, respectively, under the provisions of this treaty, such sum as may be fixed, by the legislatures of said nations, not exceeding $1 per acre.” * * *
We think the fifth stipulation meant tribal occupancy and a future agreement with reference to this kind of an occupancy, and there is no such agreement to be found in article 30.
The term “ elsewhere,” appearing in the fifth stipulation, embraced any and all country in which such tribes were located at that time except the State of Kansas. As it appears in the fifth stipulation it is clearly not embodied in the said article. Its provisions can not apply to tribes not located either in Kansas or north of the Indian Territory. The word “ elsewhere ” can not be ignored, nor can it be assumed that it only embraces localities north of the Indian Territory and that all tribes are covered by that part of article 30 referring to “civilized Indians, from the tribes known by the general name of the Kansas Indians, being Indians to the north of the Indian Territory.” The term must be taken to mean what the president of the_ council stated when he informed the Indians that the commissioners were empowered to treat with the delegates of the tribes located within the Indian Territory and others living west and north of it. The propositions were addressed to seventeen tribes, living in various places.
The proposition that the leased district could not have been embraced within the land required by the fifth stipulation to be set apart for friendly Indians is sought to be maintained upon the theory that the stipulation required “ a portion of the lands hitherto owned and occupied ” by those to whom the stipulations were submitted, and the Choctaws and Chickasaws it is known were not then in the occupancy of the leased district. This argument is tantamount to saying that the fifth stipulation meant that the lands to be set apart should not only be owned but actually occupied by the owners at the *135 same time and that tbe portion to be set apart for friendly Indians was not to come from the large portion owned but constructively occupied. As the land west of the ninety-eighth meridian was still owned by the claimants and the lease did not terminate their rights as owners, and as article 3 of the treaty of 1855 provided that the land in suit should be a part of the Choctaw district, and by article 9 of the same treaty it was to remain open to settlement by Choctaws and Chickasaws, as it had been, we think the commissioners did not mean to exclude the leased land from that required to be set apart. The claimants were as much the actual occupants of that part of the leased district not used by the Wichitas as they were of the major portion of their domain east of the ninety-eighth meridian.
Articles 30,31, and 37 presented a general scheme for a survey and division of the lands in severalty east of the ninety - eighth degree, the whole thing being elaborated in articles 11 and 12 to 37, inclusive. The scheme of the treaty outside of tribal occupancy is disclosed in article 11, where provision is made for allotting lands among the people of the two nations so that the lands would be held in severalty instead of in common, and for that purpose to survey it into ranges, townships, and sections aud parts of sections. Then came the series of articles providing for the maimer of making selections. This scheme failed for want of Choctaw and Chickasaw consent, as stated. So everything contained in the articles beginning with 11 and ending with 37 maybe considered out of the treaty. The commissioners of the United States would most probably not have made a demand for a portion of the lands of these claimants and then put it in their power to completely nullify the demand unless it was intended to give effect to the fifth stipulation somewhere else.
Article 30 does not mean the admission of tribes as such, but individual civilized Indians from tribes who upon their admission might become citizens of the Choctaw and Chickasaw nations.
Article 31 provides that they might come at once, settling themselves temporarily as citizens on lands not occupied.
Article 37 provides that the United States should pay the Choctaws and Chickasaws such sums as the legislatures might fix, not exceeding $1 per acre, for the lands taken by those *136 coming in as citizens. These were provisions for individuals to become citizens and take special allotments of sections and to hold the surplus or unallotted lands in common by all the Choctaws and Chickasaws and the new citizens together, who, by the act of coming in and taking a part of the land, become Choctaws and Chickasaws to all intents and purposes.
This scheme was not a setting apart of a portion of the lands owned and occupied for the friendly Indians in Kansas and elsewhere.
The fifth stipulation is either implied from the language of the third article or omitted altogether from the treaty. The fourth article of the unsigned treaty contemplated a definitive agreement by the Choctaws and Chickasaws to admit friendly Indians to their country east of the ninety-eighth degree. The agreement as actually made was a conditional one for the admission of friendly Indians, limited to a certain number, to come in as citizens. Their occupancy was not to be a tribal occupancy.
Article 31 can not be construed to mean that the United States possessed the right to settle Indians east of the ninety-eighth degree until the Choctaw and Chickasaw legislatures should decide to survey and divide their lands east of that degree. In stipulating that the Kansas Indians might come into the Choctaw and Chickasaw country at once without waiting for the surveys and maps, the agreement must be read with other articles on this subject and interpreted to mean that when the legislatures approved the plan of making the surveys and maps for the division of the lands the Kansas Indians might then come at once. The survey was never begun, none of the Kansas Indians ever came east of the ninety-eighth degree, and the United States has never attempted to put any of them there. The terms prescribed in article 37 have reference to the Kansas Indians and the terms of their admission if they were to be admitted by the action of the legislatures of the Choctaws and Chickasaws within the limits prescribed by the treaty. The fifth stipulation contemplated the terms to be fixed either by the parties with the approval of the Government or by the Government itself. The difference is apparent-enough to lead to the conclusion that article 37 does not embody the fifth stipulation.
*137 For the reasons set forth, articles 30, 31, and 37 do not satisfy the requirements of the ultimatum presented at Fort Smith.
The fifth stipulation is implied from the language of the cession, because as to the land west of the ninety-eighth degree it was to be set apart and presumably conveyed to carry out the purpose resting unmistakably in writing in the statement of the president of" the council at Fort Smith and in the unsigned treaty offered by the commissioners of the United States before the adjournment of the council. If the purpose of the cession was not explicitly stated in the treaty, the conditions were present upon which it was demanded and acceded to, and having been acted on under these circumstances the cession and the demand for it must be construed together as the thing the parties intended to consummate.
The proviso to article 3 relates to the disposition and uses of the fund when the grantors should, within two years after the ratification of the treaty, make laws, rules, and regulations conferring on persons of African descent resident among them all the rights, privileges, and immunities of said nation, including the right of suffrage, together with 40 acres of land to be assigned to each of them. On the enactment of the necessary laws providing for these people the consideration was to be paid to the claimants, less such sum at $100 per capita as should be sufficient to pay those persons of African descent actually removing. If these laws were not made within the two years, then the money was to be held by the United States for the use and benefit of such of those freedmen as the Government should remove, the United States agreeing within ninety days from the expiration of two years to remove all those willing to •go, but the freedmen remaining or returning to have no benefit of the $300,000, but to be upon the same footing as other citizens of the United States in said nations. The express language is, that the consideration shall cease to be held in trust for the Choctaws and Ohickasaws should the laws of the nations necessary to give the privileges and rights of property named not be passed within the two years. And to guard against the contingency of the failure of the nations to pass the laws necessary to invest the freedmen with the certain rights stipulated for their benefit in the third article, it was provided by article 4 that—
*138 “The said nations further agree that all negroes, not otherwise disqualified or disabled, shall be competent witnesses in all civil and criminal suits and proceedings in the Choctaw and Chickasaw courts, any law to the contrary notwithstanding; and they fully recognize the right of the freedmen to a fair remuneration on reasonable and equitable contracts for their labor, which the law should aid them to enforce. And they agree, on the part of their respective nations, that all laws shall be equal in their operation upon Choctaws, Ohicka-saws, and negroes, and that no distinction affecting the latter shall at any time be made, and that they shall be treated with kindness and protected against injury; and they further agree that while the said freedmen now in the Choctaw and Chickasaw nations remain in said nations, respectively, they shall be entitled to as much land as they may cultivate for the support of themselves and families, in cases where they do not support themselves by hiring, not interfering with the existing improvements without the consent of the occupant, it being understood that in the event of the making of the laws, rules, and regulations aforesaid, the forty acres aforesaid shall stand in place of the land cultivated as last aforesaid.”
Thus, article 4 substitutes immediate actual but temporary civil and property rights to be enjoyed by the freedmen until the permanent scheme of the treaty was worked out.
Article 46 is as follows:
“ Of the money stipulated to be paid to the Choctaws and Chickasaws under this treaty for the cession of the leased district, and the admission of the Kansas Indians among them, the sum of one hundred and fifty thousand dollars shall be advanced and paid to the Choctaws and fifty thousand dollars to the Chickasaws through their respective treasurers, as soon as practicable after the ratification of this treaty, to be repaid out of said moneys or any other moneys of said nations in the hands of the United States; the residue, not affected by any provision of this treaty, to remain in the Treasury of the United States at an annual interest of five per cent, no part of which shall be paid out as an annuity, but shall be annually paid to the treasurer of said nations, respectively, to be regularly and judiciously applied, under the direction of their respective legislative councils, to the support of their government, the purposes of education, and such other objects as may be calculated to promote and advance the welfare and happiness of said nations and their people, respectively.”
Stripped of all technical considerations, the practical effect of the claim for the absoluteness of the cession is such as to involve the taking by the white man, for a consideration to be applied to the benefit of the black man, some millions of acres *139 of land belonging to tbe red man, tbe transfer so operating as to enable tbe whites to keep tbe land and tbe red people to get tbe consideration only by surrendering its equivalent to tbe blacks. That tbe Government took tbe ceded land followed by some sort of a use in tbe grant in those making tbe cession seems probable, unless tbe intention existed to wrong tbe grantors, and that we can not any more believe than we can to entertain tbe suggestion that it was the policy of tbe United States to take this land from tbe claimants because of their participation in tbe rebellion.
Tbe theory that tbe cession became absolute involves tbe United States in the plan of deliberately abandoning the original lease of tbe ceded territory. By that lease tbe Government already bad all tbe rights it wanted in tbe land except tbe privilege of putting Indians there not named in tbe lease. Tbe effect of tbe abandonment of tbe lease would include an abandonment of tbe very purpose for which tbe lease was taken, for if tbe leased land was to become a part of tbe public domain it ceased to be Indian country. Every stipulation that tbe country should be kept intact as Indian country would thus be violated as well as every policy of tb.e Government reversed.
Article 43 expressly prohibits white intruders. Taken in connection with tbe establishment of an Indian territorial government in tbe Indian Territory, as provided in article 8 of tbe treaty, the sixth stipulation presented at Fort Smith is made to appear, and additional emphasis is given to tbe guaranty of tbe Dancing Rabbit Greek treaty under which the Choctaws left Mississippi to live upon this land. Article 43 is as follows:
“Akt. 43. Tbe United States promise and agree that no white person, except officers, agents, and employees of tbe Government, and of any internal improvement company, or persons traveling through or temporarily sojourning in, the said nations, or either of them, shall be permitted to go into said Territory, unless formally incorporated and naturalized by tbe joint action of tbe authorities of both nations into one of tbe said nations of Choctaws and Cliickasaws, according to their laws, customs, or usages; but this article is not to be construed to affect parties heretofore adopted, or to prevent tbe employment temporarily of white persons who are teachers, mechanics, or skilled in agriculture, or to prevent tbe legislative authorities of tbe respective nations from authorizing such works of *140 internal improvement as they may deem essential to the welfare and prosperity of the community, or be taken to interfere with or invalidate any action which has heretofore been had in this connection by either of the said nations.”
Article 4 of the treaty of 1830 says:
“ The Government and people of the United States are hereby obliged to secure to the said Choctaw Nation of Eed People the jurisdiction and government of all the persons and property that may be within their limits west, so that no Territory or State shall ever have a right to pass laws for the government of the Choctaw Nation of Ked People and their descendants.”
Articles 10 and 45 reaffirmed the obligations of the Government with respect to all rights to which the nations were entitled by former treaties and the legislation thereunder as far as consistent with the new treaty. These articles are consistent with the cession for Indian purposes and in harmony with the recitals which, providing for the repayment of a part of the money after the admission of the Kansas Indians and the application of the other part of the consideration to the support of a government which included the new population proposed to be incorporated, continued the country for the use of Indians.
That a use should have been retained to the Seminóles, the Creeks, and the Oherokees in the lands ceded by them while an implied trust did not result to the Choctaws and Chickasaws is incredible when we consider the purposes for which all the lands were wanted under the ultimatum addressed to all alike.
The grant in the Seminole treaty of March 11, 1866, was made “ in compliance with the desire of the United States to locate other Indians and freedmen thereon.” (14 Stat. L., 755.) It was an unlimited grant and the Seminóles ceded and conveyed their entire domain of 2,169,080 acres for $325,362, being about 15 cents an acre. When these lands were sought to be diverted from the purposes for which they were set apart the question arose as to the measure of Seminole right therein, with the result that Congress appropriated $1,912,942.02 for their reversionary interest. (Ex. Doc., 50th Cong., 2d sess.; 25 .Stat. L., 1004.)
The grant of lands in the Creek treaty of June 14,1866, was made “in compliance with the desire of the United States to *141 locate other Indians and freedmen thereon.” The Creeks ceded the west half of their entire domain “to be sold and used as homes for such other civilized Indians as the United States-may desire to settle thereon.” (14 Stat. L., 785.) This was a cession, with limitations, of 3,250,500 acres for $975,168, or about 30 cents an acre. When the Creek lands were sought to be opened for public settlement Congress appropriated $2,280,857.10 for the equity of the Creeks in the lands, being at the rate of $1.25 per acre, deducting the 30 cents per acre paid under the treaty of 1866 as to unassigned lands and 20 cents per acre to cover expenses on lands which had been assigned to other Indians and occupied by them. (Ex. Doc. 98, 50th Cong., 2d sess.; 25 Stat. L., 759.)
The treaty with the Cherokees of July 19, 1866, was dissimilar from all the other treaties. The Cherokees agreed to sell to the United States, at a price to be agreed on, the territory west of the ninety-sixth degree of west longitude, for the settlement of friendly Indians, as wanted. By the failure to agree on terms the President of the United States was to fix the price of the land, and in the meantime the Cherokees were to have exclusive jurisdiction of all the unoccupied lands, so that no white man should come in. (14 Stat. L., 799.)
The suggestion appears that the lands which formed the subject of these different treaties were not held by the same kind of a title, and that the terms are unlike in all the agreements.
The existing circumstances were not precisely alike, and there were different conditions of estate held by the different tribes, and different subjects were necessary to be treated. This state of affairs accounts for the use of different phraseology in making each treaty. Pervading each agreement is the purpose to continue to hold all the lands for Indians alone. Nowhere does the suggestion appear to have lands ceded to be added to the public domain.
No reason existed for discrimination against the Choctaws and Ghickasaws, except that the United States held a lease on some of their land. But it was only a lease for purposes quite restricted — a permit to the Government to put certain Indians there. The Government not only could not sell the land, but it could not go upon it. The lease itself stood in the way of the enlarged policy suggested in 1864, but with some provision *142 admitting Indians from country not named in the treaty of 1855 •, or with a cession having in view those objects we think the Government got all it intended to get. Under its terms the Choctaws and Ohickasaws might have occupied its unsettled portion by abandoning every other acre of land than occupied by them not embraced in the lease, thus frustrating the purpose of getting more settlements on the leased territory.
The treaty which finally defined the title and tenure of the Creeks and Seminóles to their lands was entered into August 7,1856. (11 Stat. L., 699.) In article 3 of that agreement the same title by which the lands were held by the Creek Nation by the fourteenth article of the treaty of 1832, the third of the treaty of 1833, and by the letters patent of 1852 were guaranteed to the Seminóles and to the Creeks. (11 Stat. L., 699.) Those agreements conferred the fee to continue to said Indians so long as they existed as nations and occupied the country. This was substantially what was done for the Choctaws by the treaty of 3830.
It would be against the history of our dealings with nearly every other tribe at the close of the war to say that the civilized tribes were singled out because of their acts of hostility during the strife as special objects of punishment, and that because of their participation in the struggle it was the policy of the Government to inflict punishment upon them either by the deprivation of any of their funds or by the forfeiture of their lands. It would also be in the face of the treaties with the other three civilized nations and the acts of the Government under these now to insist that the Choctaws and Chieka-saws were intentionally deprived of any part of their lands as the penalty of their hostility, while the Creeks, the Semi-nóles, and the Cherokees were not. If any such purpose had existed Congress no doubt would have manifested it, as they did do in the only case of the kind, where for an unprovoked attack on the settlements of Minnesota the Sioux were deprived of their annuities. (12 Stat. L., 652.)
It was an era of reconciliation and restoration, and while it is true the Indians assembled at Fort Smith in September, 1865, were informed that they were at the mercy of the Government, the suggestion was impressed upon the loyal and disloyal alike, with no suggestion, however, that the common property of all was to be taken for the disobedience of those *143 wbo bad not adhered to the cause of the United States. However true it is that the large majority of the claimants had taken up arms against the Government, the fact remains that individual members of the nations did not do so, and the forfeiture of lands would have been the punishment of all.
And that any such intention existed as regards Indians who happened to be possessed of lands and who were not immediately responsible for hostilities is without belief when it is considered that as to the whites who were responsible and possessed of similar property no suggestion of confiscation was anywhere made. The purpose to take property as a penalty from Indians who could not commit treason, and not take the equivalent from white citizens who could, can not be attributed to the Government without reflecting upon its generosity and justice and contradicting all history.
When the peace demanded was secured from these tribes, the conqueror disappeared, and the public guardian took the place of the agencies of force. Then began in earnest the efforts of the commissioners to secure land for the colonization of other Indians and at the same time to protect as far as practicable the freedmen in the nations, whose situation at that time was peculiar and regarded so to such an extent their removal was deemed especially desirable by the Government.
There is no evidence that it was the understanding that white people were to be excluded merely from the home country of the Choctaws and Chickasaws. What evidence we have points to the conclusion that the parties supposed the guaranty on this subject related to the exclusion of the whites from all Choctaw and Chickasaw territory. The unsigned treaty asked for a modification of the terms of the ninth article of the treaty of 1855, under which Indians were admitted and whites excluded. The modification sought the admission of other Indians only. Everything suggested in the negotiations related to the freedmen who happened to be in the country and to Indians who did not happen to be there; but all propositions were in line with previous treaties, which guaranteed the exclusion of white men and white men’s government, with absolutely nothing to apprise the Choctaws and Chickasaws that the guaranties were meant for a part only of their territory.
The Choctaw and Chickasaw treaty came next after the Seminole treaty. Seeing the Seminóles cede over 2,000,000 *144 acres of land for about $325,000 for a specific purpose — named, it is true, but with no limitation upon the grant, and yet one thought at that time, and conceded now, to leave a reversion-ary interest to the grantors — the Choctaws and Chicksaws had a right to understand, and we think did understand, that when they were required to cede nearly 8,000,000 acres of their land for $300,000 they were not surrendering all their interest in it. While the Seminóles got 15 cents an acre the Choctaws and Chickasaws got about 4 cents an acre, if we assume they got anything at all. The lease which the United States already had on the laud diminished the interest of the Choctaws and Chickasaws to the extent of the rights granted by the lease, and herein we find the reason which probably accounts for the estimate of 4 cents an acre on their land.
On July 4,1866, the United States made a treaty with the Delawares (14 Stat. L., 793). In its preamble it was recited that the United States had made treaties with the Choctaws and Chickasaws, the Creeks and the Seminóles, whereby the Government had ‘ ‘ acquired the right to locate other Indians within ” the Indian country. Under article 4 the United States agreed to sell to the Delaware Indians a tract of land in the Indian country ceded by the Choctaws and Chickasaws, the Creeks or the Seminóles, or which thereafter might be ceded by the Cherokees, the land to be selected by the Delawares. This language implied that the Government got as much of a title from one tribe as from auother, no more and no less, and all for the same purpose. The agreement with the Delawares was in line with and pursuant to the previously announced policy of obtaining land upon which other Indians might be located.
In 1879 the question was raised as to the right of the Government to remove persons from the unoccupied lands who, in apparent violation of the treaties, had gone there. The Secretary of the Interior, in reply'to an inquiry from the Secretary of War on this subject, after reciting the lease of 1855 and the effect of article 9 thereof, stated “that the treaty of 1866 substituted a direct purchase for the lease, but did not extinguish or alter the trust.” This statement is inaccurate as a legal proposition. If the direct purchase become the substitute of the lease which originated the trust, on its face there could be no trust. A direct purchase would supersede the trust outright. Secretary Schurz seems to have confused the *145 matter of an express trust with a trust implied by law. None, however, can doubt that the idea intended to be conveyed was that, despite the direct cession, the Government conceded the reversionary interest of the claimants. And who else could he have meant but the claimants when the Secretary said the purchase did not alter the trust, after referring to the lease which created it in favor of the Choctaws and Chickasaws, and in them alone*? The theory that the trust was for somebody else is not only without support in the proof, but against every conceivable reason for taking a trust for other tribes. ' If the Government took the land in trust for the benefit of other Indians who had no interest in the ceded territory, it accomplished by indirection what it could better have done upon the claim of absolute ownership and with much less inconvenience to itself.
In response to a resolution of the Senate, adopted February 17,1882, calling for information concerning the rights of settlers, another Secretary of the Interior went into the history of these lands and informed the Senate that the cession of the treaty of April 28,1866, with the claimants was, by its tenth article, “made subject to the conditions of the compact of June 22,1855,” in the ninth article thereof. (Secretary Kirkwood’s letters.) President Hayes had, in the meantime, issued his proclamation warning white intruders off these lands, on the ground that they constituted Indian country, for Indians only. President Arthur followed with his proclamation to the same effect. (H. R. 3147, 51st Gong., 1st sess., 19,25.) These proclamations originated before any questions had been sprung from the claimants or in their behalf. The Government was interpreting its own treaty. After the controversy was on and the issue had been made in Congress President Cleveland issued his proclamation on the same subject, thus keeping in line with his predecessors, until the courts should overthrow the •Executive and legislative view of the purposes for which the lands had been ceded. (Proc. March 16,1896.)
As far back as 1881 the Land Office did not regard the leased district as the absolute property of the United States, but “subject to specific trusts,” set forth in detail. Acting Commissioner Holcomb conceded the assumption of trusts under the several treaties which included the Choctaw and Chickasaw agreement. (Rep., Apr. 25,1881.)
*146 . Secretary Teller, in a communication to the Senate concerning lands in the Indian Territory not claimed and occupied by the Five Tribes, said in 1884 that “these lands were acquired by treaties with the various Indian nations or tribes in that Territory in 1866, to be held for Indian purposes, and to some extent for the settlement of the former slaves of some of said nations, or portions thereof.” (Com. Sec. of Int., Feb. 14,1884.) The status of the ceded lands was again considered by the same Secretary the following year, and the first opinion elaborated to the general conclusion that there was a direct trust. (Secretary Teller’s Com. to Senate, Jan. 26,1885.)
The trust character of the estate acquired by the United States was referred to from time to time by other officials connected with the administration of the public lands and of the affairs of the Indians. (Eepts. Comm’r Price, 1885, and Acting Comm’r Belt, 1890.) And in 1889, construing the analogous treaty with the Seminóles, Secretary Yilas said it was claimed, “perhaps with force,” that the unconditional cession by the Seminóles was, in fact, made upon the same understanding as the cession by the Creeks. In the clear absence of any stipulation in the Seminole agreement that the lands would be used according to the expectation, the Secretary did not recognize the demand of the Seminóles made at that time, but when Congress considered the matter, at the instance of the Secretary, an appropriation was made in recognition of the implied trust (25 Stat. L., 1004, supra). The legislation was by the Congress preceding that which recognized the Choctaw and Chickasaw claim.
The persuasive character of the construction given by officials so intimately connected with the proper disposition of the public lands, and so intent upon procuring lands for nonreservation tribes, becomes of great value when it is considered that such departmental construction was nearly contemporaneous with the execution of the treaty itself. Secretary Noble took a different view of the matter long after, when it came to the question of compensating the claimants for lands taken by Executive order for the Cheyennes and Arapahoes with a result not accepted by Congress, but his dissent is all the more conspicuous by the comparison of his view with that of every Other official and department of the G-overnment until the spe *147 cial message of the President adopting the view of Secretary Noble.
By the side of this continuous executive and legislative construction of the objects of the treaty we must, in justice, notice the only act of the claimants which implies, or seems to imply, that they had a different understanding of the intent.
In an act of the Choctaw council, approved November 20, 1867, entitled “An act to authorize the national attorney to attend to the claims set up against the nation under the forty-ninth and fiftieth articles of the treaty of April 28,1866, and for other purposes,” section 3 provides:
“ Sec. 3. Be it further enacted. That the national attorney be, and he is hereby, instructed to respectfully bring to the notice of the Commissioner of Indian Affairs that this nation will not consent to give the freedmen residing among them the 40-acre lots of land, including the right of suffrage, mentioned in the third article of the treaty of April 28, 1866, where they have humbly to submit to the forced sale of the leased district, lying west of ninety-eight degrees west longitude, for about 2£ cents per acre, for objects of negro colonization upon their borders; and he shall also request the said Commissioner of Indian Affairs to provide in due time for said freedmen, for their removal to some country, and remove Kansas Indians here in their stead, if they are willing to be removed.”
This recital came a year after the Choctaws had failed by act of their council to ratify that part of the treaty which secured if ratified the assignment of 40 acres each of land east of the ninety-eighth meridian to several thousand freedmen. In the meantime the United States had made no effort to remove the freedmen. They were still there in a state of uncertainty as to their future and a source of apprehension to their late masters. Under these circumstances it may well be supposed the Choctaws, having refused to admit Kansas Indians or settle freedmen either, reasonably apprehended the appropriation of other lands for that purpose. Though they had not received the consideration, and had put themselves in a situation where it was not likely they would ever receive it, who doubts that under these circumstances they did not feel the power of the United States and had reason to apprehend the colonization of their former slaves on land west of the ninety-eighth meridian with the price of the cession of the land still in the hands of the United States to accomplish it?
*148 Tbe inconsistency of this act with any other understanding is diminished by time of its passage and the previous and subsequent conduct of the Choctaws. It is completely contradicted by the conduct of their immediate neighbors and coadjutors, the Chickasaws; and being enacted with reference to exigencies and the probable removal of freedmen to the land, either threatened or supposed to be, we attach no necessary importance to it. And being in the face of what we believe was the understanding as to the uses to which the lands where to be put when they were called on to make the cession, the departmental construction must be held to be what the Government intended, and with that kind of an understanding by able and conscientious officials of the Government the Indians likewise must have understood their act as they allege.
We hold the cession in the treaty of 1866 was not intended to divest the Choctaws and Chickasaws of all their interest in the leased district, but was intended to enlarge the scope of the ninth article of the treaty of 1855. Hence, a trust must be implied in favor of the claimants under the terms of the grant.
And when, after refusing to ratify the full treaty, Congress appropriated sums sufficient to cover the amounts to be paid under article 46 of the agreement and the Choctaws and Chickasaws took the money, the character of the transaction could not be changed by their acceptance of the consideration. If the cession was not absolute, but one in trust, the payments could not operate as an estoppel. If any part of the consideration i>rovided for in article 3 was received as an advance not in payment for the land, but for another purpose, whether for the benefit of freedmen or for securing a government into which large numbers of other Indians were to come and to share, the Choctaws and Chickasaws can not be held to be estopped by receiving the consideration. And, finally, if they received the consideration upon the same understanding that every administrative officer of the Government had proclaimed as to the character of the transaction, their act can not be held to estop them from asserting its true character. The joiut resolution of the Fifty-second Congress establishing the trust in the lands allotted to the Cheyennes and Arapahoes is a recognition, as far as that resolution can affect this case, that no payments had ever been made for any part of the leased *149 district. The act of 1895 ratifying the agreement of 1891 with the defendant Indians is a violation of the trust. The Government had the right to settle Indians permanently on the lands mentioned in the agreement, but not to divert the proceeds of the sale of the lands from the Choctaw and Chickasaw nations to other Indians. We can not say that the allotment of 160 acres to each one of the defendant Indians is unreasonable in the establishment of Wichitas and the affiliated bands as permanent settlers, but beyond this the agreement violates the trust. A decree will therefore be entered in conformity with this opinion, following as far as the same may be applicable the form of the decree in the case of The Western Oherolcee Indians (27 C. Cls. E.,1) and Journeyealce v. The Cherokee Nation (28 C. Cls. E., 281; 30 ibid., 172).